**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

LARRY KLAYMAN

     Plaintiff

  v.

INFOWARS, LLC, et al

     Defendants.

**Case Number: 0:20-cv-61912**

**PLAINTIFF LARRY KLAYMAN'S OPPOSITION TO DEFENDANT ROGER STONE'S
<u>MOTION TO DISMISS, MOTION TO STRIKE, AND MOTION FOR SANCTIONS</u>**

   Plaintiff Larry Klayman ("Mr. Klayman") hereby submits the following in response to

Defendant Roger Stone's ("Defendant Stone") Motion to Dismiss, Motion to Strike, and Motion

for Sanctions.

**I.  INTRODUCTION**

   As the Complaint alleges, Defendant Stone, who had been indicted thought that Mr.

Klayman and his client, Dr. Jerome Corsi ("Dr. Corsi") were out to harm him, even though they

were not. Comp. ¶ 9. Defendant Stone also thought that Randy Credico was out to harm him,

and as a result, Defendant Stone threatened to kill Mr. Credico and his service dog. Comp. ¶ 24.

During the course of his threats towards Mr. Credico, he also threatened bar complaints against

Margaret Kuntzler, the wife of deceased activist William Kuntzler and Mr. Credico's best friend.

Not surprisingly, Defendant Stone has done the same here to Mr. Klayman, and has even paid

individuals as surrogates to do so – another key part of Defendant Stone's *modus operandi.*

Defendant Stone pattern and practice of threatening those he deems as threats extends all the way

to federal judges, as he threatened the presiding judge in his criminal case, the Honorable Amy

Berman Jackson ("Judge Jackson"), by posting on Instagram a photo of Judge Jackson's head

with crosshairs aimed to it – signaling to his supporters that Judge Jackson be harmed or even killed. Comp. ¶ 30.

In this instant case, as set forth in the Complaint, Defendant Stone felt threatened by Dr. Corsi and his counsel, Mr. Klayman, because Defendant Stone was a focal point of Special Counsel Robert Mueller's ("Special Counsel Mueller") Russian collusion investigation and later prosecution. He was fearful that Dr. Corsi would testify truthfully to Special Counsel Mueller if he was to be called as a witness, which, given his apparent paranoia, incorrectly would have sealed his conviction, which later occurred on seven felony counts in any event even without Dr. Corsi's testimony. (Contrary to the false statement in Stone's brief, his own counsel subpoenaed Dr. Corsi, as did the government's prosecutors, as he was witness number 1 in Stone's indictment. Ultimately, Special Counsel Mueller did also not require Dr. Corsi's testimony, as Defendant Stone was convicted on seven counts of perjury, witness tampering and obstruction of justice and was sentenced to 40 months in a federal penitentiary.

To that end, Defendant Stone has worked together closely in concert with his co-Defendants, the Infowars Defendants to try Mr. Klayman's legal career and reputation as a public interest advocate and private attorney, thinking that if he harmed Klayman this would also harm Corsi, who was never indicted thanks in large part to Klayman's legal representation. This is expressly set forth in the Complaint:

> The InfoWars Defendants, acting in concert, as part of their latest scheme for notoriety, fame, and profit, are have at all material times been working in concert with Defendant Stone to defame, intimidate, and threaten Plaintiff. Comp. ¶ 22.

Defendant Stone, in concert with the Infowars Defendants, did the same to try to destroy Dr. Corsi's career as an investigative journalist as well as his reputation. Defendant Stone's motivations were clear. If Dr. Corsi and Mr. Klayman's reputations were severely harmed, then

he would be insulated from Dr. Corsi's truthful testimony.

Specifically, Defendant Stone personally broadcasted severely defamatory statements about both Mr. Klayman and Dr. Corsi through the Infowars network, as has directed his Infowars co-Defendant colleagues to participate with him do the same. These defamatory statements are set forth in full in the Complaint: They include that:

> **(1) Mr. Klayman has "never actually won a courtroom victory in his life." Comp. ¶ 39.**
>
> **(2) "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'" Comp. ¶ 40.**
>
> **(3) "He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the  single worst lawyer in America. With him as Jerry Corsi's lawyer, Corsi may get the electric chair. So your idea that he's a good guy is entirely wrong" Comp. ¶ 43.**
>
> **(4) "For those people out there who think…that Larry Klayman's IQ is higher than 70, you're wrong…" Comp. ¶ 46.**

As set forth in detail below, not only are these statements patently false, they were made with actual knowledge of their falsity and therefore with malice.

These acts were perpetrated by Defendant Stone and his close-knit colleagues at Infowars simply because he perceived Mr. Klayman and his client, Dr. Corsi, as threats, both personally and particularly as competitors. He has therefore tried to eliminate Plaintiffs by maliciously and vindictively destroying their reputations and careers – all for his own personal gain.

## II.    LEGAL ARGUMENT

Curiously, Defendant Stone makes no arguments regarding the substance of Mr. Klayman's complaint. His sole basis for arguing for dismissal is because he was served one day outside of the 120 days provided for under the Florida Rules of Civil Procedure. Thus, any argument pertaining to the substance of Mr. Klayman's complaint must be treated as conceded. It

is easy to see why Defendant Stone chose this tactic – there are no substantive defenses available to his clearly defamatory conduct.

A.    **Defendant Stone Offers No Argument Regarding Defamation**

For instance, as alleged in paragraph 40 of the Complaint, Defendant Stone maliciously stated: He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'" This is a false statement of fact.  As pled in the Complaint, Mr. Klayman "left Judicial Watch voluntarily on his own accord in order to run for U.S. Senate in Florida in 2003-2004." Comp. ¶ 41. This is also a fact. Defendant Stone's false revisionist history is therefore a malicious and false statement of fact.

Furthermore, as the final "nail in the coffin" to the Infowars Defendants' assertions, Thomas Fitton ("Fitton"), under oath, at a deposition in another matter testified that "[y]ou [Mr. Klayman] weren't ousted as a result of a sexual harassment complaint." Exhibit 1. This conclusively shows that Defendant Stone, in concert with the Infowars Defendants, published an objectively verifiable false statement.  Indeed, at the same deposition, Fitton admits to never haven spoke to Stone, which shows that Stone simply made this lie up. Exhibit 1. Stone admitted under oath in a deposition that he did not speak to Fitton about this either, so its clear that Stone made this up to defame Mr. Klayman. Exhibit 1.

**As for actual malice, Mr. Klayman has submitted an affidavit buttressing his well-pled allegations.** The affidavit shows exactly how Defendant Stone knew at all material times that the statements that he made on Infowars, in concert with the Infowars Defendants, were false or at minimum acted with reckless disregard for the truth. Exhibit 2; *Affidavit of Larry Klayman*

Defendant Stone was a "political consultant" who claimed to help get presidents and other politicians elected. The firm made money by then lobbying the very men they put in office.

Defendant Stone backed Republican candidate Jack Kemp for President and he recommended that I be put on the executive finance committee, which also included Donald J. Trump.

Because Defendant Stone knew of my successes and capabilities as a private lawyer, he told me that he had recommended me for U.S. Attorney when George Bush was President in 1992.

In 1996, at a Republican Convention in San Diego, California, Defendant Stone was filmed at a "toga party" with his wife at a "swingers party."

The media at the time went after Defendant Stone because of his alleged participation in the "sex party" and created a scandal.

The media alleged at the time that Defendant Stone solicited sex half-naked, and that there was a picture of Defendant Stone in a compromising position to back up the story.

Defendant Stone contacted me and, because he knew my capabilities and acumen as a lawyer, retained me to represent him to get the media to cease what he claimed then was a smear campaign.

I successfully got the media to back off Defendant Stone through my skill as a lawyer and Defendant Stone was grateful. Exhibit 2 at ¶ 37 – 44.

Furthermore:

Because he was aware of my prior successes at Judicial Watch and before, Defendant Stone wanted to work with me as my U.S. Senate campaign manager. During this time, the spring, summer, and fall of 2003, and in preparation for my U.S. Senate run, Defendant Stone researched and kept books and records of many of my accomplishments. He had several binders (2-3 feet) full of information about me and the victories that I had obtained at Judicial Watch and elsewhere. Again, because Defendant Stone knew of my successes and legal political acumen, Defendant Stone wanted to be on my team and help me run for the U.S. Senate.

Defendant Stone thus knew of many cases I had won in courtrooms and other legal accomplishments and in fact had kept records of successes in a book of my accomplishments. Exhibit 2 at ¶ 49-50.

Given this affidavit, which shows that Defendant Stone had actual knowledge of Mr. Klayman's

numerous successes and courtroom victories – to the extent that he wanted to work with Mr.

Klayman as his campaign manager – it is clear that he had actual knowledge that his statements

pertaining to Mr. Klayman's abilities as an attorney were patently false. Otherwise, why would

Defendant Stone want to "hitch his wagon" to someone that he knew had an "I.Q. of 70" or had

"never actually won a courtroom victory in his life?"

