**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

LARRY KLAYMAN

                Plaintiff

     v.

INFOWARS, LLC, et al

              Defendants.

**Case Number:   0:20-cv-61912**

**PLAINTIFF LARRY KLAYMAN'S OPPOSITION TO DEFENDANT DAVID JONES'S**
<u>**MOTION TO DISMISS**</u>

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

LEGAL STANDARD ............................................................................................................4

LEGAL ARGUMENT ...........................................................................................................5

    Personal Jurisdiction is Proper in Florida ...........................................................5

    The Amended Complaint Alleges David Jones Was Working Together in Concert  with Defendant Stone and the Rest of the Infowars Defendants And is T Therefore Jointly and Severally Liable  ...........................................................................................................7

    Mr. Klayman Has More Than Adequately Pled Defamation Causes of Action ................9

        Mr. Klayman is Not a Public Figure ...........................................................9

        Mr. Klayman Has More Than Adequately Pled Malice. ......................................10

        Mr. Klayman's Specific Allegations as to Defamation. .......................................13

            The January 18, 2019 Video ..................................................................13

    Mr. Klayman Has More Than Adequately Pled Unfair Competition Cause of Action .....13

    The Honorable Roy K. Altman's Order in the U.S District Court for the Southern District of Florida is Not Binding on this Court ............................................................................16

CONCLUSION ...................................................................................................................19

## <u>TABLE OF AUTHORITIES</u>

***Cases***

*Ashcroft v. Iqbal*, 556 U.S. 662 (U.S. 2009) ...................................................................5

*AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC,* 608 F. Supp. 2d 1349 (S.D. Fla. 2009) ...4

*Barnes v. Horan*, 841 So. 2d 472 (Fla. Dist. Ct. App. 2002)) ........................................9

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364  (11th Cir.1997) ......................5

*Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty., Inc.*, 169 So. 3d 164, (Fla. Dist. Ct. App. 2015) ...............................................................17

*Carroll v. The Street.com, Inc*., 2014 U.S. Dist. LEXIS 156499  (S.D. Fla. 2014).......................9

*Dorleus v. Bank of New York*, 2014 WL 1621941 (S.D. Fla. Apr. 23, 2014).............................4, 5

*Imerys Talc Am., Inc. v. Ricketts*, 262 So. 3d 799  (Fla. Dist. Ct. App. 2018) ...............................5

*Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163 (1993)...............................................................................................4

*Mile Marker, Inc. v. Petersen Publ'g, L.L.C.*, 811 So. 2d 841 (Fla. Dist. Ct. App. 2002).............10

*Peerenboom v. Perlmutter*, 2017 Fla. Cir. LEXIS 14957 .............................................9

*Philip Morris USA Inc. v. Boatright,* 217 So. 3d 166 (Fla. Dist. Ct. App. 2017)...........................8

*Smith v. Cuban Am. Nat'l Found*., 731 So.2d 702 (Fla. 3d DCA 1999).........................................9

*Urquilla–Diaz v. Kaplan Univ.*, 780 F.3d 1039 (11th Cir.2015) ...................................4

*Wilchombe v. TeeVee Toons, Inc*., 555 F.3d 949 (11th Cir. 2009 ...................................5


***Statutes***

FDUTPA ..................................................................................................... 16-18

Fla. Stat § 48.193 ...........................................................................................6

Plaintiff LARRY KLAYMAN ("Mr. Klayman") hereby opposes Defendant David Jones' Motion to Dismiss. David Jones, Defendant Alex Jones, Defendant Shroyer, Defendant Infowars, LLC, and Defendant Free Speech Systems LLC will be referred to collectively as the "Infowars Defendants."

## I.    INTRODUCTION

This case is centered around the Infowars Defendants' latest attempt at pecuniary gain and notoriety through their pattern and practice of spewing false, malicious, and defamatory statements. In collaboration with their co-conspirator, Defendant Roger Stone ("Stone"), the Infowars Defendants did everything that they could muster to smear, discredit, and threaten Mr. Klayman and his client, Dr. Jerome Corsi ("Dr. Corsi") in order try to have helped Stone avoid prison time for his role Special Counsel Robert Mueller's Russian collusion investigation, for which he was indicted on seven separate felony charges and had a pending criminal case in the District of Columbia. Defendant Stone was then convicted on seven counts of perjury, witness tampering and obstruction of justice and was sentenced to 40 months in a federal penitentiary. Comp. ¶ 9. His sentence was commuted by President Donald J. Trump.

To that end, Defendant Stone had already made numerous false, malicious, and defamatory statements in public in order to try to improperly influence and corrupt Special Counsel Mueller's investigation and prosecution. Defendant Stone, in concert with the Infowars Defendants, has falsely broadcasted that Mr. Klayman was ousted from Judicial Watch as the result of a sexual harassment complaint. Comp. ¶ 40. This is a provably and demonstrable false statement of fact and/or published with a reckless disregard for the truth. Defendant Stone has also made other malicious and defamatory statements regarding Mr. Klayman's trade and profession as an attorney, in concert with the Infowars Defendants.

It is easy to see why Defendant Stone made these types of statements – he was trying to do everything in his power to discredit, coerce, intimidate, and threaten Mr. Klayman and his client, Dr. Corsi, who had no choice but to cooperate with Mueller's investigation, and if subpoenaed, to testify truthfully at Defendant Stone's trial. Tellingly, Dr. Corsi was not indicted, while Defendant Stone was and later convicted. He also intended to compete unfairly with Mr. Klayman as set forth below. This speaks for itself.

David Jones and his co-Infowars Defendants gladly stepped in for their colleague at Stone's direction to aid their co-conspirator Stone who worked as a co-host along with Defendant Shroyer's on *The War Room*, in hopes of not only discrediting Dr. Corsi to aid Stone, but also to eliminate them as competitors. David Jones and his co-Infowars Defendants, all acting in concert, have come up with and published a myriad of lies and blatant falsities that have severely damaged Mr. Klayman's reputation, good will and standing in his trades and professions.

In his motion, David Jones has adopted the strategy of trying to falsely distance himself from the conduct of his co-Defendants. However, as set forth in the Complaint, "Defendant Infowars and Defendant Free Speech Systems are both owned, controlled, and operated by….David Jones." Comp. ¶ 11.This is buttressed by an affidavit from Kelly Morales, Defendant Alex Jones' ex-wife that details the intricate involvement and much more total control that David Jones has in Infowars's and Alex Jones' life. For instance, Ms. Morales states, "David Jones runs Infowars with Alex Jones and helps him with his activities, including fixing media stories and endorsing and/or aiding his slanderous and/or fraudulent behaviors." Furthermore, "Alex Jones could not function without David Jones, and has conspired with him on the past to commit this breach of fiduciary duty and fraud on my business/estate with Alex Jones." In fact, in an affidavit

filed by David Jones in Alex Jones' bankruptcy case, he swears, "I have been involved with Alex Jones' personal and business finances for many years…." Exhibit 1.

Indeed, David Jones was given the opportunity to retract the defamatory publications and chose not to do so, thereby ratifying and adopting the defamatory conduct. Comp. ¶ 34.

Tellingly, this is not David Jones and his co-Infowars Defendants' first foray into the misinformation business and defamatory world, all for profit:

> The Infowars Defendants have a long and sordid history of publishing and broadcasting defamatory material, including falsely, recklessly and baselessly accusing the families of the schoolchildren who lost their lives during the 2012 Sandy Hook Elementary School massacre of staging the massacre and faking the deaths of their children.

> The Sandy Hook families had to endure years of abuse and torture from Defendants before finally filing suit against numerous parties involved with InfoWars, including Defendant Alex Jones and Shroyer, for defamation.

> As just one example, a Florida woman was arrested for making death threats to a parent of a Sandy Hook victim. According to the U.S. Department of Justice, the motivation behind the threats was the lies propagated by these Defendants that the Sandy Hook massacre
> was a hoax.

> Furthermore, Defendant Alex Jones in concert with the other Defendants propagated and promoted the "Pizzagate" conspiracy on his show, accusing a restaurant called Comet Ping Pong in the Washington D.C. area of operating a child sex ring in its non-existent basement that purportedly involved Hillary Clinton and John Podesta. This caused one of his listeners to shoot up the restaurant after being told by Defendant Jones to "self-investigate" the "Pizzagate" conspiracy theory. Comp. ¶¶ 17-20

David Jones and his co-Infowars Defendants have shown time and time again that they are willing to shamelessly and they think without consequence say just about anything, however false and misleading, for notoriety, fame, and profit. Thus, it is hardly surprising that they are willing to come to further the nefarious interests of their colleague, joint tortfeasor and co-conspirator Roger Stone in this instance. Indeed they all have routinely worked together and

Stone was and is now, with his 40 month prison sentence commuted,  apparently  again a host on

Infowars. A simple Google search bears this out.

David Jones and his co-Infowars Defendants and Defendant Stone have made numerous

false, malicious, and defamatory statements about Mr. Klayman. They include that:

> **(1) Mr. Klayman has "never actually won a courtroom victory in his life."
> Comp. ¶ 39.**
>
> **(2) "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the
> current president of Judicial Watch] why he left. He was 'ousted' because of
> a 'sexual harassment complaint.'" Comp. ¶ 40.**
>
> **(3) "He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an
> egomaniac, and he could be the  single worst lawyer in America. With him as
> Jerry Corsi's lawyer, Corsi may get the electric chair. So your idea that he's
> a good guy is entirely wrong" Comp. ¶ 43.**
>
> **(4) "For those people out there who think…that Larry Klayman's IQ is
> higher than 70, you're wrong…" Comp. ¶ 46.**

As set forth in detail below, not only are these statements patently false, they were made with

actual knowledge of their falsity and therefore with malice.

## II.    LEGAL STANDARD

A motion to dismiss is designed to test the legal sufficiency of a complaint and not to

determine any factual issues. *Dorleus v. Bank of New York*, No. 14-80124-CIV, 2014 WL

1621941, at *2 (S.D. Fla. Apr. 23, 2014); *see Leatherman v. Tarrant County Narcotics*

*Intelligence and Coordination Unit,* 507 U.S. 163, 164 (1993)*.* All allegations of the complaint

must be taken as true and all reasonable inferences drawn therefrom must be construed in favor

the non-moving party. *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC,* 608 F. Supp. 2d

1349, 1353 (S.D. Fla. 2009). A motion to dismiss a complaint is not a motion for summary

judgment in which the court may rely on facts adduced in other proofs. *Urquilla–Diaz v. Kaplan*

*Univ.*, 780 F.3d 1039, 1053 n. 12 (11th Cir.2015). Instead, a motion to dismiss tests the legal

sufficiency of the complaint. *Dorleus*, No. 14-80124-CIV, 2014 WL 1621941, at *2 (S.D. Fla. Apr. 23, 2014).

A complaint "does not require detailed factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (U.S. 2009) (internal quotations omitted). To survive a motion to dismiss, a complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotations omitted).