Indeed, Defendant Stone had actual knowledge of Mr. Klayman's many courtroom victories. Mr. Klayman's affidavit sets forth that he was "on the trial team that successfully broke up the AT&T monopoly- creating competition in the telecommunications industry." Exhibit 2 ¶ 13. Furthermore:

> Because of my work during the time I ran Judicial Watch, a court ruled that President William Clinton committed a crime during the Filegate litigation. I also triggered the famous Chinagate scandal in a Freedom of Information Act, 5 U.S.C. § 552 et seq., which gave rise to Judicial Watch ultimately being awarded almost a million dollars. I filed cases which ended Bill and Hillary Clinton's attempted illegal purchase at below market rates for their mortgage of their home at Chappaqua, New York and ended the illegal payment of legal fees to the Clintons by State Farm, which was a form of bribery. I also participated in the famous *Gore v. Bush* litigation in Tallahassee, Florida that settled the 2000 presidential elections by the U.S Supreme Court. I also brought a case under the Foreign Agents Registration Act ("FARA") over the Cheney Energy Task Force that made its way to the U.S. Supreme Court. Exhibit 2 ¶ 20.

> On December 16, 2013, Judge Richard J. Leon granted my request for a preliminary injunction in my case against the National Security Agency ("NSA") and the Obama administration, when Judge Leon found for the first time in history that the collection of metadata telephony records by the NSA was likely unconstitutional.

> Because of that ruling, Congress enacted the USA Freedom Act, which sought to end illegal and unconstitutional mass surveillance by government intelligence agencies and the Federal Bureau of Investigation ("FBI").

> I obtained a jury verdict in the U.S. District Court for the Southern District of Florida against my former public interest group Judicial Watch, which was then run by Fitton, for maliciously defaming me in the amount of $181,000, which included punitive damages.

> My client Sheriff Joe Arpaio and I were the first to challenge former President Obama's unconstitutional executive amnesty for over 5 million illegal aliens and were ultimately successful, along with 25 other attorneys general, in front of the U.S. Supreme Court. Exhibit 2 ¶¶ 22-25.

These courtroom victories, and many more as attested to in Mr. Klayman's affidavit at Exhibit 2, were all highly publicized and Defendant Stone knew of them at all material times. Accordingly,

his flat-out false statement that Mr. Klayman had "never won a courtroom victory in his life" was not only false and defamatory, but also malicious.

### B.   Defendant Stone Offers No Argument Regarding Unfair Competition

Like Mr. Klayman's claims for defamation, Defendant Stone does not even attempt to set forth any argument regarding Mr. Klayman's claims under the FDUTPA.

FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." *Waste Pro USA v. Vision Constr. ENT, Inc.*, 282 So. 3d 911, 917 (Fla. Dist. Ct. App. 2019). A claim for damages under the FDUTPA must include: claim ": (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Id*. Importantly, the FDUTPA is not limited to consumers. "This change indicates that the legislature no longer intended FDUTPA to apply to only consumers, but to other entities able to prove the remaining elements of the claim as well." *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty., Inc.*, 169 So. 3d 164, 169 (Fla. Dist. Ct. App. 2015). Thus, as a direct competitor, Mr. Klayman is able to bring a FDUTPA claim against Defendant Stone.

The deceptive practice here is clear. The Defendant Stone is knowingly making false statements about Mr. Klayman in order to lower his standing and reputation in the conservative media personality market, where Mr. Klayman competes with the Defendant Stone.

> In addition to being an investigative journalist/author and a public interest litigator/advocate, respectively, Plaintiff Klayman is a competitor to Defendants as conservative media personalities, broadcasters, authors and columnists on social media and elsewhere. For instance, Plaintiff Klayman also hosts an online radio show and produces videos that are posted on the internet, issues press releases, commentary and other publications." Comp. ¶¶ 48-49.

Thus, by discrediting and defaming Mr. Klayman, Defendant Stone is trying to "materially prejudice the viewers and/or listeners as to the quality, nature, and contents of

Plaintiff's services, which has caused significant competitive and commercial injury to Plaintiff, as well as loss of good will and reputation. Comp. ¶51. Thus, in essence, the motivation behind the Defendant Stone's misconduct is also financial, as he seek to destroy Mr. Klayman's reputation in order to eliminate him as a competitor.

This is set forth further in Mr. Klayman's second affidavit. Exhibit 3. Mr. Klayman swears under oath that he "derive[s] financial benefit from appearing on radio and internet programs as a conservative political analysit and media personality." Exhibit 3 ¶ 10. Furthermore, Mr. Klayman swears:

> I am a direct competitor of Defendant Roger Stone, as well as the Infowars Defendants, as I derive income from appearing on radio and internet programs and my writings as a conservative political analysts and media pundit nationwide and in this judicial district
>
> Defendant Stone and the Infowars Defendants are direct competitors with me, as they are also conservative political analysts and media pundits who broadcast and do business in this judicial district.
>
> Defendant Stone and the Infowars Defendants sell products, publish books, and appear on the radio and internet nationwide and in this judicial district.
>
> I also sell products, publish books, and appear on the radio and internet nationwide in this judicial district.
>
> Defendant Stone and the Infowars Defendants have harmed me as a competitor by publishing false statements about and which bear on my services in order to eliminate me as a competitor. All of the Defendants compete with me on the airwaves and in written publications.
>
> Defendant Stone and the Infowars Defendants are therefore liable under the FDUTPA. Exhibit 3 at ¶¶ 11-16.

Accordingly, all of the elements of the FDUTPA are clearly met.

### C.    Defendant Stone's Motion to Dismiss Based on Service Must be Denied

Mr. Klayman has already moved this Court for leave to serve Defendant Stone and therefore adopts the arguments set forth in that motion.

Furthermore, in *Crews v. Shadburne*, 637 So. 2d 979 (Fla. Dist. Ct. App. 1994), the Court came across a similar situation, and found that dismissal due to late service was improper. In *Crews*, the Plaintiff had the summons issued immediately after filing the Complaint. The same occurred here. Summons were issued on May 5, 2020, just a few days after the Complaint was filed on April 28, 2020. This is in stark contrast to cases where the Court found that dismissal was warranted, such as *Gondal v. Martinez*, 606 So. 2d 490 (Fla. 3d DCA 1992), where service was not attempted until approximately two years after the filing of the Complaint. *See also Morales v. Sperry Rand Corporation*, 601 So. 2d 538 (Fla. 1992) (dismissal proper where the Plaintiff waited three and a half months to have the summons issued, then attempted to service it by mail.) Here, Defendant Stone was personally served through a process server.

Defendant Stone is known to hide from process servers. In another case brought by MR. Klayman on behalf of Dr. Corsi, Defendant Stone had to be served during a fundraiser at a strip club. Here, Defendant Stone was served just one day after the 120 statutory period. Defendant Stone would therefore be hard pressed to argue that he has been prejudiced in any way. Accordingly, Defendant Stone's motion to dismiss based on service must be denied, and Mr. Klayman's motion to serve Defendant Stone one day late must be granted.

### D.   Defendant Stone's Motion to Strike Must Be Denied

"In reviewing a motion to strike pleadings, the "striking of pleadings   is not favored and all doubts are to be resolved in favor of the pleadings." *Costa Bella Dev. Corp. v. Costa Dev. Corp.*, 445 So. 2d 1090, 1090 (Fla. 3d DCA 1984) (citations omitted). *See also Ivey v. Southern States Power Co.*, 128 Fla. 345, 174 So. 834 (1937). A "motion to strike a pleading admits the truth of all facts well pleaded." *Ivey*, 174 So. at 836 (citations omitted). Finally, in *Scarfone v. Silverman*, 408 So. 2d 778 (Fla. 2d DCA 1982), this court concluded that when a party submits

any evidence to support his allegations which directly contradicts the other party's position, the

court cannot strike one party's pleadings simply because the opposing party says they are false."

*McWhirter, Reeves, McGothlin, Davidson, Rief & Bakas, P.A. v. Weiss*, 704 So. 2d 214, 216

(Fla. Dist. Ct. App. 1998).

  Here, Defendant Stone moves to strike Mr. Klayman's prayer for damages. However, Mr.

Klayman's prayer clearly states that he is asking for "an amount to be determined at trial." This

is entirely proper and therefore not subject to any motion to strike.

  Furthermore, Defendant Stone asks the Court to strike references to Defendant Stone

having threatened Mr. Klayman "Mafia style." There is nothing irrelevant about this, as it shows

Defendant Stone's character and willingness to do whatever it takes to eliminate those that he

perceives as a threat, including Mr. Klayman. The only reference to "mafia" is found at

paragraph 24 of the Complaint, which states, in part:

> The proof against Stone was so overwhelming that he did not present even one
> witness at trial and did not testify himself, for obvious fear he would be indicted
> again for perjury, as Stone has a hard time telling the truth. Indeed, he has a
> reputation of being a selfstyled dirty trickster and at a minimum an admirer of the
> Mafia, which is what likely caused the FBI to use multiple armed agents to raid
> his home in the months leading up to his indictment.

Importantly, Defendant Stone is an admirer of the mafia, as came up during his criminal

prosecution when he told a material witness he had threatened if he did not like under oath or

take the Fifth Amendment to do a Frank Pentageli, a Mafia figure from the film the Godfather.