Finally, when considering a Rule 12(b)(6) motion, trial courts are generally limited to the four corners of the complaint and may only consider documents incorporated in the complaint— i.e., either documents attached to the complaint or documents which do not allege acts extrinsic to the pleadings. *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009); *see also Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir.1997) (A court may consider only the complaint itself and any documents referred to in the complaint which are central to the claims..

## III.   LEGAL ARGUMENT

### A.   Personal Jurisdiction is Proper in Florida

"Determining whether a court can exercise personal jurisdiction over a defendant involves a two-step inquiry." *Imerys Talc Am., Inc. v. Ricketts*, 262 So. 3d 799, 802 (Fla. Dist. Ct. App. 2018). "The court must determine whether the allegations in the complaint bring the action within Florida's long-arm statute and, if so, whether sufficient "minimum contacts" exist between the non-resident defendant and Florida to satisfy due process." *Id*.

"Specific personal jurisdiction exists when 'the alleged activities or actions of the defendant are directly connected to the forum state." *Imerys Talc Am., Inc. v. Ricketts*, 262 So. 3d 799, 802 (Fla. Dist. Ct. App. 2018). "The Supreme Court has explained that for

specific personal jurisdiction to be appropriate, the defendant's suit-related conduct must create a substantial connection with the forum State." *Id*. (internal quotations omitted).

Here, Defendant David Jones and the Infowars Defendants, in concert with Defendant Stone (who is a citizen of Florida) maliciously defamed Mr. Klayman and engaged in unfair competition with him as well. Mr. Klayman is a Florida citizen, is licensed to practice law in Florida, and therefore suffered damages from Defendant David Jones' conduct in Florida.

The publications at issue – a video interview with Defendant Stone that appeared on Infowars – occurred while Defendant Stone was in Florida and the defamation was projected into Florida. Thus the tort occurred in Florida. Indeed, pursuant to the Florida Long Arm Statute, Fla. Stat. § 48.193:

> (1) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts…. (b) Committing a tortious act within this state.

Accordingly, Defendant David Jones, along with the rest of his Infowars Defendants specifically and tortiously targeted Florida, which is where Klayman practices law and his other professional and personal endeavors, with their concerted actions and are therefore subject to personal jurisdiction here. Case closed!

Even more, as alleged in the Complaint, Defendant David Jones and his Infowars co-Defendants "do substantial business and promote and sell various goods in this judicial circuit and nation-wide, including medicine, supplements, and "tchotchkes" with InfoWars branding." Comp. ¶ 15. Their www.infowars.com website is available 24/7 to residents of this judicial district as well, which confers even general personal jurisdiction over Defendant David Jones and his co-Infowars Defendants.

Thus, personal jurisdiction is proper in Florida. However, should the Court choose to use its discretion to transfer this case to Texas, Mr. Klayman does not object. Mr. Klayman has already moved this Court for a transfer to the Western District of Texas, which moots out any personal jurisdiction issues that were raised by David Jones. ECF No. 30.

**B.      The Amended Complaint Alleges That David Jones Was Working Together in Concert with Defendant Stone and the Rest of the Infowars Defendants And is Therefore Jointly and Severally Liable**

The Complaint specifically and expressly alleges that the Infowars Defendants were at all material times "working in concert with Stone, jointly and severally…." Comp. ¶ 32. Furthermore, "Plaintiff has demanded retraction and correction by the Defendants of the defamatory videos and publications set forth below and generally in this Complaint, but Defendants have refused, thereby ratifying any and all defamatory statements contained herein. Comp. ¶ 34.

There is nothing conclusory about these allegations:

Defendant InfoWars and Defendant Free Speech Systems are both owned, controlled, and operated by Defendant Alex Jones and David Jones. Defendant Free Speech Systems owns www.infowars.com, where content created by Defendants Alex Jones, Shroyer and Stone were at all material times posted and broadcast into this district, nationally and internationally. Comp. ¶ 11.

Defendant David Jones is Defendant Alex Jones's father and holds the official title of Director of Human Relations for Defendant Free Speech Systems. On information and belief, Defendant David Jones is the owner of Defendant InfoWars and Free Speech Systems and he manages and controls the business and related activities for Defendants InfoWars and Free Speech Systems, as well as Defendant Alex Jones' other companies. At all material times, he worked in concert with the other Defendants and Roger Stone and furthered and ratified the illegal acts set forth in this Complaint. Comp. ¶ 7.

Thus, given the fact that each of every one of the Infowars Defendants are intricately bound together by virtue of the fact that they all directly participate in creating and publishing the content on the Infowars site, it is more than merely plausible that they are working together in

concert. Furthermore, under Florida law, civil conspiracy claim holds co-conspirators liable for harm caused by other members of a conspiracy to commit an intentional tort. *Philip Morris USA Inc. v. Boatright,* 217 So. 3d 166 (Fla. Dist. Ct. App. 2017).  Thus, as the Complaint clearly alleges that each and every one of the Infowars Defendants conspired with Defendant Stone to maliciously defame and otherwise harm Mr. Klayman, they are jointly and severally liable for each others' actions.

Furthermore, any assertion by Defendant David Jones that he was not involved in the defamation of Mr. Klayman is rebutted by the attached affidavit of Kelly Morales, Defendant Alex Jones' ex-wife. Exhibit 1. For instance, Ms. Morales states, "David Jones runs Infowars with Alex Jones and helps him with his activities, including fixing media stories and endorsing and/or aiding his slanderous and/or fraudulent behaviors." Furthermore, "Alex Jones could not function without David Jones, and has conspired with him on the past to commit this breach of fiduciary duty and fraud on my business/estate with Alex Jones." In fact, in an affidavit filed by David Jones in Alex Jones' bankruptcy case, he swears, "I have been involved with Alex Jones' personal and business finances for many years…." Exhibit 1.

Given this, it is not surprising that Defendants were given a chance to retract the defamatory statements, but chose not to, thereby ratifying them. Comp. ¶ 34.

Lastly, Defendant Stone is still appearing regularly on Infowars, as recently as a few weeks ago, as reported by the Huffington Post.[1] This shows that Defendant Stone is still working together closely with the Infowars Defendants after having his 40 month prison sentence commuted by President Trump, evidencing their intimate relationship.

---

[1] Allison Quinn, *Roger Stone's Election Plan: Have Feds Block Voting, Arrest 'Seditious' Daily Beast Staff*, Daily Beast, Sept. 13, 2020, available at: https://www.thedailybeast.com/roger-stones-election-plan-have-feds-block-voting-arrest-seditious-daily-beast-staff

C.      **Mr. Klayman Has More Than Adequately Pled Defamation Causes of Action**

Under Florida law, the elements of defamation are "(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Peerenboom v. Perlmutter*, 2017 Fla. Cir. LEXIS 14957, *24. To determine whether a statement is defamatory, it must be considered in the context of the publication. *Smith v. Cuban Am. Nat'l Found.*, 731 So.2d 702, 705 (Fla. 3d DCA 1999); *see also Carroll v. The Street.com, Inc*., 2014 U.S. Dist. LEXIS 156499, *29 (S.D. Fla. 2014) (". . . the Court cannot view the defamatory remarks in a vacuum. It must view the [a]rticle as a whole.").

Furthermore, the Florida courts  have found that a defendant may not escape liability for his defamatory conduct simply by attempting to couch his defamatory statement as an "opinion."

> However, a statement that although ostensibly in the form of an opinion "implies the allegation of undisclosed defamatory facts as the basis for the opinion," Restatement (Second) of Torts § 566 (1977), *is* actionable. The difference between the former, unactionable, pure opinion and the latter, sometimes called "mixed opinion," is that: "Pure opinion occurs when the defendant makes a comment or opinion based on facts which are set forth in the article or which are otherwise known or available to the reader or listener as a member of the public. Mixed expression of opinion occurs when an opinion or comment is made which is based upon facts regarding the plaintiff or his conduct that have not been stated in the article or assumed to exist by the parties to the communication."

*Barnes v. Horan*, 841 So. 2d 472, 476-77 (Fla. Dist. Ct. App. 2002)

1.      **Mr. Klayman is Not a Public Figure**

First and foremost, it is important to establish that Mr. Klayman is not a public figure. "Courts are to employ a two-step process in determining whether a particular claimant is a limited public figure or simply a private plaintiff. First, the court must determine whether there is a "public controversy." *Id.* In determining whether a matter is a "public controversy," the court should ask whether a reasonable person would have expected persons beyond the immediate

participants in the dispute to feel the impact of its resolution." *Mile Marker, Inc. v. Petersen Publ'g, L.L.C.*, 811 So. 2d 841, 845 (Fla. Dist. Ct. App. 2002). Here, there is simply no "public controversy" at issue. Falsely accusing someone of being ousted as a result of sexual harassment complaint, and calling someone an "numbskull," or "idiot" does not affect anyone beyond the persons immediately involved. Thus, the inquiry ends here.

However, even if there were a "public controversy," Mr. Klayman is still not a public figure. After determining that there is a "public controversy," the court must then determine whether the plaintiff played a sufficiently central role in the instant controversy to be considered a public figure for purposes of that controversy." *Mile Marker, Inc. v. Petersen Publ'g, L.L.C.*, 811 So. 2d 841, 846 (Fla. Dist. Ct. App. 2002).

Here, Mr. Klayman's  involvement was not by choice, but instead forced by Defendants and Special Counsel Mueller and his staff, who named Dr. Corsi, and then Mr. Klayman, as his counsel, had make public statements in order to protect Dr. Corsi's critical reputation as an investigative journalist. Put another way, Mr. Klayman never sought out any of the media attention from the Defendants, but was involuntarily brought into the controversy and forced to defend himself once Defendants began maliciously defaming them. Furthermore, it is abundantly clear that Defendants' false, malicious, and misleading statements essentially, such as by way of just one example, falsely stating that Mr. Klayman was ousted from Judicial Watch as the result of sexual harassment complaint, have absolutely nothing to do with Special Counsel Mueller's investigation and prosecution, and were made simply to try to destroy Mr. Klayman's reputation.

### 2.    Mr. Klayman Has More Than Adequately Pled Actual Malice

As set forth above, Mr. Klayman  is not a public figure the purposes of this litigation, rendering a showing of malice unnecessary. However, even in the unlikely event that this Court

finds that Mr. Klayman is a limited-public figure, it is clear that the Infowars Defendants acted with actual malice. Mr. Klayman specifically pled that each of the false and defamatory statements were made by Defendants <u>with malice</u> and actual knowledge of their falsity.

The Amended Complaint sets forth the fact that the Infowars Defendants "published these malicious false, misleading, and defamatory statements with malice and with full knowledge that they were false and misleading, and/or at a minimum, with a reckless disregard for its truthfulness." Comp. ¶ 47.