<u>Exhibit 4.</u> This directly pertains to Defendant Stone's lack of truthfulness, which is primarily at

issue in this Complaint for defamation and unfair competition. Accordingly, Defendant Stone's

Motion to Strike must be denied.

  **E.**  **Defendant Stone's Motion for Sanctions Must Be Denied**

  Defendant Stone moves for sanctions solely on the basis of "repetitive filings," which as

set forth above, is a function of Defendant Stone's inability to stop defaming, interfering with, and harming Mr. Klayman, and not any vexatiousness on Mr. Klayman's part.

To the extent that Defendant Stone relies on a case previously filed by Mr. Klayman in the U.S. District Court for the Southern District of Florida styled *Klayman v. Infowars,* 20-cv-80614 (S.D. Fl.)(the "Florida Complaint") as evidence that this instant complaint is a "shotgun pleading," it is clear that such an assertion must fail.

The Florida Complaint was dismissed voluntarily by Mr. Klayman, and was therefore never adjudicated substantively. Mr. Klayman believed that the Court had overstepped its bounds when it issued an Order Requiring More Definite Statement before the Defendants were even served. Due to this Mr. Klayman thought that the Court may have been biased and maybe knew Defendant Stone personally. Mr. Klayman raised this issue and the Court did not respond, which ultimately led to Mr. Klayman taking a voluntary dismissal.

## III.   CONCLUSION

Based on the foregoing, Mr. Klayman respectfully requests that Defendant Stone's Motion to Dismiss and for Sanctions be denied and this matter proceed to discovery.

Dated: November 2, 2020                                         Respectfully Submitted,


                                                               */s/ Larry Klayman*
                                                               Larry Klayman, Esq.
                                                               7050 W. Palmetto Park Rd
                                                               Boca Raton, FL, 33433
                                                               Telephone: (561)558-5336
                                                               Email:leklayman@gmail.com

                                                               *Pro Se*


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd  day of November, 2020, a true copy of the

foregoing was filed via ECF and served to all counsel of record though the Court's ECF system.

*/s/ Larry Klayman*

# EXHIBIT 1



# Transcript of Thomas J. Fitton

**Date:** June 6, 2019
**Case:** Klayman -v- Fitton

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

Transcript of Thomas J. Fitton
Conducted on June 6, 2019

---

**Page 1**

```
1          IN THE UNITED STATES DISTRICT COURT
2          FOR THE SOUTHERN DISTRICT OF FLORIDA
3
4   LARRY KLAYMAN,          *
5          Plaintiff,       *
6   vs.                     *  Civil Action
7   THOMAS FITTON,          *  No. 1:19-cv-20544
8          Defendant.       *
9
10
11
12      Videotaped Deposition of THOMAS J. FITTON
13                  Washington, D.C.
14              Thursday, June 6, 2019
15                    3:06 p.m.
16
17
18
19  Job No.: 247643
20  Pages 1 - 92
21  Reported by:  Vicki L. Forman
22
23
24
25
```

---

**Page 2**

```
1          Videotaped Deposition of THOMAS J. FITTON,
2   held at the offices of:
3
4       Planet Depos
5       Suite 950
6       1100 Connecticut Avenue, Northwest
7       Washington, D.C.  20036
8       (888) 433-3767
9
10
11
12          Pursuant to agreement, before Vicki L.
13  Forman, Court Reporter and Notary Public in and
14  for the District of Columbia.
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 3**

```
1                   A P P E A R A N C E S
2
3   ON BEHALF OF THE PLAINTIFF PRO SE:
4       LARRY KLAYMAN, ESQUIRE
5       Klayman Law Group, P.A.
6       Suite 345
7       2020 Pennsylvania Avenue, Northwest
8       Washington, D.C.  20006
9       (310) 595-8088
10
11
12
13  ON BEHALF OF THE DEFENDANT:
14      RICHARD W. DRISCOLL, ESQUIRE
15      Driscoll & Seltzer
16      Suite 610
17      300 North Washington Street
18      Alexandria, Virginia  22314
19      (703) 822-5001
20
21
22
23
24
25
```

---

**Page 4**

```
1   ON BEHALF OF THE DEFENDANT:
2       KATIE M. MERWIN, ESQUIRE
3       Cole, Scott & Kissane, P.A.
4       Suite 120
5       222 Lakeview Avenue
6       West Palm Beach, Florida  33401
7       (561) 383-9206
8       (Present via Telephone.)
9
10
11
12  ALSO PRESENT:  Joannis Arsenis, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Transcript of Thomas J. Fitton
Conducted on June 6, 2019

11 (41 to 44)

41

1       MR. KLAYMAN:  Certify it.
2   Q  So as President of Judicial Watch you
3   would have known for sure that this Complaint had
4   been filed, correct?
5       MR. DRISCOLL:  Objection to form.
6   **A  Well, the press release indicates it was**
7   **filed and I recall we sued about the raid, yes.**
8   Q  And you gave interviews about suing in the
9   raid, correct, in the media?
10  **A  I don't remember.**
11  Q  Turn to the last page, page five.
12      The Complaint is signed by James F
13  Peterson, correct?
14  **A  His name is on the last page of the**
15  **Complaint as a signatory.**
16  Q  He is an attorney at Judicial Watch,
17  correct?
18  **A  Yes.**
19  Q  Now, Mr. Peterson had contact with Roger
20  Stone over the issue of the raid on his house, did
21  he not?
22  **A  Not that I'm aware of.**
23      MR. DRISCOLL:  Objection to form.
24  Q  You're saying you don't know one way or
25  the other?

42

1   **A  I don't believe he has.  I said I would**
2   **know if he had.**
3   Q  How would you know if you couldn't even
4   identify the Complaint?
5   **A  Another abusive harassing question.**
6       MR. DRISCOLL:  It's a foundation question.
7   You can go ahead and answer it.
8       How would you know if he had contacted
9   Roger Stone?
10      MR. KLAYMAN:  Or if Roger Stone contacted
11  him.
12  **A  Is it privileged?**
13      MR. DRISCOLL:  That's an interesting
14  question.  The fact of the communication would not
15  be.  The contents of it would be.
16  **A  How I would know is my question of whether**
17  **it's privileged or not.**
18      MR. DRISCOLL:  No, I'm going to allow you
19  to answer that one.
20  **A  How I would know about what my attorneys**
21  **are doing or Judicial Watch's attorneys are doing?**
22      MR. DRISCOLL:  Yeah, and you're not
23  disclosing a communication.  You're just
24  describing a process.
25  **A  Typically that type of communication would**

43

1   **have been disclosed to me.**
2   Q  But you don't know for sure that
3   Mr. Peterson didn't have contact with Roger Stone?
4       MR. DRISCOLL:  Objection to form.
5   **A  I'm confident there was no such contact.**
6   Q  You have told Mr. Peterson in the past,
7   have you not, that I was ousted from Judicial
8   Watch because of a sexual harassment complaint?
9       MR. DRISCOLL:  Objection to form.
10  Mr. Peterson is an in-house counsel and I'm going
11  to direct the witness not to answer.  That's an
12  attorney-client privilege.
13      MR. KLAYMAN:  Certify it.
14  Q  So you don't know whether or not
15  Mr. Peterson repeating what you had told him then
16  republished that to Roger Stone?
17      MR. DRISCOLL:  The communications between
18  an in-house counsel and the President of the
19  corporation relating to legal advice and
20  assistance are privileged.  He can't answer the
21  question about the contents of the communication
22  or derivative questions that would disclose the
23  content of the communication.
24      MR. KLAYMAN:  That's the crux of the
25  lawsuit.  That does not apply in this context.

44

1       MR. DRISCOLL:  That doesn't waive the
2   privilege.
3   Q  Are you saying that you never told anyone
4   at Judicial Watch that I was ousted because of a
5   sexual harassment complaint?
6       MR. DRISCOLL:  Anyone other than the
7   attorneys?
8       MR. KLAYMAN:  Anyone.
9       MR. DRISCOLL:  No, I can't allow him to
10  answer that question.
11  Q  Are you saying that you never told anyone
12  that I was -- regardless -- let's take attorneys
13  out of it.
14      Have you ever -- you have told other
15  people in addition to -- strike that.
16      You have told other people excluding
17  attorneys that I was ousted from Judicial Watch
18  because of a sexual harassment complaint?
19  **A  You have to ask the question again.**
20      MR. KLAYMAN:  Read it back, please.
21  **A  Please.**
22      MR. KLAYMAN:  Let me rephrase it.
23  Q  I'm taking attorneys out of this question.
24  I'm saying you have told others who aren't
25  attorneys over the course of the last 16 years

Transcript of Thomas J. Fitton
Conducted on June 6, 2019

12 (45 to 48)

45

1   since I left Judicial Watch that I was ousted
2   because of a sexual harassment complaint?
3       A No, because that's not true. You weren't
4   ousted as a result of a sexual harassment
5   complaint.
6       Q After I sued you in this particular case
7   has anyone -- have you or anyone at Judicial Watch
8   or your counsel tried to contact Roger Stone?
9       MR. DRISCOLL: Objection to form. The
10  question invades the attorney-client privilege and
11  the attorney work product. I direct the witness
12  not to answer.
13      MR. KLAYMAN: Certify it.
14      Madam court reporter, have a page in the
15  front where you have all the certified questions
16  and where you can find them to make it easy for
17  the Magistrate Judge. Thank you.
18      Q Now, I turn your attention back to your
19  affidavit which is --
20      A Exhibit 3.
21      Q Exhibit 3. Turn your attention to
22  paragraph seven where it says "I have no
23  recollection of ever having any communication with
24  Roger Stone," do you see that?
25      A Uh-huh.