Indeed, the fact that the Infowars Defendants have known Mr. Klayman for a long time and even worked with him conclusively shows the actual malice stemming from the false and defamatory statements now being made. Why would the Infowars Defendants have worked so closely with an individual that they allegedly knew was a "sexual harasser" or was "incompetent…a numbskull…and idiot…an egomaniac…the single worst lawyer in America…." Am. Comp. ¶ 59. They would not have, because they know that Mr. Klayman is none of those things. <u>Exhibit 2</u>; *Affidavit of Larry Klayman.*

Mr. Klayman's affidavit is of particular importance in this regard. It sets forth his detailed history with Defendant Stone, who has now defamed him in concert with the Infowars Defendants. The affidavit shows exactly how Defendant Stone knew at all material times that the statements that he made on Infowars, in concert with the Infowars Defendants, were false or at minimum acted with reckless disregard for the truth.

> Defendant Stone was a "political consultant" who claimed to help get presidents and other politicians elected. The firm made money by then lobbying the very men they put in office.
> Defendant Stone backed Republican candidate Jack Kemp for President and he recommended that I be put on the executive finance committee, which also included Donald J. Trump.
> Because Defendant Stone knew of my successes and capabilities as a private lawyer, he told me that he had recommended me for U.S. Attorney when George

Bush was President in 1992.

In 1996, at a Republican Convention in San Diego, California, Defendant Stone was filmed at a "toga party" with his wife at a "swingers party.

The media at the time went after Defendant Stone because of his alleged participation in the "sex party" and created a scandal.

The media alleged at the time that Defendant Stone solicited sex half-naked, and that there was a picture of Defendant Stone in a compromising position to back up the story.

Defendant Stone contacted me and, because he knew my capabilities and acumen as a lawyer, retained me to represent him to get the media to cease what he claimed then was a smear campaign.

I successfully got the media to back off Defendant Stone through my skill as a lawyer and Defendant Stone was grateful. Exhibit 2 at ¶ 37 – 44.

Furthermore:

Because he was aware of my prior successes at Judicial Watch and before, Defendant Stone wanted to work with me as my U.S. Senate campaign manager. During this time, the spring, summer, and fall of 2003, and in preparation for my U.S. Senate run, Defendant Stone researched and kept books and records of many of my accomplishments. He had several binders (2-3 feet) full of information about me and the victories that I had obtained at Judicial Watch and elsewhere. Again, because Defendant Stone knew of my successes and legal political acumen, Defendant Stone wanted to be on my team and help me run for the U.S. Senate.

Defendant Stone thus knew of many cases I had won in courtrooms and other legal accomplishments and in fact had kept records of successes in a book of my accomplishments. Exhibit 2 at ¶ 49-50.

Accordingly, this shows that Defendant Stone, in concert with the Infowars Defendants, had actual knowledge that his statements regarding Mr. Klayman's abilities as a lawyer were flat out false, including but not limited to the "fact" that Mr. Klayman had "never won a courtroom victory in his life." Mr. Klayman's sworn affidavit expressly attests:

Each of the Defendants, Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars, is intimately familiar with my background, qualifications and successes as a public interest and private attorney. For this reason, I was previously invited to appear on Infowars on many occasions before Defendants decided - at the direction of Defendant Stone - to defame my client, Dr. Corsi and me. Exhibit 1 at ¶ 78.

Thus, Mr. Klayman has far exceeded any requisite showing of actual malice, should the Court

find that Mr. Klayman a public figure.

### 3.   Mr. Klayman's Specific Allegations as to Defamation

#### i.   The January 18, 2019 Video

The Infowars Defendants' sole argument pertains to paragraph 40 of the Complaint, which states that "At 1:30 in the January 18 Video, Stone maliciously falsely published, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'" In their defense, Defendants cite a paragraph from *Klayman v. Judicial Watch, Inc.,* 247 F.R.D. 10, 12-13 (D.D.C. 2007) which read:

> Judicial Watch alleges that in May 2003, Klayman informed Fitton and Orfanedes that his wife, a former Judicial Watch employee, had commenced divorce proceedings against him and that she alleged that Klayman had had an inappropriate relationship with a Judicial Watch employee with whom he had been in love and that Klayman had assaulted her physically. According to Judicial Watch, Klayman denied having a sexual relationship with the employee but acknowledged that he had been in love with the employee, that he had purchased gifts for the employee and had kissed her, and also acknowledged an incident with his wife that clearly provided the basis for his wife's allegation of physical assault. Judicial Watch alleges that Fitton and Orfanedes considered Klayman's acknowledged behavior entirely inconsistent with that of a leader of a conservative, pro-family organization, as well as Klayman's fiduciary duties to the organization, and that they were concerned about Klayman's possible misuse of Judicial Watch resources. Judicial Watch further alleges that, as a result of these revelations, Fitton requested that Klayman resign, and Fitton and Orfanedes also insisted that Judicial Watch undertake an internal investigation into Klayman's conduct, including an audit. According to Judicial Watch, Klayman offered to resign rather than face such an inquiry, and the parties began negotiating for his separation from Judicial Watch, which eventually culminated in the September 19, 2003 Severance Agreement.

This matter is on appeal, and not on point or relevant in any event. However, even so, absolutely nothing contained in this excerpt supports the factual finding that Mr.

13

Klayman was "ousted" from Judicial Watch due to a "sexual harassment complaint." Indeed, plain language of the excerpt clearly states that Mr. Klayman "offered to resign," which is frankly not true either, as Mr. Klayman left Judicial Watch to run for the U.S. Senate in 2003-2004. This is not being "ousted." Furthermore, the unfounded "sexual harassment complaint" allegation appears to be based solely on allegations from Mr. Klayman's ex-wife as grounds for divorce, which Mr. Klayman denied. "Klayman denied having a sexual relationship with the employee but acknowledged that he had been in love with the employee…." *Id.* Indeed, this is false as well, but in any event this is not sexual harassment. Defendant Stone had no basis to make these false, malicious, and defamatory claims.

As pled in the Complaint, Mr. Klayman "left Judicial Watch voluntarily on his own accord in order to run for U.S. Senate in Florida in 2003-2004." Comp. ¶ 41. This is a fact. Defendant Stone's false revisionist history is a malicious and false statement of fact.

Furthermore, as the final "nail in the coffin" to the Infowars Defendants' assertions, Thomas Fitton ("Fitton"), under oath, at a deposition in another matter testified that "[y]ou [Mr. Klayman] weren't ousted as a result of a sexual harassment complaint." Exhibit 3. This conclusively shows that Defendant Stone, in concert with the Infowars Defendants, published an objectively verifiable false statement.  Indeed, at the same deposition, Fitton admits to never haven spoke to Stone, which shows that Stone simply made this lie up. Exhibit 3. Stone admitted under oath in a deposition that he did not speak to Fitton about this either, so its clear that Stone made this up to defame Mr. Klayman. Exhibit 3.

Tellingly, the Infowars Defendants do not even attempt to defend the numerous other false and defamatory statements set forth in Comp. ¶¶ 43-47. They must be treated as conceded. For instance, Defendant Stone, in concert with the Infowars Defendants made the false statement that Mr. Klayman had "never actually won a courtroom victory in his life." Comp. ¶ 39. To the contrary:

> Klayman has been a practicing attorney for over four decades and has won numerous cases on behalf of his clients and also against the government for constitutional and other violations. He is the founder of both Judicial Watch and Freedom Watch, a former candidate for the U.S. Senate in Florida, a former trial attorney and prosecutor of the Antitrust Division of the U.S. Department of Justice, where he was a member of the trial team that successfully broke up the AT&T monopoly and created competition in the telecommunications industry. Among many other legal victories, Plaintiff Klayman also won landmark decisions at the chairman and general counsel of Freedom Watch enjoining the illegal mass surveillance by the National Security Agency. *Klayman v. Obama*, 1:13-cv-851 (D.D.C). Comp. ¶ 44.

Mr. Klayman's numerous courtroom victories are set forth in his affidavit. Exhibit 2. Mr. Klayman's affidavit sets forth that he was "on the trial team that successfully broke up the AT&T monopoly- creating competition in the telecommunications industry." Exhibit 2 ¶ 13. Furthermore:

> Because of my work during the time I ran Judicial Watch, a court ruled that President William Clinton committed a crime during the Filegate litigation. I also triggered the famous Chinagate scandal in a Freedom of Information Act, 5 U.S.C. § 552 et seq., which gave rise to Judicial Watch ultimately being awarded almost a million dollars. I filed cases which ended Bill and Hillary Clinton's attempted illegal purchase at below market rates for their mortgage of their home at Chappaqua, New York and ended the illegal payment of legal fees to the Clintons by State Farm, which was a form of bribery. I also participated in the famous *Gore v. Bush* litigation in Tallahassee, Florida that settled the 2000 presidential elections by the U.S Supreme Court. I also brought a case under the Foreign Agents Registration Act ("FARA") over the Cheney Energy Task Force that made its way to the U.S. Supreme Court. Exhibit 2 ¶ 20.

> On December 16, 2013, Judge Richard J. Leon granted my request for a preliminary injunction in my case against the National Security Agency ("NSA")

and the Obama administration, when Judge Leon found for the first time in history that the collection of metadata telephony records by the NSA was likely unconstitutional.

Because of that ruling, Congress enacted the USA Freedom Act, which sought to end illegal and unconstitutional mass surveillance by government intelligence agencies and the Federal Bureau of Investigation ("FBI").

I obtained a jury verdict in the U.S. District Court for the Southern District of Florida against my former public interest group Judicial Watch, which was then run by Fitton, for maliciously defaming me in the amount of $181,000, which included punitive damages.

My client Sheriff Joe Arpaio and I were the first to challenge former President Obama's unconstitutional executive amnesty for over 5 million illegal aliens and were ultimately successful, along with 25 other attorneys general, in front of the U.S. Supreme Court. Exhibit 2 ¶¶ 22-25.

With regard to the remaining false and defamatory statements, the Infowars Defendants offer nothing more than a half-hearted assertion of "opinion" and "hyperbole." However, as set forth above, a tortfeasor may not escape liability by simply couching their defamatory statements as opinion. Since Defendants make no showing of how these statements are supposedly "opinion" or "hyperbole"- nor could they - these unaddressed statements of fact should be treated as conceded to be defamatory, as they clearly are factually based. Indeed, as just one example, Stone stated that Mr. Klayman had an "I.Q. of 70." This is an objectively verifiable statement of fact.

### D.     Mr. Klayman Has Adequately Pled Unfair Competition Cause of Action

The Infowars Defendants falsely assert that Mr. Klayman's claim under the FDUTPA  for must fail because they did not make and false statements of fact. This is disproven easily above in the preceding section.

FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." *Waste Pro*

*USA v. Vision Constr. ENT, Inc.*, 282 So. 3d 911, 917 (Fla. Dist. Ct. App. 2019). A claim for damages under the FDUTPA must include: claim ": (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Id*. Importantly, the FDUTPA is not limited to consumers. "This change indicates that the legislature no longer intended FDUTPA to apply to only consumers, but to other entities able to prove the remaining elements of the claim as well." *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty., Inc.*, 169 So. 3d 164, 169 (Fla. Dist. Ct. App. 2015). Thus, as a direct competitor, Mr. Klayman is able to bring a FDUTPA claim against the Infowars Defendants.