46

1       Q Now, it doesn't say you didn't have a
2   communication with Roger Stone. It just says that
3   you have no recollection of having one, correct?
4       A That's correct.
5       Q Do you remember during the Clinton years
6   that witnesses would always come in and say we
7   have no specific recollection and we would contest
8   that?
9       MR. DRISCOLL: Just ask your question,
10  Larry.
11      Q So you can't say categorically that you
12  haven't had communications with Roger Stone?
13  You're just saying you don't have a recollection
14  of ever having it, correct?
15      A I think the statement speaks for itself.
16      Q You could have said I have never
17  communicated with Roger Stone, correct, if that's
18  what you were trying to say, that you never had
19  any contact?
20      A The statement speaks for itself.
21      Q Then you state in the next sentence "I
22  have never published, uttered or implied to Roger
23  Stone that Klayman was the subject of a sexual
24  harassment complaint during his employment by
25  Judicial Watch or that his resignation from

47

1   Judicial Watch was motivated by an employee's
2   sexual harassment complaint," do you see that?
3       A Yeah.
4       Q Again, that statement does not say that
5   you never spoke with Roger Stone, just that you've
6   never published that particular issue, correct?
7       A It says what it says.
8       Q And then it states "Any statement by Roger
9   Stone regarding Klayman was made without my
10  knowledge or information and therefore I did not
11  intend and could not intend to harm Klayman or his
12  reputation," do you see that?
13      A Yes.
14      Q Now, you're not saying in that statement
15  that you didn't communicate with Roger Stone.
16  You're saying that you didn't know that he was
17  going to republish anything about me, correct?
18      MR. DRISCOLL: Objection to form. The
19  document speaks for itself.
20      A The document speaks for itself.
21      Q If you don't want to explain it that's
22  fine.
23      A You're mischaracterizing it.
24      Q I do agree. It speaks for itself and
25  there's a lot of loopholes in it.

48

1       MR. DRISCOLL: Why don't you just ask him
2   the question. Did he ever --
3       MR. KLAYMAN: I will ask the questions
4   that I want to ask, Mr. --
5       MR. DRISCOLL: All right.
6       Q I want to turn to paragraph eight.
7       Do you see the statements in the last
8   sentence of paragraph eight where it says "To
9   support his claim Judicial Watch submitted
10  evidence demonstrating that Klayman was forced to
11  resign due to inappropriate conduct" and you list
12  three examples of your alleged inappropriate
13  conduct, do you see that?
14      A Yeah.
15      Q Now, you have in the last 16 years told
16  many people, and I'm excluding any attorneys,
17  exactly what is written in this affidavit and
18  which you swore to under oath?
19      MR. DRISCOLL: I'm going to object to the
20  question and direct the witness not to answer that
21  question to the extent it's related to the other
22  lawsuit that is currently pending in the U.S.
23  District Court for the District of Columbia, Case
24  Number 06-cv-670.
25      MR. KLAYMAN: That's not a basis to tell

1              IN THE CIRCUIT COURT OF THE SEVENTEENTH CIRCUIT
        IN AND FOR BROWARD COUNTY AND THE FIFTEENTH JUDICIAL
2            CIRCUIT FOR PALM BEACH COUNTY, FLORIDA, FLORIDA

3

4  LARRY KLAYMAN,
                                  CASE NO. 19-011394
5            Plaintiff,

6      -vs-

7  ROGER STONE,

8            Defendant.
      _____/

9
      JEROME CORSI, et al
10
                  Plaintiff
11

12     vs.                    CASE NO. 50-2019-CA-013711

13
      ROGER STONE, et al
14
            Defendant
15    _____/

16
              VIDEOTAPED DEPOSITION OF ROGER STONE
17
                   VOLUME I OF II
18
             Wednesday, February 12, 2020
19             9:42 a.m. - 4:28 p.m.

20
          110 Southeast 6th Street, Suite 1700
21           Fort Lauderdale, Florida 33301

22
      Stenographically Reported By:
23    PATRICIA BAILEY-ENTIN, FPR
      Notary Public, State of Florida
24    BAILEY & ASSOCIATES REPORTING, INC.
      Fort Lauderdale Office
25    Phone - 954-358-9090

1              But let's start with my sworn affidavit on top,

2      and I'll ask that that be marked.  It -- it entails --

3              MR. KLAYMAN:  And you can just mark it right in

4          the book --

5              THE REPORTER:  Sure.

6              MR. KLAYMAN:  -- to make it easy.

7              That's Exhibit 2 to the Stone deposition and it

8          entails 59 pages.

9              (Plaintiffs' No. 2, Affidavit of Larry Klayman,

10     was marked for Identification.)

11     BY MR. KLAYMAN:

12         Q.   You are aware, Mr. Stone, that I'm the founder

13     of Judicial Watch?

14         A.   I am.

15         Q.   You've spoken to Tom Fitton, haven't you?

16         A.   One time in my entire life.   I saw him

17     backstage at a conference in -- at Dural, maybe a couple

18     months ago, and we -- we shook hands in passing.   Beyond

19     that, I've never spoken to the man.

20         Q.   You've spoken to others at Judicial Watch,

21     though, haven't you?

22         A.   No, actually, I haven't.  Not that I recall.

23         Q.   You -- you may have, but you just don't recall?

24         A.   I don't recall ever speaking to anyone at -- at

25     Judicial Watch.  I couldn't name anybody else at

EXHIBIT 2

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTIRCT OF FLORIDA

| | | |
|---|---|---|
| **LARRY KLAYMAN**, | § § § § § | CIVIL ACTION NO. 0-20-cv-61912 |
| Plaintiff, | § | |
| vs. | § § | |
| **INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC, ALEX E. JONES, DAVID JONES, OWEN SHROYER**, and **ROGER STONE** | § § § § § | |
| Defendants. | § | |

## SWORN AFFIDAVIT OF LARRY KLAYMAN

I, Larry Klayman, being over eighteen years of age and duly competent to testify, hereby swear and affirm as follows:

## A BRIEF HISTORY OF MY BACKGROUND

1.      I have personal knowledge of the following facts and if called upon as a witness, could testify competently thereto.

2.      In 1973, I graduated from Duke University where I majored in political science and French literature. I excelled academically and graduated with honors.

3.      I then matriculated at Emory Law School where I excelled academically and graduated in 1977. While in law school, I worked as an intern at the U.S. International Trade Commission, the Georgia Attorney General and the U.S. Attorney for the Northern District of Georgia.

4.      I passed The Florida Bar the first time I took the exam.

5.      I passed all bar exams on my first attempt, including the District of Columbia Bar.

1

6.      I began my legal career in this circuit in Miami, Florida as an associate for Blackwell, Walker, Gray, Roberts, Flick & Hoehl ("Blackwell"), which was then the largest and most prestigious law firm in Florida. I was admitted into The Florida Bar having been sworn in on December 7, 1977. I have practiced law in this circuit continuously and extensively throughout my forty-two-year career and have active cases pending in this circuit and elsewhere in Florida, including during the period that I was a trial attorney for the U.S. Department of Justice's ("DOJ") Antitrust Division, from 1980 to 1982, where I was assigned litigation in this circuit.

7.      I conceived of and founded Judicial Watch, Inc. ("Judicial Watch") in 1994, a public interest group that's mission was to investigate and prosecute government corruption and abuse. I was the Chairman, General Counsel, and Corporate Treasurer of Judicial Watch until I voluntarily departed in 2003 to run as a candidate for the U.S. Senate in Florida in the Republican primary election.

8.      In 1998, during the time I ran Judicial Watch, I hired Thomas J. Fitton ("Fitton") as my contract assistant. I later appointed him president of the organization I founded.

9.      In September of 2003, I voluntarily departed from Judicial Watch to run for the U.S. Senate in Florida. At the time I left Judicial Watch, I learned that Fitton had never graduated from college, which he had told me he had when I initially hired him.

10.     Contrary to Defendant Roger Stone's ("Defendant Stone") false and defamatory publications, I have enjoyed many successes in my career as a lawyer, many of which have been brought to the attention of the public by complimentary newspapers, magazines, editorials and journals.

11.     For example, I practiced law at Blackwell with my supervising partners Paul Larkin and Layton Mank and participating in winning product liability cases as defense counsel for Blackwell including cases involving Raleigh bicycles, pharmaceutical drugs manufactured by

Burroughs-Wellcome, and allegedly misdiagnosed cancer victims, and other personal injury and medical malpractice cases. Additionally, I handled lawsuits in admiralty.