The deceptive practice here is clear. The Infowars Defendants are knowingly making false statements about Mr. Klayman in order to lower his standing and reputation in the conservative media personality market, where Mr. Klayman competes with the Infowars Defendants:

> In addition to being an investigative journalist/author and a public interest litigator/advocate, respectively, Plaintiff Klayman is a competitor to Defendants as conservative media personalities, broadcasters, authors and columnists on social media and elsewhere. For instance, Plaintiff Klayman also hosts an online radio show and produces videos that are posted on the internet, issues press releases, commentary and other publications." Comp. ¶¶ 48-49.

Thus, by discrediting and defaming Mr. Klayman, the Infowars Defendants are trying to "materially prejudice the viewers and/or listeners as to the quality, nature, and contents of Plaintiff's services, which has caused significant competitive and commercial injury to Plaintiff, as well as loss of good will and reputation. Comp. ¶51. Thus, in essence, the motivation behind the Infowars Defendants' misconducts entirely financial, as they seek to destroy Mr. Klayman's reputation in order to eliminate him as a competitor.

This is set forth further in Mr. Klayman's second affidavit. <u>Exhibit 4</u>.  Mr. Klayman swears under oath that he "derive[s] financial benefit from appearing on radio and internet

programs as a conservative political analysist and media personality." <u>Exhibit 4</u> ¶ 10.

Furthermore, Mr. Klayman swears:

> I am a direct competitor of Defendant Roger Stone, as well as the Infowars Defendants, as I derive income from appearing on radio and internet programs and my writings as a conservative political analysts and media pundit nationwide and in this judicial district

> Defendant Stone and the Infowars Defendants are direct competitors with me, as they are also conservative political analysts and media pundits who broadcast and do business in this judicial district.

> Defendant Stone and the Infowars Defendants sell products, publish books, and appear on the radio and internet nationwide and in this judicial district.

> I also sell products, publish books, and appear on the radio and internet nationwide in this judicial district.

> Defendant Stone and the Infowars Defendants have harmed me as a competitor by publishing false statements about and which bear on my services in order to eliminate me as a competitor. All of the Defendants compete with me on the airwaves and in written publications.

> Defendant Stone and the Infowars Defendants are therefore liable under the FDUTPA. <u>Exhibit 4</u> at ¶¶ 11-16.

Accordingly, allof the elements of the FDUTPA are clearly met, and therefore the Infowars

Defendants' motion to dismiss in this regard must be denied.

**E.     The Honorable Roy K. Altman's Order in the U.S. District Court for the Southern District of Florida is Not Binding on this Court**

The Infowars Defendants cite a case previously filed by Mr. Klayman in the U.S. District

Court for the Southern District of Florida styled *Klayman v. Infowars,* 20-cv-80614 (S.D. Fl.)(the

"Florida Complaint") as evidence that this instant complaint is a "shotgun pleading."

The Florida Complaint was dismissed voluntarily by Mr. Klayman, and was therefore

never adjudicated substantively. Mr. Klayman believed that the Court had overstepped its bounds

when it issued an Order Requiring More Definite Statement before the Defendants were even

served. Due to this Mr. Klayman thought that the Court may have been biased and maybe knew Defendant Stone personally. Mr. Klayman raised this issue and the Court did not respond, which ultimately led to Mr. Klayman taking a voluntary dismissal.

## IV.   CONCLUSION

Based on the foregoing, Mr. Klayman respectfully requests that this Court deny the Infowars Defendants motion to dismiss, as it lacks merit. Notably, Defendant David Jones who has separate counsel than the other Infowars Defendants did not move for sanctions, as the other Infowars Defendants did frivolously, underscoring the gamesmanship of the other Infowars Defendants and their out of state lead counsel.

Dated: November 5, 2020                                    Respectfully Submitted,


                                                                       */s/ Larry Klayman*
                                                                       Larry Klayman, Esq.
                                                                       7050 W. Palmetto Park Rd
                                                                       Boca Raton, FL, 33433
                                                                       Telephone: (561)558-5336
                                                                       Email:leklayman@gmail.com

                                                                       *Pro Se*


### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of November 2020, a true copy of the foregoing was filed via ECF and served to all counsel of record though the Court's ECF system.


                                                                       */s/ Larry Klayman*

EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

DR. JEROME CORSI, ET AL

Plaintiffs

        v.

INFOWARS, LLC, et al

        Defendants.

**Case Number:   1:20-cv-298-LY**

**SWORN DECLARATION OF KELLY MORALES**

    1. I, Kelly Morales, hereby declare under penalty of perjury that the following is true and correct and based on my personal knowledge and belief.

    2. I am over the age of 18 and mentally and legally competent to make this affidavit, sworn under oath.

    3. I am the former wife of Defendant Alex Jones.  I was married to Alex Jones for 12 years and with him for 15 years and we have 3 children together. During our time together, I was involved in the activities of Alex, his father David and Infowars and am intimately knowledgeable about their activities and business structure.

    4. Based on my personal knowledge and experience, David Jones runs Infowars with Alex Jones and helps him with his activities, including fixing media stories and endorsing and/or aiding his slanderous and/or fraudulent behaviors, all for profit.

    5. Infowars, LLC is a sub-entity of Free Speech Systems, LLC ("FSS"), and David Jones is an employee of FSS, or he has been.

    6. David Jones is additionally a managing member of multiple entities that are closely held businesses, constituting financial holding companies or financial distribution centered around Infowars/Alex Jones' supplement line, which are quintessential to funding and running Infowars.

    7. Alex Jones could not function without David Jones, and has conspired with him on the past to commit this breach of fiduciary duty and fraud on my business/estate with Alex Jones. While David Jones did this, he slandered and/or defamed me to experts and assisted Alex Jones and his attorneys to do the same, so as to steal/hide my estate and his grandchildren's inheritance.

    8. Alex Jones is quasi-illiterate, and cannot use technology or apps such as email with any fluency, and he cannot function without assistance from those around him, including David Jones.

    I hereby swear under oath and penalty of perjury that the foregoing facts are true and correct to the best of my knowledge and belief.

    Executed on September 30, 2020

Kelly Morales

2

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| Alexander E. Jones, | § | CASE NO. 20-10118-hcm |
| | § | |
| Alleged Debtor. | § | Chapter 11 |
| | § | |

**Affidavit of David Jones in Support of Alleged Debtor's Motion to Dismiss**

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

BEFORE ME, the undersigned authority, on this day personally appeared David Jones, who after being sworn did state upon his oath, as follows:

1. "My name is David Jones. I am over 18 years of age and otherwise competent and capable of making this Affidavit. I have personal knowledge of the facts set forth herein and they are true and correct.

2. "I have been involved with Alex Jones' personal and business finances for many years and have personal knowledge of the matters set forth herein, and they are true and correct.

3. "I have personally reviewed the Real Estate Lien Note from Alexander Jones to Kelly R. Jones dated March 19, 2015 (the "*Note*"), which is attached to the Involuntary Bankruptcy Petition filed in the above referenced case and have reviewed the record of payments made by Alexander Jones to Kelly R. Jones under the Note. I have personally calculated the remaining balance of the Note. The balance of the Note is $596,267.16 as of the date hereof.

"Further Affiant sayeth not."

SIGNED on this 12th day of February, 2020.

_____
David Jones

Sworn to and subscribed before me, the undersigned authority, on this 13th day of February, 2020.

_____
Notary Public for the State of Texas
EXP    09-24-2022

PATRICK RILEY
Notary Public, State of Texas
Comm. Expires 09-24-2022
Notary ID 131734177

4837-5475-576

1

# EXHIBIT 2

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTIRCT OF FLORIDA

| | | |
|---|---|---|
| **LARRY KLAYMAN**, | § § § | CIVIL ACTION NO. 0-20-cv-61912 |
| Plaintiff, | § § | |
| vs. | § § | |
| **INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC, ALEX E. JONES, DAVID JONES, OWEN SHROYER**, and **ROGER STONE** | § § § § § | |
| Defendants. | § | |

### SWORN AFFIDAVIT OF LARRY KLAYMAN

I, Larry Klayman, being over eighteen years of age and duly competent to testify, hereby swear and affirm as follows:

### A BRIEF HISTORY OF MY BACKGROUND

1.      I have personal knowledge of the following facts and if called upon as a witness, could testify competently thereto.

2.      In 1973, I graduated from Duke University where I majored in political science and French literature. I excelled academically and graduated with honors.

3.      I then matriculated at Emory Law School where I excelled academically and graduated in 1977. While in law school, I worked as an intern at the U.S. International Trade Commission, the Georgia Attorney General and the U.S. Attorney for the Northern District of Georgia.

4.      I passed The Florida Bar the first time I took the exam.

5.      I passed all bar exams on my first attempt, including the District of Columbia Bar.

1

6.      I began my legal career in this circuit in Miami, Florida as an associate for Blackwell, Walker, Gray, Roberts, Flick & Hoehl ("Blackwell"), which was then the largest and most prestigious law firm in Florida. I was admitted into The Florida Bar having been sworn in on December 7, 1977. I have practiced law in this circuit continuously and extensively throughout my forty-two-year career and have active cases pending in this circuit and elsewhere in Florida, including during the period that I was a trial attorney for the U.S. Department of Justice's ("DOJ") Antitrust Division, from 1980 to 1982, where I was assigned litigation in this circuit.

7.      I conceived of and founded Judicial Watch, Inc. ("Judicial Watch") in 1994, a public interest group that's mission was to investigate and prosecute government corruption and abuse. I was the Chairman, General Counsel, and Corporate Treasurer of Judicial Watch until I voluntarily departed in 2003 to run as a candidate for the U.S. Senate in Florida in the Republican primary election.

8.      In 1998, during the time I ran Judicial Watch, I hired Thomas J. Fitton ("Fitton") as my contract assistant. I later appointed him president of the organization I founded.

9.      In September of 2003, I voluntarily departed from Judicial Watch to run for the U.S. Senate in Florida. At the time I left Judicial Watch, I learned that Fitton had never graduated from college, which he had told me he had when I initially hired him.

10.     Contrary to Defendant Roger Stone's ("Defendant Stone") false and defamatory publications, I have enjoyed many successes in my career as a lawyer, many of which have been brought to the attention of the public by complimentary newspapers, magazines, editorials and journals.

11.     For example, I practiced law at Blackwell with my supervising partners Paul Larkin and Layton Mank and participating in winning product liability cases as defense counsel for Blackwell including cases involving Raleigh bicycles, pharmaceutical drugs manufactured by

Burroughs-Wellcome, and allegedly misdiagnosed cancer victims, and other personal injury and medical malpractice cases. Additionally, I handled lawsuits in admiralty.