12.     I left Blackwell to join the DOJ as a trial lawyer, prosecutor and defense lawyer in late 1979. During my time at the DOJ, I had many victories in the courtroom as well as favorable settlements for the government, i.e., such as for the Consumer Affairs Section of the Antitrust Division over misbranded, adulterated food and drug products including fruit drinks and prophylactics for the Food & Drug Administration ("FDA") and successful seizures and criminal prosecutions of dangerous products on behalf of the Consumer Product Safety Commission ("CPSC") such as slant-sided refuse bins, flammable children's sleepwear, and intraocular lens implants for cataract patients.

13.     Importantly, I was also on the trial team that successfully broke up the AT&T monopoly – creating competition in the telecommunications industry. I left the DOJ in late 1981.

14.     Then, working as an international trade lawyer for Busby, Rehm & Leonard and after a few years having founded my own firm The Law Offices of Larry E. Klayman, later named Klayman & Associates, P.C., I won countervailing duty and antidumping duty cases concerning steel from South Africa, garden furniture from Italy, musical instrument pads from Italy, coffee filters from Brazil, key limes from Peru, fireworks from China and a host of other product imports. I represented both importers and exporters. (While at Busby, Rehm & Leonard, I also took some months on hiatus and worked in the Competition Directorate (DG-4) of the Commission of the European Communities Section ("E.C.").

15.     Later, with my law firm, I won Section 337 unfair trade practice cases at the U.S. International Trade Commission ("USITC") concerning tennis rackets from Belgium, power tools from Taiwan, luggage from Taiwan, mass spectrometers from France, jam from Belgium, and machine tools from Brazil. I won a landmark case concerning recloseable plastic bags, which

broke the patents of Minigrip and Dow Corning, Minigrip's licensee. That case victory opened up competition for zip lock bags, a multi-trillion dollar industry.

16.     There was also an USITC patent case, pursuant to Section 337, which I litigated and won involving motorcycle helmets and another antidumping and countervailing duty cases before the Commerce Department and USITC concerning fire protection products and scuba diving neoprene body suits.

17.     I also won a Section 302 case involving paper from Brazil.

18.     All of the Section 337 cases were judge-tried and I won every one of them.

19.     I won a jury trial against Makita over power tools, another jury trial against a domestic manufacture of removable swimming pools for my client Remove Pool Fence Co., and yet another jury trial for my client, Maccaferri, on a contract dispute. These are only some of the jury trials I won during my early career.

20.     Because of my work during the time I ran Judicial Watch, a court ruled that President William Clinton committed a crime during the Filegate litigation. I also triggered the famous Chinagate scandal in a Freedom of Information Act, 5 U.S.C. § 552 et seq., which gave rise to Judicial Watch ultimately being awarded almost a million dollars. I filed cases which ended Bill and Hillary Clinton's attempted illegal purchase at below market rates for their mortgage of their home at Chappaqua, New York and ended the illegal payment of legal fees to the Clintons by State Farm, which was a form of bribery. I also participated in the famous *Gore v. Bush* litigation in Tallahassee, Florida that settled the 2000 presidential elections by the U.S Supreme Court. I also brought a case under the Foreign Agents Registration Act ("FARA") over the Cheney Energy Task Force that made its way to the U.S. Supreme Court.

21.     I brought a case for Jose Basulto of Brothers to the Rescue in a Florida court, which resulted in a $1.8 million judgment against the Republic of Cuba for shooting down Brothers to

the Rescue planes, and I represented the Miami family of Elian Gonzales and other victims of Fidel Castro, such as journalists who were jailed by Castro for their political beliefs. In this regard, I not only filed criminal complaints for these victims against Fidel Castro in Belgium courts, but also lobbied and testified in both Italian and French in Italy and France, as I am fluent in both languages, before various European parliaments to increase economic sanctions on Cuba for abuse of human rights. I also lobbied the European Union in Brussels, Belgium for increased sanctions on Cuba.

22.    On December 16, 2013, Judge Richard J. Leon granted my request for a preliminary injunction in my case against the National Security Agency ("NSA") and the Obama administration, when Judge Leon found for the first time in history that the collection of metadata telephony records by the NSA was likely unconstitutional.

23.    Because of that ruling, Congress enacted the USA Freedom Act, which sought to end illegal and unconstitutional mass surveillance by government intelligence agencies and the Federal Bureau of Investigation ("FBI").

24.    I obtained a jury verdict in the U.S. District Court for the Southern District of Florida against my former public interest group Judicial Watch, which was then run by Fitton, for maliciously defaming me in the amount of $181,000, which included punitive damages.

25.    My client Sheriff Joe Arpaio and I were the first to challenge former President Obama's unconstitutional executive amnesty for over 5 million illegal aliens and were ultimately successful, along with 25 other attorneys general, in front of the U.S. Supreme Court.

26.    It was my efforts that prevented Dr. Jerome Corsi ("Dr. Corsi") from getting indicted, first because he told the truth and did not engage in witness tampering and threaten to kill a witness such as Randy Credico, as Defendant Stone did, and second because of my legal skill and acumen. Dr. Corsi is a material witness in the Russian Collusion investigation by Special

Counsel Robert Mueller ("Mueller") and is listed as a material witness as Person 1 in Defendant Stone's Mueller indictment.

27.     I have had many other successes in addition to the above-listed victories.

28.     I myself authored a book titled "Whores: Why and How I Came to Fight the Establishment" published in 2009. In it, I wrote about my unfortunate experience with Defendant Stone. *See* Exhibit A. I authored this book myself without a ghostwriter and I came runner-up at an International Book Fair. It also still has a review on www.Barnesandnoble.com of 4.5 stars out of the maximum 5 stars.

29.     Upon its publication, Jack Cashill, the author of "Ron Brown's Body" had this to say about me: "That *Time* magazine has yet to name Larry Klayman 'Man of the Year' is a failure of *Time*, not Klayman's. The work he and Judicial Watch did on the Brown case is stunning." *See* Exhibit B.

30.     Joseph Farah, the founder of WorldNetDaily.com, had this to say about me: "Larry Klayman is my hero because he has integrity – enough to prevent him from blind loyalty to party or ideology . . . That's because he is fearless and relentless in the pursuit of justice . . . There were other men like Larry early in American history. Their names were Washington, Jefferson, Madison and Henry. *See* Exhibit B.

31.     Louis Jacobson of the National Journal said this of me: " . . . through his challenge of secrecy rules, Larry Klayman has become a force in Washington. *See* Exhibit B.

32.     Bill Moyers, of "Now" PBS, said this: ". . . his idea of fun is trying to kick down a door some public official has marked secret . . . Larry Klayman is himself a conservative, but there's nothing partisan bout his indignation."

33.     Frank Rich, famed columnist for "The New York Times" said this: "Larry . . . I appreciate your own maverick – if we can still use that word! – thinking and stands."

34.    These are just a few of the accolades I have received over the years from conservatives and liberals alike, who appreciate and admire my work. *See* my biography attached as Exhibit C and incorporated herein by reference; *see also* Exhibit D, "Larry Klayman, the One Man Tea Party" which attributes the genesis of the Tea Party to me.

35.    I am now the founder, Chairman and General Counsel of Freedom Watch, Inc., which has the mission of investigating and prosecuting government corruption and abuse through legal advocacy. I also am in private practice with The Klayman Law Group, P.A. I am unique as a public interest advocate. I am a columnist for World Net Daily and have had about 500+ columns published over the last 10 years. I have also been a columnist for Newsmax through a blog titled "Klayman' Court" and in addition to my book "Whores: How and Why I Came to Fight the Establishment", I also published two other books: "Fatal Neglect" and "Essays of a Mad Man." I also have my own syndicated radio show with Radio America called "Special Prosecutor with Larry Klayman."

## MY EXPERIENCES WITH DEFENDANT ROGER STONE

36.    I met Defendant Stone at the Old Ebbitt Grill in Washington, D.C. in 1988 while he was a partner with Paul Manafort and others and was working as a lobbyist for the firm Black, Manafort, Stone, & Kelly.

37.    Defendant Stone was a "political consultant" who claimed to help get presidents and other politicians elected. The firm made money by then lobbying the very men they put in office.

38.    Defendant Stone backed Republican candidate Jack Kemp for President and he recommended that I be put on the executive finance committee, which also included Donald J. Trump.

39.     Because Defendant Stone knew of my successes and capabilities as a private lawyer, he told me that he had recommended me for U.S. Attorney when George Bush was President in 1992.

40.     In 1996, at a Republican Convention in San Diego, California, Defendant Stone was filmed at a "toga party" with his wife at a "swingers party."

41.     The media at the time went after Defendant Stone because of his alleged participation in the "sex party" and created a scandal.

42.     The media alleged at the time that Defendant Stone solicited sex half-naked, and that there was a picture of Defendant Stone in a compromising position to back up the story.

43.     Defendant Stone contacted me and, because he knew my capabilities and acumen as a lawyer, retained me to represent him to get the media to cease what he claimed then was a smear campaign.