12.     I left Blackwell to join the DOJ as a trial lawyer, prosecutor and defense lawyer in late 1979. During my time at the DOJ, I had many victories in the courtroom as well as favorable settlements for the government, i.e., such as for the Consumer Affairs Section of the Antitrust Division over misbranded, adulterated food and drug products including fruit drinks and prophylactics for the Food & Drug Administration ("FDA") and successful seizures and criminal prosecutions of dangerous products on behalf of the Consumer Product Safety Commission ("CPSC") such as slant-sided refuse bins, flammable children's sleepwear, and intraocular lens implants for cataract patients.

13.     Importantly, I was also on the trial team that successfully broke up the AT&T monopoly – creating competition in the telecommunications industry. I left the DOJ in late 1981.

14.     Then, working as an international trade lawyer for Busby, Rehm & Leonard and after a few years having founded my own firm The Law Offices of Larry E. Klayman, later named Klayman & Associates, P.C., I won countervailing duty and antidumping duty cases concerning steel from South Africa, garden furniture from Italy, musical instrument pads from Italy, coffee filters from Brazil, key limes from Peru, fireworks from China and a host of other product imports. I represented both importers and exporters. (While at Busby, Rehm & Leonard, I also took some months on hiatus and worked in the Competition Directorate (DG-4) of the Commission of the European Communities Section ("E.C.").

15.     Later, with my law firm, I won Section 337 unfair trade practice cases at the U.S. International Trade Commission ("USITC") concerning tennis rackets from Belgium, power tools from Taiwan, luggage from Taiwan, mass spectrometers from France, jam from Belgium, and machine tools from Brazil. I won a landmark case concerning recloseable plastic bags, which

broke the patents of Minigrip and Dow Corning, Minigrip's licensee. That case victory opened up competition for zip lock bags, a multi-trillion dollar industry.

16.     There was also an USITC patent case, pursuant to Section 337, which I litigated and won involving motorcycle helmets and another antidumping and countervailing duty cases before the Commerce Department and USITC concerning fire protection products and scuba diving neoprene body suits.

17.     I also won a Section 302 case involving paper from Brazil.

18.     All of the Section 337 cases were judge-tried and I won every one of them.

19.     I won a jury trial against Makita over power tools, another jury trial against a domestic manufacture of removable swimming pools for my client Remove Pool Fence Co., and yet another jury trial for my client, Maccaferri, on a contract dispute. These are only some of the jury trials I won during my early career.

20.     Because of my work during the time I ran Judicial Watch, a court ruled that President William Clinton committed a crime during the Filegate litigation. I also triggered the famous Chinagate scandal in a Freedom of Information Act, 5 U.S.C. § 552 et seq., which gave rise to Judicial Watch ultimately being awarded almost a million dollars. I filed cases which ended Bill and Hillary Clinton's attempted illegal purchase at below market rates for their mortgage of their home at Chappaqua, New York and ended the illegal payment of legal fees to the Clintons by State Farm, which was a form of bribery. I also participated in the famous *Gore v. Bush* litigation in Tallahassee, Florida that settled the 2000 presidential elections by the U.S Supreme Court. I also brought a case under the Foreign Agents Registration Act ("FARA") over the Cheney Energy Task Force that made its way to the U.S. Supreme Court.

21.     I brought a case for Jose Basulto of Brothers to the Rescue in a Florida court, which resulted in a $1.8 million judgment against the Republic of Cuba for shooting down Brothers to

the Rescue planes, and I represented the Miami family of Elian Gonzales and other victims of Fidel Castro, such as journalists who were jailed by Castro for their political beliefs. In this regard, I not only filed criminal complaints for these victims against Fidel Castro in Belgium courts, but also lobbied and testified in both Italian and French in Italy and France, as I am fluent in both languages, before various European parliaments to increase economic sanctions on Cuba for abuse of human rights. I also lobbied the European Union in Brussels, Belgium for increased sanctions on Cuba.

22.     On December 16, 2013, Judge Richard J. Leon granted my request for a preliminary injunction in my case against the National Security Agency ("NSA") and the Obama administration, when Judge Leon found for the first time in history that the collection of metadata telephony records by the NSA was likely unconstitutional.

23.     Because of that ruling, Congress enacted the USA Freedom Act, which sought to end illegal and unconstitutional mass surveillance by government intelligence agencies and the Federal Bureau of Investigation ("FBI").

24.     I obtained a jury verdict in the U.S. District Court for the Southern District of Florida against my former public interest group Judicial Watch, which was then run by Fitton, for maliciously defaming me in the amount of $181,000, which included punitive damages.

25.     My client Sheriff Joe Arpaio and I were the first to challenge former President Obama's unconstitutional executive amnesty for over 5 million illegal aliens and were ultimately successful, along with 25 other attorneys general, in front of the U.S. Supreme Court.

26.     It was my efforts that prevented Dr. Jerome Corsi ("Dr. Corsi") from getting indicted, first because he told the truth and did not engage in witness tampering and threaten to kill a witness such as Randy Credico, as Defendant Stone did, and second because of my legal skill and acumen. Dr. Corsi is a material witness in the Russian Collusion investigation by Special

Counsel Robert Mueller ("Mueller") and is listed as a material witness as Person 1 in Defendant Stone's Mueller indictment.

27.     I have had many other successes in addition to the above-listed victories.

28.     I myself authored a book titled "Whores: Why and How I Came to Fight the Establishment" published in 2009. In it, I wrote about my unfortunate experience with Defendant Stone. *See* Exhibit A. I authored this book myself without a ghostwriter and I came runner-up at an International Book Fair. It also still has a review on www.Barnesandnoble.com of 4.5 stars out of the maximum 5 stars.

29.     Upon its publication, Jack Cashill, the author of "Ron Brown's Body" had this to say about me: "That *Time* magazine has yet to name Larry Klayman 'Man of the Year' is a failure of *Time*, not Klayman's. The work he and Judicial Watch did on the Brown case is stunning." *See* Exhibit B.

30.     Joseph Farah, the founder of WorldNetDaily.com, had this to say about me: "Larry Klayman is my hero because he has integrity – enough to prevent him from blind loyalty to party or ideology . . . That's because he is fearless and relentless in the pursuit of justice . . . There were other men like Larry early in American history. Their names were Washington, Jefferson, Madison and Henry. *See* Exhibit B.

31.     Louis Jacobson of the National Journal said this of me: " . . . through his challenge of secrecy rules, Larry Klayman has become a force in Washington. *See* Exhibit B.

32.     Bill Moyers, of "Now" PBS, said this: ". . . his idea of fun is trying to kick down a door some public official has marked secret . . . Larry Klayman is himself a conservative, but there's nothing partisan bout his indignation."

33.     Frank Rich, famed columnist for "The New York Times" said this: "Larry . . . I appreciate your own maverick – if we can still use that word! – thinking and stands."

34.     These are just a few of the accolades I have received over the years from conservatives and liberals alike, who appreciate and admire my work. *See* my biography attached as Exhibit C and incorporated herein by reference; *see also* Exhibit D, "Larry Klayman, the One Man Tea Party" which attributes the genesis of the Tea Party to me.

35.     I am now the founder, Chairman and General Counsel of Freedom Watch, Inc., which has the mission of investigating and prosecuting government corruption and abuse through legal advocacy. I also am in private practice with The Klayman Law Group, P.A. I am unique as a public interest advocate. I am a columnist for World Net Daily and have had about 500+ columns published over the last 10 years. I have also been a columnist for Newsmax through a blog titled "Klayman' Court" and in addition to my book "Whores: How and Why I Came to Fight the Establishment", I also published two other books: "Fatal Neglect" and "Essays of a Mad Man." I also have my own syndicated radio show with Radio America called "Special Prosecutor with Larry Klayman."

## MY EXPERIENCES WITH DEFENDANT ROGER STONE

36.     I met Defendant Stone at the Old Ebbitt Grill in Washington, D.C. in 1988 while he was a partner with Paul Manafort and others and was working as a lobbyist for the firm Black, Manafort, Stone, & Kelly.

37.     Defendant Stone was a "political consultant" who claimed to help get presidents and other politicians elected. The firm made money by then lobbying the very men they put in office.

38.     Defendant Stone backed Republican candidate Jack Kemp for President and he recommended that I be put on the executive finance committee, which also included Donald J. Trump.

39.     Because Defendant Stone knew of my successes and capabilities as a private lawyer, he told me that he had recommended me for U.S. Attorney when George Bush was President in 1992.

40.     In 1996, at a Republican Convention in San Diego, California, Defendant Stone was filmed at a "toga party" with his wife at a "swingers party."

41.     The media at the time went after Defendant Stone because of his alleged participation in the "sex party" and created a scandal.

42.     The media alleged at the time that Defendant Stone solicited sex half-naked, and that there was a picture of Defendant Stone in a compromising position to back up the story.

43.     Defendant Stone contacted me and, because he knew my capabilities and acumen as a lawyer, retained me to represent him to get the media to cease what he claimed then was a smear campaign.

44.     I successfully got the media to back off Defendant Stone through my skill as a lawyer and Defendant Stone was grateful.

45.     I maintained in sporadic contact with Defendant Stone until 2003 when I told him of my plans to voluntarily leave Judicial Watch and run for the U.S. Senate.

46.     There were confirmed rumors that Senator Bob Graham would retire from the U.S Senate well before he announced his retirement in November 2003. Defendant Stone traveled in Republican and political circles and knew that the Senator would be retiring in early to mid 2003.

47.     Thus, I was in contact with Defendant Stone in early to mid 2003, having been put in contact with him by Scott Reed, then Chief of Staff to Jack Kemp, who then was Secretary of Housing and Urban Development, and Defendant Stone was made aware by Scott Reed that I intended to run for the U.S. Senate to fill Bob Graham's seat.

48.     As I was a newcomer to politics, it would have been virtually impossible for me to beat Bob Graham, the incumbent, given the privileges and name recognition an incumbent receives, unless he or she is enmeshed in a major scandal. Senator Bob Graham was never enmeshed in such scandal.

49.     Because he was aware of my prior successes at Judicial Watch and before, Defendant Stone wanted to work with me as my U.S. Senate campaign manager. During this time, the spring, summer, and fall of 2003, and in preparation for my U.S. Senate run, Defendant Stone researched and kept books and records of many of my accomplishments. He had several binders (2-3 feet) full of information about me and the victories that I had obtained at Judicial Watch and elsewhere. Again, because Defendant Stone knew of my successes and legal political acumen, Defendant Stone wanted to be on my team and help me run for the U.S. Senate.

50.     Defendant Stone thus knew of many cases I had won in courtrooms and other legal accomplishments and in fact had kept records of successes in a book of my accomplishments.

51.     Soon after I hired him and during the height of my U.S. Senate campaign, I discovered that Defendant Stone had a conflict of interest and was working with Al Sharpton, while simultaneously working with me. He had agreed to represent me exclusively and I considered Al Sharpton to be an unsavory character. He also was not competently running my campaign with a staff of his friends which he had hired at great expense to me.