44.     I successfully got the media to back off Defendant Stone through my skill as a lawyer and Defendant Stone was grateful.

45.     I maintained in sporadic contact with Defendant Stone until 2003 when I told him of my plans to voluntarily leave Judicial Watch and run for the U.S. Senate.

46.     There were confirmed rumors that Senator Bob Graham would retire from the U.S Senate well before he announced his retirement in November 2003. Defendant Stone traveled in Republican and political circles and knew that the Senator would be retiring in early to mid 2003.

47.     Thus, I was in contact with Defendant Stone in early to mid 2003, having been put in contact with him by Scott Reed, then Chief of Staff to Jack Kemp, who then was Secretary of Housing and Urban Development, and Defendant Stone was made aware by Scott Reed that I intended to run for the U.S. Senate to fill Bob Graham's seat.

48.     As I was a newcomer to politics, it would have been virtually impossible for me to beat Bob Graham, the incumbent, given the privileges and name recognition an incumbent receives, unless he or she is enmeshed in a major scandal. Senator Bob Graham was never enmeshed in such scandal.

49.     Because he was aware of my prior successes at Judicial Watch and before, Defendant Stone wanted to work with me as my U.S. Senate campaign manager. During this time, the spring, summer, and fall of 2003, and in preparation for my U.S. Senate run, Defendant Stone researched and kept books and records of many of my accomplishments. He had several binders (2-3 feet) full of information about me and the victories that I had obtained at Judicial Watch and elsewhere. Again, because Defendant Stone knew of my successes and legal political acumen, Defendant Stone wanted to be on my team and help me run for the U.S. Senate.

50.     Defendant Stone thus knew of many cases I had won in courtrooms and other legal accomplishments and in fact had kept records of successes in a book of my accomplishments.

51.     Soon after I hired him and during the height of my U.S. Senate campaign, I discovered that Defendant Stone had a conflict of interest and was working with Al Sharpton, while simultaneously working with me. He had agreed to represent me exclusively and I considered Al Sharpton to be an unsavory character. He also was not competently running my campaign with a staff of his friends which he had hired at great expense to me.

52.     I let Defendant Stone go roughly after about one month of his working with me on my U.S. Senate campaign. Shortly after his being let go, Defendant Stone and his sidekick Mike Caputo, whom he hired on my behalf as the campaign's press secretary, along with other staff Defendant Stone had hired, stole thousands of dollars of campaign cell phones and laptops, which I had purchased with my personal funds for the campaign.

53.     I have not spoken to Defendant Stone since I parted ways with him in 2003 given this experience.

54.     Defendant Stone is an individual and citizen of Florida. Special Counsel Robert Mueller ("Mueller") indicted Stone as part of the alleged "Russian Collusion" investigation with seven different felony counts, including lying under oath, witness tampering and obstruction of justice by threatening to kill a material witness and his service dog.

55.     The January 18, 2019 InfoWars video, published in this circuit, contained several false, misleading and defamatory statements concerning me. These false and defamatory statements include but are not limited to:

> **At 1:25, Defendant Stone says, "He's (Klayman) never actually won a courtroom victory in his life."**
>
> **At 1:30, Defendant Stone says, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton why he left. He was 'ousted' because of a 'sexual harassment complaint.'"**
>
> **At 1:37, Defendant Stone says, "He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. With him as Jerry Cori's lawyer, Corsi may get the electric chair. So your idea that he's a good guy is entirely wrong."**
>
> **At 2:01, Defendant Stone published that Plaintiff is "a piece of garbage."**
>
> **At 4:11, Defendant Stone says, "For those people out there who think . . . that Larry Klayman's IQ is higher than 70, you're wrong . . ."**

Am. Compl. at ¶¶ 55, 56, 59, 61, 62.

56.     Defendant Stone acted with actual when he published the false, misleading and defamatory statements concerning me because he knew they were false or acted with a reckless disregard to their truth, as set forth herein.

57.     Defendant Stone not only acted with actual malice when he published the false, misleading and defamatory statements concerning me, but he also had motives to maliciously

defame me. He published the false and misleading statements knowing that they were false or with a reckless disregard for their truth. Defendant Stone had reason to know that his statements were false.

58.     Defendant Stone is aware of *many, many* victories of mine as he was in charge of putting together the book of my accomplishments for fundraising purposes for my U.S. Senate campaign, among other reasons.

59.     Since the time I let Defendant Stone go as my campaign manager in late 2003, Defendant Stone has tried to trade off my clients like a "scavenger." I have warned my clients not to become involved with him as, in my opinion and through my experience, Defendant Stone is not an honorable, ethical or honest person. He has been widely and rightly called a self-styled "dirty trickster" In my opinion, this characterization is accurate based on my experience dealing with him. *See* "Get me Roger Stone" on Netflix, https://www.netflix.com/title/80114666. He tried to trade off my clients for his own profit and purposes.

60.     When the National Enquirer contacted me in 2018 to get a comment on a story it was writing about President Donald Trump and to get my legal opinion on the Mueller investigation, I told the reporter not to quote me in the same article as Defendant Stone, or any article in which he wrote, as Defendant Stone wrote for the National Enquirer at the time. The National Enquirer is located in South Florida and is apparently close with Defendant Stone, a South Florida citizen. I did not want to be quoted or associated at all with Defendant Stone because I consider him – like others do – to be a self-styled dirty trickster who was likely going to be indicted for alleged criminal behavior by Mueller and in fact was indicted by Mueller.

61.     In 2018, I also told Alex Jones and his show producers on InfoWars that I did not want to appear on any show which included Defendant Stone or had ties to Defendant Stone,

either as a guest or as a host, because I strongly felt at the time that Mueller may indict Defendant Stone. Defendant Stone was at the time a host on InfoWars.

62.     I also warned Alex Jones not to release any information – that was potentially under seal in the contempt case of *Melendrez v. Arpaio*, 07-cv-02513 (D. Ariz. 2007) – which he may have improperly obtained from Defendant Stone or others concerning Dennis Montgomery, another whistleblower client of mine who contracted with the U.S. government so it could use his software capabilities for intelligence gathering.

63.     During the criminal trial of my client Cliven Bundy, again to try to scavenge off my clients, Defendant Stone flew to Las Vegas, Nevada where the Bundys lived and boasted that he could get a pardon for Cliven Bundy and his sons. I told Carol Bundy, Cliven's wife and the sons' mother, to stay away from Defendant Stone and she did.

64.     I also warned my then client at the time, Dennis Montgomery, to stay away from Defendant Stone.

65.     Defendant Stone wanted to – and did – intimate and threaten my client Dr. Corsi since he is a material witness in the Mueller investigation as Defendant Stone obviously feared that he would testify against him to Mueller. Defendant Stone feared me as Dr. Corsi's lawyer as he knew that I know what type of person he is and must have thought falsely that my representation of Dr. Corsi was my revenge for him having harmed me during my U.S. Senate campaign.

66.     In sum, Defendant Stone tried to trade off my clients and I shut this down every time in order to protect my clients from Defendant Stone. He also knew that I wanted nothing to do with him and I predicted early on in the Russian collusion investigation that Mueller would most likely indict Defendant Stone because of – in my experience with him – his rank dishonesty and dirty tricks.

12

67.     This, in addition to other information that will be meted out in discovery, supplies the motive to maliciously defame me. That he attacks my acumen and ability as a lawyer and defamed me personally with false sexual harassment complaint claims is directly related to my having kept him away from my clients.

68.     This vindictive, malicious retaliation by Defendant Stone had a logical purpose. He tried to intimate and threaten Dr. Corsi and me in order for us not to collaborate with Mueller. We obviously did not collaborate with Mueller but Defendant Stone is both unstable and unhinged (*See* CDs containing videos of defamatory statements and publications) and apparently paranoid and he tried to prevent collaboration at all costs in order to save his own skin. His conduct toward us is similar to his conduct toward Material Witness 2 in the Mueller investigation, Randy Credico, who he allegedly threatened "Mafioso style" to kill. He even allegedly threatened to kill Credico's service dog, for which he was in part indicted.

## DAMAGES

69.     As an attorney, I rely on my virtue and integrity, as my reputation and good will determines the amount of clients that come to me to earn a living for their legal matters in the public interest and privately.

70.     Any damage done to my reputation harms my ability to practice law as a lawyer, particularly in this circuit, which is my community. This also harms my work as an author, columnist and syndicated radio talk show host, all of which depend on reputation and good will.

71.     Defendant Stone's statements in this instance have caused harm to my reputation, good will and well being in this circuit, the United States, and globally, as I am also an international lawyer as previously set forth in this affidavit.

72.     There was never any single instance of someone making a sexual harassment complaint against me during my almost ten years at Judicial Watch. Defendant Stone's statements to the contrary are false and defamatory and made with actual malice.

73.     Defendant Stone acted with actual malice when he published that I was "ousted" because of a sexual harassment complaint because he knew that was false. Am. Compl. at ¶ 56. Defendant Stone knew or had reason to know that this was false, as he was my campaign manager when I left Judicial Watch.