52.     I let Defendant Stone go roughly after about one month of his working with me on my U.S. Senate campaign. Shortly after his being let go, Defendant Stone and his sidekick Mike Caputo, whom he hired on my behalf as the campaign's press secretary, along with other staff Defendant Stone had hired, stole thousands of dollars of campaign cell phones and laptops, which I had purchased with my personal funds for the campaign.

53.     I have not spoken to Defendant Stone since I parted ways with him in 2003 given this experience.

54.     Defendant Stone is an individual and citizen of Florida. Special Counsel Robert Mueller ("Mueller") indicted Stone as part of the alleged "Russian Collusion" investigation with seven different felony counts, including lying under oath, witness tampering and obstruction of justice by threatening to kill a material witness and his service dog.

55.     The January 18, 2019 InfoWars video, published in this circuit, contained several false, misleading and defamatory statements concerning me. These false and defamatory statements include but are not limited to:

> **At 1:25, Defendant Stone says, "He's (Klayman) never actually won a courtroom victory in his life."**
>
> **At 1:30, Defendant Stone says, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton why he left. He was 'ousted' because of a 'sexual harassment complaint.'"**
>
> **At 1:37, Defendant Stone says, "He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. With him as Jerry Cori's lawyer, Corsi may get the electric chair. So your idea that he's a good guy is entirely wrong."**
>
> **At 2:01, Defendant Stone published that Plaintiff is "a piece of garbage."**
>
> **At 4:11, Defendant Stone says, "For those people out there who think . . . that Larry Klayman's IQ is higher than 70, you're wrong . . ."**

Am. Compl. at ¶¶ 55, 56, 59, 61, 62.

56.     Defendant Stone acted with actual when he published the false, misleading and defamatory statements concerning me because he knew they were false or acted with a reckless disregard to their truth, as set forth herein.

57.     Defendant Stone not only acted with actual malice when he published the false, misleading and defamatory statements concerning me, but he also had motives to maliciously

defame me. He published the false and misleading statements knowing that they were false or with a reckless disregard for their truth. Defendant Stone had reason to know that his statements were false.

58.     Defendant Stone is aware of *many, many* victories of mine as he was in charge of putting together the book of my accomplishments for fundraising purposes for my U.S. Senate campaign, among other reasons.

59.     Since the time I let Defendant Stone go as my campaign manager in late 2003, Defendant Stone has tried to trade off my clients like a "scavenger." I have warned my clients not to become involved with him as, in my opinion and through my experience, Defendant Stone is not an honorable, ethical or honest person. He has been widely and rightly called a self-styled "dirty trickster" In my opinion, this characterization is accurate based on my experience dealing with him. *See* "Get me Roger Stone" on Netflix, https://www.netflix.com/title/80114666. He tried to trade off my clients for his own profit and purposes.

60.     When the National Enquirer contacted me in 2018 to get a comment on a story it was writing about President Donald Trump and to get my legal opinion on the Mueller investigation, I told the reporter not to quote me in the same article as Defendant Stone, or any article in which he wrote, as Defendant Stone wrote for the National Enquirer at the time. The National Enquirer is located in South Florida and is apparently close with Defendant Stone, a South Florida citizen. I did not want to be quoted or associated at all with Defendant Stone because I consider him – like others do – to be a self-styled dirty trickster who was likely going to be indicted for alleged criminal behavior by Mueller and in fact was indicted by Mueller.

61.     In 2018, I also told Alex Jones and his show producers on InfoWars that I did not want to appear on any show which included Defendant Stone or had ties to Defendant Stone,

either as a guest or as a host, because I strongly felt at the time that Mueller may indict Defendant Stone. Defendant Stone was at the time a host on InfoWars.

62.     I also warned Alex Jones not to release any information – that was potentially under seal in the contempt case of *Melendrez v. Arpaio*, 07-cv-02513 (D. Ariz. 2007) – which he may have improperly obtained from Defendant Stone or others concerning Dennis Montgomery, another whistleblower client of mine who contracted with the U.S. government so it could use his software capabilities for intelligence gathering.

63.     During the criminal trial of my client Cliven Bundy, again to try to scavenge off my clients, Defendant Stone flew to Las Vegas, Nevada where the Bundys lived and boasted that he could get a pardon for Cliven Bundy and his sons. I told Carol Bundy, Cliven's wife and the sons' mother, to stay away from Defendant Stone and she did.

64.     I also warned my then client at the time, Dennis Montgomery, to stay away from Defendant Stone.

65.     Defendant Stone wanted to – and did – intimate and threaten my client Dr. Corsi since he is a material witness in the Mueller investigation as Defendant Stone obviously feared that he would testify against him to Mueller. Defendant Stone feared me as Dr. Corsi's lawyer as he knew that I know what type of person he is and must have thought falsely that my representation of Dr. Corsi was my revenge for him having harmed me during my U.S. Senate campaign.

66.     In sum, Defendant Stone tried to trade off my clients and I shut this down every time in order to protect my clients from Defendant Stone. He also knew that I wanted nothing to do with him and I predicted early on in the Russian collusion investigation that Mueller would most likely indict Defendant Stone because of – in my experience with him – his rank dishonesty and dirty tricks.

67.     This, in addition to other information that will be meted out in discovery, supplies the motive to maliciously defame me. That he attacks my acumen and ability as a lawyer and defamed me personally with false sexual harassment complaint claims is directly related to my having kept him away from my clients.

68.     This vindictive, malicious retaliation by Defendant Stone had a logical purpose. He tried to intimate and threaten Dr. Corsi and me in order for us not to collaborate with Mueller. We obviously did not collaborate with Mueller but Defendant Stone is both unstable and unhinged (*See* CDs containing videos of defamatory statements and publications) and apparently paranoid and he tried to prevent collaboration at all costs in order to save his own skin. His conduct toward us is similar to his conduct toward Material Witness 2 in the Mueller investigation, Randy Credico, who he allegedly threatened "Mafioso style" to kill. He even allegedly threatened to kill Credico's service dog, for which he was in part indicted.

## DAMAGES

69.     As an attorney, I rely on my virtue and integrity, as my reputation and good will determines the amount of clients that come to me to earn a living for their legal matters in the public interest and privately.

70.     Any damage done to my reputation harms my ability to practice law as a lawyer, particularly in this circuit, which is my community. This also harms my work as an author, columnist and syndicated radio talk show host, all of which depend on reputation and good will.

71.     Defendant Stone's statements in this instance have caused harm to my reputation, good will and well being in this circuit, the United States, and globally, as I am also an international lawyer as previously set forth in this affidavit.

72.     There was never any single instance of someone making a sexual harassment complaint against me during my almost ten years at Judicial Watch. Defendant Stone's statements to the contrary are false and defamatory and made with actual malice.

73.     Defendant Stone acted with actual malice when he published that I was "ousted" because of a sexual harassment complaint because he knew that was false. Am. Compl. at ¶ 56. Defendant Stone knew or had reason to know that this was false, as he was my campaign manager when I left Judicial Watch.

74.     As set forth in my opposition to Defendants' motions to dismiss, which attaches the testimony of Fitton of Judicial Watch, this also proves the falsity of this statement. Indeed, both Fitton and Defendant Stone have been forced to testify under oath that they never spoke about my being "ousted." Defendant Stone thus fabricated this falsity, according to Fitton's sworn testimony.

75.     The damage done to me and my clients Dr. Corsi, Cliven Bundy, and the Gold Star parents of Extortion 17 whose sons died in combat in Afghanistan, because of Defendant Stone is continuing. As just one example, a person approached me in an elevator and told me that I was "ousted" at Judicial Watch.

76.     Defendant Stone acted with actual malice when he published all of the defamatory statements. He knew the statements were false or had a reckless disregard for their truth. He had reason to know his false and misleading statements were false.

77.     I was damaged financially, as well as to my reputation and good will, and emotionally, by the defamatory and other tortious acts of Defendant Stone.

78.     Each of the Defendants, Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars, is intimately familiar with my background, qualifications and successes as a public interest and private attorney. For this reason, I was previously invited to appear on Infowars on

many occasions before Defendants decided – at the direction of Defendant Stone – to defame my client, Dr. Corsi and me.

Affiant Sayeth Not

SWORN TO UNDER OATH THIS 2ND DAY OF NOVEMBER OF 2020.

Larry Klayman

# EXHIBIT A



*Larry Klayman is a prickly troublemaker uncongenial to party and ideological establishment.*
Robert Novak, columnist

# WHORES

## WHY AND HOW I CAME
## TO FIGHT THE ESTABLISHMENT

## LARRY KLAYMAN
FOUNDER OF JUDICIAL WATCH AND FREEDOM WATCH

# EXHIBIT B



©1998, The Washington Post. Photography by Larry Morris. Reprinted with permission.

*...his idea of fun is trying to kick down a door some public official has marked secret...Larry Klayman is himself a conservative, but there's nothing partisan about his indignation.*
—BILL MOYERS, "NOW" PBS

*Larry...I appreciate your own maverick—if we can still use that word!—thinking and stands.*
—FRANK RICH, COLUMNIST FOR *THE NEW YORK TIMES*

*That* Time *magazine has yet to name Larry Klayman "Man of the Year" is a failure of* Time, *not Klayman's. The work he and Judicial Watch did on the Brown case is stunning.*
—JACK CASHILL, AUTHOR OF *RON BROWN'S BODY*

*Larry Klayman is my hero because he has integrity—enough to prevent him from blind loyalty to party or ideology...That's because he is fearless and relentless in the pursuit of justice...There were other men like Larry throughout American history. Their names were Washington, Jefferson, Madison and Henry.*
—JOSEPH FARAH, WORLDNETDAILY.COM

*...through his challenge of secrecy rules, Larry Klayman has become a force in Washington.*
—LOUIS JACOBSON, *NATIONAL JOURNAL*

*Nobody ever accused Larry Klayman of thinking small, but his latest suit may be outsized by even his standards. The former head of conservative watchdog Judicial Watch who now runs Freedom Watch has filed a $10 trillion class action against Iran at the U.S. District Court for the District of Columbia.*
—*THE NATIONAL LAW JOURNAL*

$26.95

ISBN: 978-0-9792012-2-6

5 2 6 9 5

9 780979 201226

# EXHIBIT C



**FREEDOM WATCH**    JOIN OUR FIGHT AT WWW.FWUSA.ORG

# ABOUT LARRY KLAYMAN



Larry Klayman, founder of Judicial Watch and Freedom Watch, is known for his strong public interest advocacy in furtherance of ethics in government and individual freedoms and liberties. During his tenure at Judicial Watch, he obtained a court ruling that Bill Clinton committed a crime, the first lawyer ever to have done so against an American president. Larry became so famous for fighting corruption in the government and the legal profession that the NBC hit drama series "West Wing" created a character after him: Harry Klaypool of Freedom Watch. His character was played by actor John Diehl.

In 2004, Larry ran for the U.S. Senate as a Republican in Florida's primary. After the race ended, he founded Freedom Watch.