74.     As set forth in my opposition to Defendants' motions to dismiss, which attaches the testimony of Fitton of Judicial Watch, this also proves the falsity of this statement. Indeed, both Fitton and Defendant Stone have been forced to testify under oath that they never spoke about my being "ousted." Defendant Stone thus fabricated this falsity, according to Fitton's sworn testimony.

75.     The damage done to me and my clients Dr. Corsi, Cliven Bundy, and the Gold Star parents of Extortion 17 whose sons died in combat in Afghanistan, because of Defendant Stone is continuing. As just one example, a person approached me in an elevator and told me that I was "ousted" at Judicial Watch.

76.     Defendant Stone acted with actual malice when he published all of the defamatory statements. He knew the statements were false or had a reckless disregard for their truth. He had reason to know his false and misleading statements were false.

77.     I was damaged financially, as well as to my reputation and good will, and emotionally, by the defamatory and other tortious acts of Defendant Stone.

78.     Each of the Defendants, Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars, is intimately familiar with my background, qualifications and successes as a public interest and private attorney. For this reason, I was previously invited to appear on Infowars on

many occasions before Defendants decided – at the direction of Defendant Stone – to defame my

client, Dr. Corsi and me.

Affiant Sayeth Not

SWORN TO UNDER OATH THIS 2ND DAY OF NOVEMBER OF 2020.

Larry Klayman

# EXHIBIT A



# EXHIBIT B



©1998, The Washington Post. Photography by Larry Morris. Reprinted with permission.

*...his idea of fun is trying to kick down a door some public official has marked secret...Larry Klayman is himself a conservative, but there's nothing partisan about his indignation.*
—Bill Moyers, "NOW" PBS

*Larry...I appreciate your own maverick—if we can still use that word!—thinking and stands.*
—Frank Rich, columnist for *The New York Times*

*That* Time *magazine has yet to name Larry Klayman "Man of the Year" is a failure of* Time, *not Klayman's. The work he and Judicial Watch did on the Brown case is stunning.*
—Jack Cashill, author of *Ron Brown's Body*

*Larry Klayman is my hero because he has integrity—enough to prevent him from blind loyalty to party or ideology...That's because he is fearless and relentless in the pursuit of justice...There were other men like Larry throughout American history. Their names were Washington, Jefferson, Madison and Henry.*
—Joseph Farah, WorldNetDaily.com

*...through his challenge of secrecy rules, Larry Klayman has become a force in Washington.*
—Louis Jacobson, *National Journal*

*Nobody ever accused Larry Klayman of thinking small, but his latest suit may be outsized by even his standards. The former head of conservative watchdog Judicial Watch who now runs Freedom Watch has filed a $10 trillion class action against Iran at the U.S. District Court for the District of Columbia.*
—*The National Law Journal*

$26.95

ISBN: 978-0-9792012-2-6

5 2 6 9 5

9 780979 201226

# EXHIBIT C



**FREEDOM WATCH**    JOIN OUR FIGHT AT WWW.FWUSA.ORG

# ABOUT LARRY KLAYMAN



Larry Klayman, founder of Judicial Watch and Freedom Watch, is known for his strong public interest advocacy in furtherance of ethics in government and individual freedoms and liberties. During his tenure at Judicial Watch, he obtained a court ruling that Bill Clinton committed a crime, the first lawyer ever to have done so against an American president. Larry became so famous for fighting corruption in the government and the legal profession that the NBC hit drama series "West Wing" created a character after him: Harry Klaypool of Freedom Watch. His character was played by actor John Diehl.

In 2004, Larry ran for the U.S. Senate as a Republican in Florida's primary. After the race ended, he founded Freedom Watch.

Larry graduated from Duke University with honors in political science and French literature. Later, he received a law degree from Emory University. During the administration of President Ronald Reagan, Larry was a Justice Department prosecutor and was on the trial team that succeeded in breaking up the telephone monopoly of AT&T, thereby creating competition in the telecommunications industry.

Between Duke and Emory, Larry worked for U.S. Senator Richard Schweiker (R-Pa.) during the Watergate era. He has also studied abroad and was a stagiaire for the Commission of the European Union in its Competition Directorate in Brussels, Belgium. During law school, Larry also worked for the U.S. International Trade Commission in Washington, D.C.



Larry speaks four languages—English, French, Italian, and Spanish —and is an international lawyer, among his many areas of legal expertise and practice.

The author of two books, *Fatal Neglect* and *Whores: Why and How I Came to Fight the Establishment,* Larry has a third book in the works dealing with the breakdown of our political and legal systems. His current book, *Whores,* is on now sale at WND.com, Amazon.com, BarnesandNoble.com, Borders.com, and all major stores and booksellers.

Larry is a frequent commentator on television and radio, as well as a weekly columnist, on Friday, for WND.com. He also writes a regular blog for Newsmax called "Klayman's Court."

Larry has been credited as being the inspiration for the Tea Party movement. (See "Larry Klayman - The One Man TEA Party," by Dr. Richard Swier.)

# EXHIBIT D

 **FREEDOM**WATCH     JOIN OUR FIGHT AT WWW.FWUSA.ORG

# LARRY KLAYMAN – THE ONE MAN TEA PARTY

By Dr. Richard Swier (Scribe)
RedCounty.com
July 31, 2010

Long before there was a TEA Party, Glenn Beck 912 movement, 13 Patriots and thousands of others, there was Larry Klayman. Larry believes it is more important to be virtuous than be liked.

**Larry believes there is an ultimate right and wrong.**

Some of you may not know Larry Klayman but you should. If you believe in the Constitution of the United States and that the Executive, Legislative and Judicial branches of our federal government are corrupt to the core then you need to read Larry's book, *WHORES: Why and How I Came to Fight the Establishment*.

If you see our courts legislating from the bench rather than enforcing the law as in Arizona then you will love Larry Klayman. If you love politics and want to understand what really happens behind the scenes get his book. I just finished reading WHORES and could not put it down. It is a mosaic of both the man and his struggles against an out of control government bent on aggrandizing itself at the expense of the people and the law. It is about corruption on the part of both parties writ large. I found it particularly interesting because of Larry's insights into Florida politics. You see Larry ran for the very same U.S. Senate seat Marco Rubio is seeking. Larry ran against, among others, Bill McCollum and Mel Martinez. If you want to learn more about Florida politics and political insiders, read this book.

Larry is the founder of Judicial Watch and Freedom Watch USA. Freedom Watch USA "is the only group that speaks through actions, rather than just words." When reading his book I found it a fascinating personal and professional journey that reflects the work of a real patriot. Larry has won my patriot award for being a thorn in the side of Iran, Hugo Chavez, Bill and Hillary Clinton, Dick Cheney, George W. Bush and Barack Obama. Not a bad record if I say so myself.

I really felt a symbiotic relationship with Larry as I read his story. When you speak truth to power you are always attacked. The progressive model is identify the target, marginalize it and then demonize it. That is the cross that Larry, TEA Party members and others who are like minded bear today.

**Larry was fighting the establishment since the early 1990s and he continues to do so even today with the filing of a lawsuit against Elena Kagan, President Obama's nominee for the U.S. Supreme Court.**

According to the WorldNetDaily.com column, *Papers prepped to disbar Elena Kagan*:

One of Washington, D.C.'s most feared and fearless corruption watchers has told WND he intends to file an ethics complaint to have Supreme Court nominee Elena Kagan disbarred from practicing before the court she aspires to join – and possibly subjected to criminal prosecution – for her role in an escalating controversy over partial-birth abortion.

As WND reported, dozens of pro-life organizations are already asking the Senate to investigate Kagan's 1997 amendment to an American College of Obstetricians and Gynecologists report, which was then used by the Supreme Court as justification for overturning Nebraska's partial-birth abortion ban in 2000.

In her confirmation hearings, Kagan defended the amendment, saying, "My only dealings with (the College) were about talking with them about how to ensure that their statement expressed their views."

Several analyses have concluded, however, that Kagan's amendment dramatically changed the meaning of the organization statement, and court records show the statement was passed off on the Supreme Court as official scientific opinion, even though the organization's panel of scientists never approved Kagan's wording.

Klayman told WND he believes Kagan's behind-the-scenes work constitutes "conspiracy to defraud the Supreme Court," and he intends to take the evidence that has been compiled by the pro-life groups to file a complaint before the clerk's office of the U.S. Supreme Court, seeking to have Kagan disbarred as a practicing lawyer infront of the Supreme Court.

So the battle goes on for Larry, you and me. I hope you will read Larry's book and make it a point to learn more about the great work he is doing to stop corruption in our courts, at the White House and in Congress. Larry has been a one man TEA Party, now it is time for us to join with him as we together fight in the same cause – a grass roots revolution to save the Republic.

http://www.redcounty.com/content/larry-klayman-one-man-tea-party

EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

LARRY KLAYMAN

          Plaintiff

    v.

INFOWARS, LLC, et al

          Defendants.