Larry graduated from Duke University with honors in political science and French literature. Later, he received a law degree from Emory University. During the administration of President Ronald Reagan, Larry was a Justice Department prosecutor and was on the trial team that succeeded in breaking up the telephone monopoly of AT&T, thereby creating competition in the telecommunications industry.

Between Duke and Emory, Larry worked for U.S. Senator Richard Schweiker (R-Pa.) during the Watergate era. He has also studied abroad and was a stagiaire for the Commission of the European Union in its Competition Directorate in Brussels, Belgium. During law school, Larry also worked for the U.S. International Trade Commission in Washington, D.C.



Larry speaks four languages—English, French, Italian, and Spanish —and is an international lawyer, among his many areas of legal expertise and practice.

The author of two books, *Fatal Neglect* and *Whores: Why and How I Came to Fight the Establishment,* Larry has a third book in the works dealing with the breakdown of our political and legal systems. His current book, *Whores,* is on now sale at WND.com, Amazon.com, BarnesandNoble.com, Borders.com, and all major stores and booksellers.

Larry is a frequent commentator on television and radio, as well as a weekly columnist, on Friday, for WND.com. He also writes a regular blog for Newsmax called "Klayman's Court."

Larry has been credited as being the inspiration for the Tea Party movement. (See "Larry Klayman - The One Man TEA Party," by Dr. Richard Swier.)

# EXHIBIT D



**FREEDOM**WATCH          JOIN OUR FIGHT AT WWW.FWUSA.ORG

# LARRY KLAYMAN – THE ONE MAN TEA PARTY

By Dr. Richard Swier (Scribe)
RedCounty.com
July 31, 2010

Long before there was a TEA Party, Glenn Beck 912 movement, 13 Patriots and thousands of others, there was Larry Klayman. Larry believes it is more important to be virtuous than be liked.

**Larry believes there is an ultimate right and wrong.**

Some of you may not know Larry Klayman but you should. If you believe in the Constitution of the United States and that the Executive, Legislative and Judicial branches of our federal government are corrupt to the core then you need to read Larry's book, *WHORES: Why and How I Came to Fight the Establishment*.

If you see our courts legislating from the bench rather than enforcing the law as in Arizona then you will love Larry Klayman. If you love politics and want to understand what really happens behind the scenes get his book. I just finished reading WHORES and could not put it down. It is a mosaic of both the man and his struggles against an out of control government bent on aggrandizing itself at the expense of the people and the law. It is about corruption on the part of both parties writ large. I found it particularly interesting because of Larry's insights into Florida politics. You see Larry ran for the very same U.S. Senate seat Marco Rubio is seeking. Larry ran against, among others, Bill McCollum and Mel Martinez. If you want to learn more about Florida politics and political insiders, read this book.

Larry is the founder of Judicial Watch and Freedom Watch USA. Freedom Watch USA "is the only group that speaks through actions, rather than just words." When reading his book I found it a fascinating personal and professional journey that reflects the work of a real patriot. Larry has won my patriot award for being a thorn in the side of Iran, Hugo Chavez, Bill and Hillary Clinton, Dick Cheney, George W. Bush and Barack Obama. Not a bad record if I say so myself.

I really felt a symbiotic relationship with Larry as I read his story. When you speak truth to power you are always attacked. The progressive model is identify the target, marginalize it and then demonize it. That is the cross that Larry, TEA Party members and others who are like minded bear today.

**Larry was fighting the establishment since the early 1990s and he continues to do so even today with the filing of a lawsuit against Elena Kagan, President Obama's nominee for the U.S. Supreme Court.**

According to the WorldNetDaily.com column, *Papers prepped to disbar Elena Kagan*:

One of Washington, D.C.'s most feared and fearless corruption watchers has told WND he intends to file an ethics complaint to have Supreme Court nominee Elena Kagan disbarred from practicing before the court she aspires to join – and possibly subjected to criminal prosecution – for her role in an escalating controversy over partial-birth abortion.

As WND reported, dozens of pro-life organizations are already asking the Senate to investigate Kagan's 1997 amendment to an American College of Obstetricians and Gynecologists report, which was then used by the Supreme Court as justification for overturning Nebraska's partial-birth abortion ban in 2000.

In her confirmation hearings, Kagan defended the amendment, saying, "My only dealings with (the College) were about talking with them about how to ensure that their statement expressed their views."

Several analyses have concluded, however, that Kagan's amendment dramatically changed the meaning of the organization statement, and court records show the statement was passed off on the Supreme Court as official scientific opinion, even though the organization's panel of scientists never approved Kagan's wording.

Klayman told WND he believes Kagan's behind-the-scenes work constitutes "conspiracy to defraud the Supreme Court," and he intends to take the evidence that has been compiled by the pro-life groups to file a complaint before the clerk's office of the U.S. Supreme Court, seeking to have Kagan disbarred as a practicing lawyer infront of the Supreme Court.

So the battle goes on for Larry, you and me. I hope you will read Larry's book and make it a point to learn more about the great work he is doing to stop corruption in our courts, at the White House and in Congress. Larry has been a one man TEA Party, now it is time for us to join with him as we together fight in the same cause – a grass roots revolution to save the Republic.

http://www.redcounty.com/content/larry-klayman-one-man-tea-party

# EXHIBIT 3



# Transcript of Thomas J. Fitton

**Date:** June 6, 2019
**Case:** Klayman -v- Fitton

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

Transcript of Thomas J. Fitton

1 (1 to 4)

Conducted on June 6, 2019

---

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF FLORIDA
 3
 4  LARRY KLAYMAN,            *
 5          Plaintiff,        *
 6    vs.                     *  Civil Action
 7  THOMAS FITTON,            *  No. 1:19-cv-20544
 8          Defendant.        *
 9
10
11
12      Videotaped Deposition of THOMAS J. FITTON
13                  Washington, D.C.
14              Thursday, June 6, 2019
15                    3:06 p.m.
16
17
18
19  Job No.: 247643
20  Pages 1 - 92
21  Reported by: Vicki L. Forman
22
23
24
25
```

**Page 2**

```
 1        Videotaped Deposition of THOMAS J. FITTON,
 2  held at the offices of:
 3
 4      Planet Depos
 5      Suite 950
 6      1100 Connecticut Avenue, Northwest
 7      Washington, D.C.  20036
 8      (888) 433-3767
 9
10
11
12          Pursuant to agreement, before Vicki L.
13  Forman, Court Reporter and Notary Public in and
14  for the District of Columbia.
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1                A P P E A R A N C E S
 2
 3  ON BEHALF OF THE PLAINTIFF PRO SE:
 4      LARRY KLAYMAN, ESQUIRE
 5      Klayman Law Group, P.A.
 6      Suite 345
 7      2020 Pennsylvania Avenue, Northwest
 8      Washington, D.C.  20006
 9      (310) 595-8088
10
11
12
13  ON BEHALF OF THE DEFENDANT:
14      RICHARD W. DRISCOLL, ESQUIRE
15      Driscoll & Seltzer
16      Suite 610
17      300 North Washington Street
18      Alexandria, Virginia  22314
19      (703) 822-5001
20
21
22
23
24
25
```

**Page 4**

```
 1  ON BEHALF OF THE DEFENDANT:
 2      KATIE M. MERWIN, ESQUIRE
 3      Cole, Scott & Kissane, P.A.
 4      Suite 120
 5      222 Lakeview Avenue
 6      West Palm Beach, Florida  33401
 7      (561) 383-9206
 8      (Present via Telephone.)
 9
10
11
12  ALSO PRESENT:  Joannis Arsenis, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

41

1    MR. KLAYMAN:  Certify it.
2    Q  So as President of Judicial Watch you
3  would have known for sure that this Complaint had
4  been filed, correct?
5    MR. DRISCOLL:  Objection to form.
6    **A  Well, the press release indicates it was**
7  **filed and I recall we sued about the raid, yes.**
8    Q  And you gave interviews about suing in the
9  raid, correct, in the media?
10   **A  I don't remember.**
11   Q  Turn to the last page, page five.
12     The Complaint is signed by James F
13  Peterson, correct?
14   **A  His name is on the last page of the**
15  **Complaint as a signatory.**
16   Q  He is an attorney at Judicial Watch,
17  correct?
18   **A  Yes.**
19   Q  Now, Mr. Peterson had contact with Roger
20  Stone over the issue of the raid on his house, did
21  he not?
22   **A  Not that I'm aware of.**
23   MR. DRISCOLL:  Objection to form.
24   Q  You're saying you don't know one way or
25  the other?

42

1    **A  I don't believe he has.  I said I would**
2  **know if he had.**
3    Q  How would you know if you couldn't even
4  identify the Complaint?
5    **A  Another abusive harassing question.**
6    MR. DRISCOLL:  It's a foundation question.
7  You can go ahead and answer it.
8      How would you know if he had contacted
9  Roger Stone?
10   MR. KLAYMAN:  Or if Roger Stone contacted
11  him.
12   **A  Is it privileged?**
13   MR. DRISCOLL:  That's an interesting
14  question.  The fact of the communication would not
15  be.  The contents of it would be.
16   **A  How I would know is my question of whether**
17  **it's privileged or not.**
18   MR. DRISCOLL:  No, I'm going to allow you
19  to answer that one.
20   **A  How I would know about what my attorneys**
21  **are doing or Judicial Watch's attorneys are doing?**
22   MR. DRISCOLL:  Yeah, and you're not
23  disclosing a communication.  You're just
24  describing a process.
25   **A  Typically that type of communication would**

43

1  **have been disclosed to me.**
2    Q  But you don't know for sure that
3  Mr. Peterson didn't have contact with Roger Stone?
4    MR. DRISCOLL:  Objection to form.
5    **A  I'm confident there was no such contact.**
6    Q  You have told Mr. Peterson in the past,
7  have you not, that I was ousted from Judicial
8  Watch because of a sexual harassment complaint?
9    MR. DRISCOLL:  Objection to form.
10  Mr. Peterson is an in-house counsel and I'm going
11  to direct the witness not to answer.  That's an
12  attorney-client privilege.
13   MR. KLAYMAN:  Certify it.
14   Q  So you don't know whether or not
15  Mr. Peterson repeating what you had told him then
16  republished that to Roger Stone?
17   MR. DRISCOLL:  The communications between
18  an in-house counsel and the President of the
19  corporation relating to legal advice and
20  assistance are privileged.  He can't answer the
21  question about the contents of the communication
22  or derivative questions that would disclose the
23  content of the communication.
24   MR. KLAYMAN:  That's the crux of the
25  lawsuit.  That does not apply in this context.