**Case Number:   0:20-cv-61912**

## SWORN AFFIDAVIT OF LARRY KLAYMAN

I, Larry Klayman, being over eighteen years of age and duly competent to testify, hereby swear and affirm as follows:

## A BRIEF HISTORY OF MY BACKGROUND

1.    I have personal knowledge of the following facts and if called upon as a witness, could testify competently thereto.

2.    In 1973, I graduated from Duke University where I majored in political science and French literature. I excelled academically and graduated with honors.

3.    I then matriculated at Emory Law School where I excelled academically and graduated in 1977. While in law school, I worked as an intern at the U.S. International Trade Commission, the Georgia Attorney General and the U.S. Attorney for the Northern District of Georgia.

4.    I passed The Florida Bar the first time I took the exam.

5.    I passed all bar exams on my first attempt, including the District of Columbia Bar.

6.    I began my legal career in this circuit in Miami, Florida as an associate for Blackwell, Walker, Gray, Roberts, Flick & Hoehl ("Blackwell"), which was then the largest and most prestigious law firm in Florida. I was admitted into The Florida Bar having been sworn in on

1

December 7, 1977. I have practiced law in this circuit continuously and extensively throughout my forty-two-year career and have active cases pending in this circuit and elsewhere in Florida, including during the period that I was a trial attorney for the U.S. Department of Justice's ("DOJ") Antitrust Division, from 1980 to 1982, where I was assigned litigation in this circuit.

7.     I conceived of and founded Judicial Watch, Inc. ("Judicial Watch") in 1994, a public interest group that's mission was to investigate and prosecute government corruption and abuse. I was the Chairman, General Counsel, and Corporate Treasurer of Judicial Watch until I voluntarily departed in 2003 to run as a candidate for the U.S. Senate in Florida in the Republican primary election.

8.     In September of 2003, I voluntarily departed from Judicial Watch to run for the U.S. Senate in Florida.  Tom Fitton later took control of Judicial Watch and was there at the time I left Judicial Watch and knows that I was not ousted as a result of a sexual harassment complaint.

9.     I am now the founder, Chairman and General Counsel of Freedom Watch, Inc., which has the mission of investigating and prosecuting government corruption and abuse through legal advocacy. I also am in private practice with The Klayman Law Group, P.A. I am unique as a public interest advocate. I am a columnist for World Net Daily and have had about 500+ columns published over the last 10 years. I have also been a columnist for Newsmax through a blog titled "Klayman' Court" and in addition to my book "Whores: How and Why I Came to Fight the Establishment", I also published two other books: "Fatal Neglect" and "Essays of a Mad Man." I also have my own syndicated radio show and daily podcasts with Radio America called "Special Prosecutor with Larry Klayman."

10.     I derive financial benefit from appearing on radio and internet programs as a conservative political analysist and media personality.

11.     I am a direct competitor of Defendant Roger Stone, as well as the Infowars Defendants, as I derive income from appearing on radio and internet programs and my writings as a conservative political analysts and media pundit nationwide and in this judicial district.

12.     Defendant Stone and the Infowars Defendants are direct competitors with me, as they are also conservative political analysts and media pundits who broadcast and do business in this judicial district.

13.     Defendant Stone and the Infowars Defendants sell products, publish books, and appear on the radio and internet nationwide and in this judicial district.

14.     I also sell products, publish books, and appear on the radio and internet nationwide in this judicial district.

15.     Defendant Stone and the Infowars Defendants have harmed me as a competitor by publishing false statements about and which bear on my services in order to eliminate me as a competitor. All of the Defendants compete with me on the airwaves and in written publications.

16.     Defendant Stone and the Infowars Defendants are therefore liable under the FDUTPA.

Affiant Sayeth Not

SWORN TO UNDER PENALTY OF PERJURY THIS 2nd DAY OF NOVEMBER 2020

Larry Klayman

3

# EXHIBIT 4

```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,    :
                             :      Criminal Action
            Plaintiff,       :      No. 19-CR-018
                             :
                             :      JURY TRIAL - DAY 6
                             :      Afternoon Session
        vs.                  :
                             :      Washington, D.C.
                             :      November 13, 2019
ROGER JASON STONE, JR.,      :      Time: 1:05 p.m.
                             :
            Defendant.       :
_____


             TRANSCRIPT OF JURY TRIAL
                  HELD BEFORE
          THE HONORABLE AMY BERMAN JACKSON
             UNITED STATES DISTRICT JUDGE
_____


              A-P-P-E-A-R-A-N-C-E-S

For the Plaintiff:   JONATHAN IAN KRAVIS, Esquire
                     MICHAEL JOHN MARANDO, Esquire
                     ADAM C. JED, Esquire
                     AARON SIMCHA JON ZELINSKY, Esquire
                     U.S. Attorney's Office for
                     the District of Columbia
                     555 Fourth Street, NW
                     Washington, DC  20530
                     (202) 252-7698
                     Email: Jonathan.kravis3@usdoj.gov
                     Email: Asjz@usdoj.gov
                     Email: Michael.marando@usdoj.gov
                     Email: Adam.Jed@usdoj.gov

For the Defendant:   Bruce S. Rogow, Esquire
                     Law Office of Bruce S. Rogow, P.A.
                     100 NE 3rd Avenue
                     Suite 1000
                     Fort Lauderdale, FL 33301
                     (954) 767-8909
                     Email: brogow@rowlaw.com
```

1   Credico -- after Credico gets the letter requesting the

2   interview, Credico tells Stone:  "My lawyers want to see me

3   today."

4       Look at how Stone responds:  "Stonewall it, plead the

5   Fifth, anything to save the plan."

6       This is a Richard Nixon quote from Watergate, and this is

7   Roger Stone's plan for his loose end.  Credico cannot expose

8   Stone's lies to the committee if the committee never hears from

9   Credico.

10      Again, two days later on November 21st, Credico writes:

11  "I was told I'll be getting a subpoena."

12      Stone responds:  "That was the point when your lawyer

13  should have told them you'd assert your Fifth Amendment

14  rights."

15      Here are three more messages from December of 2017, all

16  referencing the Fifth Amendment:  Facebook message, Fifth

17  Amendment; text message, You can plead the Fifth; text message,

18  So what, all legal, take the Fifth, fuck em.

19      Then there's this:  Randy Credico eventually gets a

20  subpoena from the House Intelligence Committee on November 27th

21  or 28th of 2017.  Take a look at what Roger Stone writes to him

22  one day later as they're texting about the subpoena:  "The

23  whole thing will be worthless unless you find a place to do

24  your Frank Pentangeli impression, sure, sure, Roger Stone this,

25  Roger Stone that."

1    Here it is again, December 1st, 2017:  "Start practicing

2  your Pentangeli," followed by four links to news articles about

3  Credico testifying before the committee.

4    Remember who Frank Pentangeli is.  He's a character in the

5  movie The Godfather Part II.  And there's a scene in the movie

6  where Pentangeli is supposed to testify before a congressional

7  committee.  Pentangeli is called to testify so the committee

8  can bring a perjury charge against his associate.  Stop me when

9  this starts to sound familiar.

10    But Pentangeli lies to the committee.  He says he doesn't

11  know anything about that criminal activity, and -- and this is

12  the kicker -- the lines, the words that Pentangeli uses in the

13  movie to claim to the committee he doesn't remember, those are

14  the same lines that Roger Stone texted to Randy Credico one day

15  after Credico gets the subpoena.  Look at the message:  "Sure,

16  sure, Roger Stone, this, Roger Stone that."

17    Miss Taylor told you about this.  She told you that in

18  this scene in the movie Pentangeli says to the committee:  "I

19  made all that stuff up.  The FBI offered me a deal, and when

20  they offered me the deal, I told them, sure, sure, Michael

21  Corleone this, Michael Corleone that."

22    Here's Stone one day after the subpoena, "Sure, Sure,

23  Roger Stone this, Roger Stone that."

24    Credico told you how he understood these text messages.

25  He said:  Look, I can't just go in there like Frank Pentangeli

```
 1    and say I don't know Roger Stone.  This isn't the 1950s, like
 2    when The Godfather was set.  There's text messages and emails
 3    that show we know each other, unless of course you lie to the
 4    committee about the text messages and emails."
 5         But Credico told you he understood Stone to be telling him
 6    you can, quote, throw them off, throw the committee off.  You
 7    can quote, "not recall events that actually transpired."
 8         Those are Credico's words about what these messages meant.
 9    When Stone told Credico to do a Pentangeli, Credico full-well
10    understood that Stone was telling him to lie to the committee.
11         Ladies and gentlemen of the jury, when you send a witness
12    before a congressional committee, text messages telling him to
13    do a movie character who lies to a congressional committee,
14    that is witness tampering, plain and simple.  And it's not just
15    the committee investigation.
16         December 1st, 2017:  "If you turned over anything to the
17    FBI you're a fool."
18         December 24th, 2017:  "I'm not talking to the FBI, and if
19    you are smart you won't either."
20         January 25th, 2018:  "Waste of your time, tell him to go
21    fuck himself.
22         Who?
23         Special Counsel Robert Mueller."
24         This is Stone telling Credico:  Keep your mouth shut.
25    Don't talk to the committee, don't talk to the FBI, don't talk
```