44

1    MR. DRISCOLL:  That doesn't waive the
2  privilege.
3    Q  Are you saying that you never told anyone
4  at Judicial Watch that I was ousted because of a
5  sexual harassment complaint?
6    MR. DRISCOLL:  Anyone other than the
7  attorneys?
8    MR. KLAYMAN:  Anyone.
9    MR. DRISCOLL:  No, I can't allow him to
10  answer that question.
11   Q  Are you saying that you never told anyone
12  that I was -- regardless -- let's take attorneys
13  out of it.
14      Have you ever -- you have told other
15  people in addition to -- strike that.
16      You have told other people excluding
17  attorneys that I was ousted from Judicial Watch
18  because of a sexual harassment complaint?
19   **A  You have to ask the question again.**
20   MR. KLAYMAN:  Read it back, please.
21   **A  Please.**
22   MR. KLAYMAN:  Let me rephrase it.
23   Q  I'm taking attorneys out of this question.
24  I'm saying you have told others who aren't
25  attorneys over the course of the last 16 years

Transcript of Thomas J. Fitton
Conducted on June 6, 2019

12 (45 to 48)

45

1 since I left Judicial Watch that I was ousted
2 because of a sexual harassment complaint?
3      A No, because that's not true.  You weren't
4 ousted as a result of a sexual harassment
5 complaint.
6      Q After I sued you in this particular case
7 has anyone -- have you or anyone at Judicial Watch
8 or your counsel tried to contact Roger Stone?
9      MR. DRISCOLL:  Objection to form.  The
10 question invades the attorney-client privilege and
11 the attorney work product.  I direct the witness
12 not to answer.
13      MR. KLAYMAN:  Certify it.
14      Madam court reporter, have a page in the
15 front where you have all the certified questions
16 and where you can find them to make it easy for
17 the Magistrate Judge.  Thank you.
18      Q Now, I turn your attention back to your
19 affidavit which is --
20      A Exhibit 3.
21      Q Exhibit 3.  Turn your attention to
22 paragraph seven where it says "I have no
23 recollection of ever having any communication with
24 Roger Stone," do you see that?
25      A Uh-huh.

46

1      Q Now, it doesn't say you didn't have a
2 communication with Roger Stone.  It just says that
3 you have no recollection of having one, correct?
4      A That's correct.
5      Q Do you remember during the Clinton years
6 that witnesses would always come in and say we
7 have no specific recollection and we would contest
8 that?
9      MR. DRISCOLL:  Just ask your question,
10 Larry.
11      Q So you can't say categorically that you
12 haven't had communications with Roger Stone?
13 You're just saying you don't have a recollection
14 of ever having it, correct?
15      A I think the statement speaks for itself.
16      Q You could have said I have never
17 communicated with Roger Stone, correct, if that's
18 what you were trying to say, that you never had
19 any contact?
20      A The statement speaks for itself.
21      Q Then you state in the next sentence "I
22 have never published, uttered or implied to Roger
23 Stone that Klayman was the subject of a sexual
24 harassment complaint during his employment by
25 Judicial Watch or that his resignation from

47

1 Judicial Watch was motivated by an employee's
2 sexual harassment complaint," do you see that?
3      A Yeah.
4      Q Again, that statement does not say that
5 you never spoke with Roger Stone, just that you've
6 never published that particular issue, correct?
7      A It says what it says.
8      Q And then it states "Any statement by Roger
9 Stone regarding Klayman was made without my
10 knowledge or information and therefore I did not
11 intend and could not intend to harm Klayman or his
12 reputation," do you see that?
13      A Yes.
14      Q Now, you're not saying in that statement
15 that you didn't communicate with Roger Stone.
16 You're saying that you didn't know that he was
17 going to republish anything about me, correct?
18      MR. DRISCOLL:  Objection to form.  The
19 document speaks for itself.
20      A The document speaks for itself.
21      Q If you don't want to explain it that's
22 fine.
23      A You're mischaracterizing it.
24      Q I do agree.  It speaks for itself and
25 there's a lot of loopholes in it.

48

1      MR. DRISCOLL:  Why don't you just ask him
2 the question.  Did he ever --
3      MR. KLAYMAN:  I will ask the questions
4 that I want to ask, Mr. --
5      MR. DRISCOLL:  All right.
6      Q I want to turn to paragraph eight.
7      Do you see the statements in the last
8 sentence of paragraph eight where it says "To
9 support his claim Judicial Watch submitted
10 evidence demonstrating that Klayman was forced to
11 resign due to inappropriate conduct" and you list
12 three examples of your alleged inappropriate
13 conduct, do you see that?
14      A Yeah.
15      Q Now, you have in the last 16 years told
16 many people, and I'm excluding any attorneys,
17 exactly what is written in this affidavit and
18 which you swore to under oath?
19      MR. DRISCOLL:  I'm going to object to the
20 question and direct the witness not to answer that
21 question to the extent it's related to the other
22 lawsuit that is currently pending in the U.S.
23 District Court for the District of Columbia, Case
24 Number 06-cv-670.
25      MR. KLAYMAN:  That's not a basis to tell

```
 1            IN THE CIRCUIT COURT OF THE SEVENTEENTH CIRCUIT
        IN AND FOR BROWARD COUNTY AND THE FIFTEENTH JUDICIAL
 2          CIRCUIT FOR PALM BEACH COUNTY, FLORIDA, FLORIDA


 3


 4   LARRY KLAYMAN,
                                    CASE NO. 19-011394
 5            Plaintiff,


 6      -vs-


 7   ROGER STONE,


 8            Defendant.
     _____/
 9
     JEROME CORSI, et al
10
                  Plaintiff
11

12   vs.                      CASE NO. 50-2019-CA-013711

13
     ROGER STONE, et al
14
              Defendant
15   _____/

16
              VIDEOTAPED DEPOSITION OF ROGER STONE
17
                     VOLUME I OF II
18
              Wednesday, February 12, 2020
19               9:42 a.m. - 4:28 p.m.

20
          110 Southeast 6th Street, Suite 1700
21             Fort Lauderdale, Florida 33301

22
     Stenographically Reported By:
23   PATRICIA BAILEY-ENTIN, FPR
     Notary Public, State of Florida
24   BAILEY & ASSOCIATES REPORTING, INC.
     Fort Lauderdale Office
25   Phone - 954-358-9090
```

1          But let's start with my sworn affidavit on top,

2     and I'll ask that that be marked.  It -- it entails --

3          MR. KLAYMAN:  And you can just mark it right in

4       the book --

5          THE REPORTER:  Sure.

6          MR. KLAYMAN:  -- to make it easy.

7          That's Exhibit 2 to the Stone deposition and it

8       entails 59 pages.

9          (Plaintiffs' No. 2, Affidavit of Larry Klayman,

10    was marked for Identification.)

11   BY MR. KLAYMAN:

12        Q.   You are aware, Mr. Stone, that I'm the founder

13   of Judicial Watch?

14        A.   I am.

15        Q.   You've spoken to Tom Fitton, haven't you?

16        A.   One time in my entire life.  I saw him

17   backstage at a conference in -- at Dural, maybe a couple

18   months ago, and we -- we shook hands in passing.  Beyond

19   that, I've never spoken to the man.

20        Q.   You've spoken to others at Judicial Watch,

21   though, haven't you?

22        A.   No, actually, I haven't.  Not that I recall.

23        Q.   You -- you may have, but you just don't recall?

24        A.   I don't recall ever speaking to anyone at -- at

25   Judicial Watch.  I couldn't name anybody else at

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

LARRY KLAYMAN

                Plaintiff

      v.

INFOWARS, LLC, et al

                Defendants.

**Case Number:   0:20-cv-61912**

**SWORN AFFIDAVIT OF LARRY KLAYMAN**

    I, Larry Klayman, being over eighteen years of age and duly competent to testify, hereby swear and affirm as follows:

**A BRIEF HISTORY OF MY BACKGROUND**

    1.    I have personal knowledge of the following facts and if called upon as a witness, could testify competently thereto.

    2.    In 1973, I graduated from Duke University where I majored in political science and French literature. I excelled academically and graduated with honors.

    3.    I then matriculated at Emory Law School where I excelled academically and graduated in 1977. While in law school, I worked as an intern at the U.S. International Trade Commission, the Georgia Attorney General and the U.S. Attorney for the Northern District of Georgia.

    4.    I passed The Florida Bar the first time I took the exam.

    5.    I passed all bar exams on my first attempt, including the District of Columbia Bar.

    6.    I began my legal career in this circuit in Miami, Florida as an associate for Blackwell, Walker, Gray, Roberts, Flick & Hoehl ("Blackwell"), which was then the largest and most prestigious law firm in Florida. I was admitted into The Florida Bar having been sworn in on

December 7, 1977. I have practiced law in this circuit continuously and extensively throughout my forty-two-year career and have active cases pending in this circuit and elsewhere in Florida, including during the period that I was a trial attorney for the U.S. Department of Justice's ("DOJ") Antitrust Division, from 1980 to 1982, where I was assigned litigation in this circuit.

7.      I conceived of and founded Judicial Watch, Inc. ("Judicial Watch") in 1994, a public interest group that's mission was to investigate and prosecute government corruption and abuse. I was the Chairman, General Counsel, and Corporate Treasurer of Judicial Watch until I voluntarily departed in 2003 to run as a candidate for the U.S. Senate in Florida in the Republican primary election.

8.      In September of 2003, I voluntarily departed from Judicial Watch to run for the U.S. Senate in Florida.  Tom Fitton later took control of Judicial Watch and was there at the time I left Judicial Watch and knows that I was not ousted as a result of a sexual harassment complaint.

9.      I am now the founder, Chairman and General Counsel of Freedom Watch, Inc., which has the mission of investigating and prosecuting government corruption and abuse through legal advocacy. I also am in private practice with The Klayman Law Group, P.A. I am unique as a public interest advocate. I am a columnist for World Net Daily and have had about 500+ columns published over the last 10 years. I have also been a columnist for Newsmax through a blog titled "Klayman' Court" and in addition to my book "Whores: How and Why I Came to Fight the Establishment", I also published two other books: "Fatal Neglect" and "Essays of a Mad Man." I also have my own syndicated radio show and daily podcasts with Radio America called "Special Prosecutor with Larry Klayman."

10.     I derive financial benefit from appearing on radio and internet programs as a conservative political analyst and media personality.

11.     I am a direct competitor of Defendant Roger Stone, as well as the Infowars Defendants, as I derive income from appearing on radio and internet programs and my writings as a conservative political analysts and media pundit nationwide and in this judicial district.

12.     Defendant Stone and the Infowars Defendants are direct competitors with me, as they are also conservative political analysts and media pundits who broadcast and do business in this judicial district.

13.     Defendant Stone and the Infowars Defendants sell products, publish books, and appear on the radio and internet nationwide and in this judicial district.

14.     I also sell products, publish books, and appear on the radio and internet nationwide in this judicial district.

15.     Defendant Stone and the Infowars Defendants have harmed me as a competitor by publishing false statements about and which bear on my services in order to eliminate me as a competitor. All of the Defendants compete with me on the airwaves and in written publications.

16.     Defendant Stone and the Infowars Defendants are therefore liable under the FDUTPA.

Affiant Sayeth Not

SWORN TO UNDER PENALTY OF PERJURY THIS 2nd DAY OF NOVEMBER 2020

_____
Larry Klayman