**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

LARRY KLAYMAN

        Plaintiff

    v.

INFOWARS, LLC, et al

        Defendants.

**Case Number:   0:20-cv-61912**

## PLAINTIFF LARRY KLAYMAN'S MOTION FOR LEAVE TO AMEND COMPLAINT

Plaintiff Larry Klayman ("Mr. Klayman") pursuant to the Court's order of November 20, 2020, hereby moves for leave to filed the attached Amended Complaint. In the Court's November 20, 2020 order, it states: "Plaintiff may file a motion requesting leave to amend his complaint, with the proposed amended complaint attached, no later than December 4, 2020."

The attached proposed amendment effectively moots out the any issues raised by the Court in its November 20, 2020 order. As leave to amend shall be "freely given," Fed. R .Civ. P 15(a), Mr. Klayman respectfully requests that leave to amend be granted here and this matter be allowed to proceed substantively to discovery.

Dated: December 5, 2020

Respectfully Submitted,

*/s/ Larry Klayman*
Larry Klayman, Esq.
7050 W. Palmetto Park Rd
Boca Raton, FL, 33433
Telephone: (561)558-5336
Email:leklayman@gmail.com

*Pro Se*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of December, 2020, a true copy of the foregoing was filed via ECF and served to all counsel of record though the Court's ECF system.

*/s/ Larry Klayman*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

LARRY KLAYMAN,

                Plaintiff

      v.

INFOWARS, LLC, et. al

              Defendants.

**Case Number:   0:20-cv-61912**

**AMENDED COMPLAINT**

## INTRODUCTION

Plaintiff LARRY KLAYMAN ("Klayman") hereby files this action against INFOWARS, LLC ("Defendant Infowars"), FREE SPEECH SYSTEMS, LLC ("Defendant Free Speech Systems"), ALEX E. JONES ("Defendant Alex Jones"), DAVID JONES ("Defendant David Jones"), and OWEN SHROYER ("Defendant Shroyer") (collectively the "Infowars Defendants") for Defamation, violation of the Lanham Act, and violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), and tortious interference.

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 under diversity of citizenship. The parties are citizens of different states and the amount in controversy exceeds $75,000. The Court also has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

2.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) as this is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## THE PARTIES

1

3.     Plaintiff Klayman is a public interest legal advocate, private practitioner and litigator who represented Plaintiff Corsi with regard to Special Counsel Robert Mueller's ("Mueller") Russian collusion investigation.  Plaintiff Klayman is also a media personality and author, columnist and syndicated radio talk show host. Plaintiff Klayman is a citizen of Florida.

4.     Defendant Infowars is a limited liability company with principal offices located in Austin, TX and does substantial commercial and other business in this district.

5.     Defendant Free Speech Systems is a limited liability company with principal offices located in Austin, TX and does substantial commercial and other business in this district.

6.     Defendant Alex Jones is a well-known extreme and totally discredited "conspiracy theorist" and media personality who creates content and sells products that are broadcasted and advertised  on the radio and posted on the internet at www.infowars.com and elsewhere on the internet and other social media sites, in this district, nationally and internationally. He does substantial business in this district as do the other Infowars Defendants and Roger Stone, their joint tortfeasor as alleged herein.

7.     Defendant David Jones is Defendant Alex Jones's father and holds the official title of Director of Human Relations for Defendant Free Speech Systems. Defendant David Jones runs, operates, and manages Infowars and Free Speech Systems in conjunction with Alex Jones and he manages the business activities for Defendants Infowars and Free Speech Systems, as well as Defendant Alex Jones' other companies.  At all material times he worked in concert with the other Defendants and Roger Stone and furthered and ratified and furthered the illegal acts set forth in this Complaint. Exhibit 1, an attached affidavit of Kelly Morales, which is incorporated substantively into this Amended Complaint, attests under oath to David Smith's direct and substantial involvement in the acts and practices alleged to be illegal in this Amended Complaint.

8.      Defendant Shroyer is a newscaster for Defendant Infowars and he acted in concert with the other Infowars Defendants as alleged herein, and is a joint-tortfeasor along with the other Infowars Defendants.

9.      Roger Stone ("Stone") is an individual and a citizen of Florida and a resident of Fort Lauderdale, Florida. Stone was indicted by Special Counsel Robert Mueller as part of the alleged "Russian Collusion' investigation and subsequently convicted on seven felony counts of perjury, witness tampering and obstruction of justice. While his 40 month sentence to serve time federal prison was commuted by President Donald J. Trump, notably he was not pardoned and his felony convictions for perjury, witness tampering and obstruction of justice stand. He is a self- proclaimed "Dirty Trickster" who admires and frequently extols the "virtues" of Mafia figures and other unsavory persons, who he professes to pattern himself after. Stone at all material times directed the Infowars Defendants, having acted in concert with them, and he will be a material witness in this matter.

10.     All of the Defendants, each and every one of them, as well as Stone, do substantial commercial and other business in this district, not only broadcasting daily into this district for profit, but also selling products and services for profit continuously in this district, nationally and internationally.

**GENERAL ALLEGATIONS**

11.     Defendant Infowars and Defendant Free Speech Systems are both owned, controlled, and operated by Defendant Alex Jones and David Jones. Defendant Free Speech Systems owns www.infowars.com, where content created by Defendants Alex Jones and Shroyer and others such as Stone are posted and broadcast into this district, nationally and internationally.

12.     Defendant Infowars is a sub-entity of Defendant Free Speech Systems.

13.     Defendant Alex Jones hosts *The Alex Jones Show*, which is broadcast on radio and internet social media networks throughout the United States of America and internationally, including this judicial district, and online.

14.     Defendant David Jones "runs Infowars with Alex Jones and directs, assists and helps him with his activities, including fixing media stores and endorsing and/or aiding his slanderous and/or fraudulent behaviors, all for profit. This is set forth in the Sworn Declaration of Kelly Morales, Alex Jones' ex-wife. Exhibit 1. Ms. Morales' affidavit is hereby incorporated substantively by reference.

15.     Ms. Morales swears under oath:

I am the former wife of Defendant Alex Jones. I was married to Alex Jones for 12 years and with him for 15 years and we have 3 children together. During our time together, I was involved in the activities of Alex, his father David and Infowars and am intimately knowledgeable about their activities and business structure.

Based on my personal knowledge and experience, David Jones runs Infowars with Alex Jones and helps him with his activities, including fixing media stories and endorsing and/or aiding his slanderous and/or fraudulent behaviors, all for profit.

Infowars, LLC is a sub-entity of Free Speech Systems, LLC ("FSS"), and David Jones is an employee of FSS, or he has been.

David Jones is additionally a managing member of multiple entities that are closely held businesses, constituting financial holding companies or financial distribution centered around Infowars/Alex Jones' supplement line, which are quintessential to funding and running Infowars.

Alex Jones could not function without David Jones, and has conspired with him on the past to commit this breach of fiduciary duty and fraud on my business with Alex Jones. While David Jones did this, he slandered and/or defamed me to experts and assisted Alex Jones and his attorneys to do the same, so as to steal/hide my estate and his grandchildren's inheritance.

David Jones is additionally a managing member of multiple entities that are closely held businesses, constituting financial holding companies or financial distribution centered around Infowars/Alex Jones' supplement line, which are quintessential to funding and running Infowars.

16.     At all material times Defendant Shroyer hosted *The War Room* along with Roger Stone ("Stone") and Alex Jones, which is broadcast on radio and internet social media networks in this district and throughout the United States of America and nationally, and internationally, and online.

17.     Defendants' reach and influence are enormous. On information and belief, Defendant Alex Jones and Infowars has a radio and other internet audience of over two million people. Before it was banned from YouTube, Defendant Alex Jones' and Infowars' channel had more than 2.4 million subscribers, which in part accounts for the huge amount of substantial business and revenues which it does and derives in this district, nationally and internationally.[1]

18.     The Infowars Defendants, each and every one of them, in concert, do substantial business and promote and sell various goods and services in this judicial district and nationwide and internationally, including questionable if not bogus so called medicine and other drugs, supplements, and "tchotchkes" with Infowars branding. The money earned from these sales funds the conspiracy between each and every Defendants and Stone to defame, intimidate, coerce and threaten Plaintiff Klayman in order to have tried to improperly influence the Mueller Russian collusion investigation and to coerce false testimony from Plaintiff's client, Jerome Corsi, favorable to Stone in his criminal prosecution, as well as to compete unfairly with false advertising and other tortious illegal means as pled herein against Plaintiff Klayman, as well as to tortiously interfere with Mr. Klayman's endeavors as a lawyer, columnist, author, and media personality and syndicated radio talk show host.

19.     The Infowars Defendants, acting in concert and at the direction of Stone, as part

---

[1] Casey Newton, *YouTube deletes Alex Jones' channel for violating its community guidelines*, The Verge, Aug. 6, 2018, available at: https://www.theverge.com/2018/8/6/17656708/youtube-alex-jones-infowars-account-deleted-facebook-apple-spotify

of their latest scheme for notoriety, fame, and profit, have worked  and continue to work in concert with and at the direction of  Stone to defame, intimidate, tortiously interfere with and threaten Plaintiff.

20.    The indictment of Stone comprised seven different felony counts. *See* <u>Exhibit 2 – Mueller Indictment</u>.

21.    Specifically, the seven count Mueller Indictment against Stone, pursuant to which he was convicted on seven felony counts for perjury, obstruction of justice and witness tampering alleged lying under oath - that is, perjury - witness tampering and obstruction of justice by threatening to kill a material witness, Randy Credico ("Credico") and his service dog, if Credico did not lie to government authorities concerning his involvement with Roger Stone. Credico is Person 2 in the Mueller Indictment of Stone. *Id.* Person 1 in this Mueller Indictment is Dr. Corsi. Importantly, Stone did not present one material witness at his criminal trial, as he had no defense to the charges and instead was convicted on his own words and writings as well as those of his attorneys, who also put forth false information on his behalf to the government but were inexplicably not indicted along with him, perhaps because those in the legal profession generally protect each other.

22.    Even before Stone was indicted, he began a public relations campaign in this district, nationally and internationally to maliciously defame, smear, intimidate and threaten Dr. Corsi and Plaintiff Klayman, Dr. Corsi's lawyer and defense counsel.

23.    Stone knew that he was going to be indicted, and therefore began this public relations campaign to maliciously defame, smear, intimidate, tortiously interfere with and threaten Plaintiff Klayman, even before his actual indictment on January 25, 2019, in order to try to influence public opinion and Special Counsel Robert Mueller – by trying to attribute guilt to

Dr. Corsi and not him - as well as to try to raise money for his legal defense. These acts in conjunction with the Infowars Defendants were also designed and intended and implemented to compete unfairly against Plaintiff Klayman as well as pled herein to tortiously interfere with and harm Mr. Klayman's endeavors and trades and professions.

24.     By defaming Plaintiff, the Infowars Defendants, at the direction of Stone were hoping to not only intimidate Plaintiff to severely harm and damage his reputations, well-being and livelihood but also to try to coerce and threaten Dr. Corsi to testify falsely if subpoenaed if he had been called as a material witness in Stone's ensuing criminal trial. He was also trying divert funds away from Dr. Corsi's legal defense fund and drain, defame, falsely compete and tortiously interfere with Plaintiff Klayman while boosting his own legal defense fund.

25.     Defendants' conspiracy to defame, smear, intimidate, tamper and interfere with and threaten Plaintiff was calculated to improperly and illegally influence the Russian collusion investigation, for which Stone was later criminally indicted and to coerce false testimony favorable to Stone at his criminal prosecution.  This illegal conduct is also maliciously intended to harm Plaintiff Klayman's reputation and credibility as Stone feared that Dr. Corsi, Klayman's client,  would have testified truthfully once subpoenaed by Special Counsel Mueller at Stone's criminal prosecution, which Dr. Corsi was by all parties but did not ultimately testify. Stone and the Infowars Defendants are also competitors of Plaintiff Klayman on the internet, radio, television and the conservative media in particular. The acts were also designed, intended and implemented to compete unfairly with false advertising and other illegal means against Plaintiff Klayman, as pled herein.

26.     Tellingly, in a video published by The Daily Caller, which is incorporated herein by reference, Defendant Shroyer appearing with Stone, admits that he will serve as a surrogate,

that is an agent by and for Stone, if Stone receives a gag order, which he has. [2]   The other Defendants, like Shroyer, are also surrogates and agents of Stone.

27.     Stone's illegal and improper attempts to influence the Russian collusion investigation were even recognized by the presiding judge, the Honorable Amy Berman Jackson ("Judge Jackson") in Stone's criminal prosecution. Judge Jackson thus issued a complete "gag" order on Stone after Stone attempted to incite violence against Judge Jackson by putting a picture of her face and gun crosshairs up on his Instagram account.[3]

28.     In her minute order of February 21, 2019 imposing the total "gag" order on Stone, Judge Jackson directly cites and references his use of surrogates such as the Infowars Defendants:

> Furthermore, the defendant may not comment publicly about the case indirectly by having statements made publicly on his behalf by surrogates, family members, spokespersons, representatives, or volunteers.

29.     Defendants, each and every one of them, jointly and severally, have, by working at the direction of and in concert with their colleague  Stone, therefore engaged in illegal witness tampering, intimidation and threats in violation of 18 U.S.C. § 1512 by virtue of the defamatory and threatening acts and practices as alleged herein. Not coincidentally, this was what largely Stone was indicted for and later convicted for by Special Counsel Robert Mueller before a petit jury. Stone has worked for and continues to work for the Infowars Defendants in their various media and commercial endeavors as pled herein and otherwise.

<u>DEFENDANTS' DEFAMATORY CONDUCT</u>

---

[2] https://www.youtube.com/watch?v=SSDkh5RYtGo
[3] *Judge in Roger Stone case orders hearing after he appeared to threaten her on Instagram*, Washington Post, Feb. 19, 2019, available at:
https://www.washingtonpost.com/politics/2019/02/18/roger-stone-deletes-photo-judge-presiding-over-his-case-says-he-didnt-mean-threaten-her/?utm_term=.2d3c5afa6326

30.     Stone has appeared numerous times on programs of his colleagues at the Infowars Defendants, *The Alex Jones Show* and The *War Room*, which are hosted by Defendant Alex Jones and Shroyer where numerous false, misleading, malicious and defamatory statements of and concerning Plaintiff were made, published, and or ratified by all of the Infowars Defendants, each and every one of them, at the direction of Stone and on their own.

31.     Plaintiff has demanded retraction and correction of the defamatory videos and publications set forth below and generally in this Complaint, but the Infowars Defendants and Stone have refused, thereby ratifying any and all defamatory statements contained therein. The latest examples are attached as Exhibit 3.

32.     As also set forth in attached Exhibit 4, Defendants, at a minimum, acted with actual malice as they knew or had reason to know that the published statements were untrue, or at a minimum acted with reckless disregard for the truth, as they have known Plaintiff Klayman for a long time and he has appeared on Infowars numerous times, during which time Klayman was effusively praised by Defendant Alex Jones and Owen Shroyer, so they were well aware that the statements made by Stone, and their own false, misleading, malicious and defamatory statements were, indeed, false, as well as their participation in and ratification of the malicious false statements published by Stone on their networks and media sites in this district, nationally and internationally.

33.     As the content containing the malicious false, misleading, and defamatory statements were published on the internet in this district  and elsewhere, they proliferated like a "cancerous virus," and are now available for viewing from countless sources, thereby exponentially increasing the prejudicial and defamatory impact and severe damage inflicted on Plaintiff. Judge Jackson, in issuing her two gag orders against Stone, herself recognized how

postings on the internet proliferate widely and once made cannot be taken back. To this day these published false and defamatory statements are therefore found proliferated on the internet in this district, nationally and internationally.

34.     Mr. Klayman has worked closely with the Infowars Defendants and Stone in the past and therefore they are all aware of his legal victories and his capabilities as an attorney and his standing and expertise as a columnist, author and syndicated media personality and syndicated radio talk show host.   Exhibit 4; *Affidavit of Larry Klayman* attached hereto and incorporated by reference.

### I.     *The January 18, 2019 Video*

35.     Before Stone was indicted, on or about January 18, 2019, he appeared on *The War Room* with Defendant Shroyer, where he made several malicious false, misleading, and defamatory statements in this district,  nationally and internationally  regarding Plaintiff (the "January 18 Video").[4] The same video was also published on Stone's YouTube channel, "*Stone Cold Truth*," on January 18, 2019.[5]

36.     These malicious false, misleading, and defamatory statements were facilitated, furthered and adopted and published by each and every one of the Infowars Defendants, rendering them joint tortfeasors and they are thus jointly and severally liable to Mr. Klayman.

37.     At 1:25 in the January 18 Video, Stone and the Infowars Defendants, each and every one of them jointly and severally as joint tortfeasors maliciously falsely published that "He's (Klayman) never actually won a courtroom victory in his life."

38.     At 1:30 in the January 18 Video, Stone and the Infowars Defendants, each and every one of them jointly and severally as joint tortfeasors, maliciously falsely published, "He

---

[4] https://www.infowars.com/watch/?video=5c3fbf24fe49383dcf6996e4
[5] https://www.youtube.com/watch?v=cJyfgdvtFx8

(Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'"

39.     In actuality and truth, Plaintiff Klayman left Judicial Watch on his own accord in order to run for U.S. Senate in Florida in 2003-2004.

40.     Not coincidentally, Plaintiff Klayman obtained  a jury verdict and judgment against Fitton's Judicial Watch for having defamed him with actual malice. Punitive damages were also awarded by the jury in the U.S. District Court for the Southern District of Florida. *Klayman v. Judicial Watch*, 13-cv-20610 (S.D.Fl.); Exhibit 4.

41.     At 1:37 in the January 18 Video, Stone and the Defendants, each and every one of them jointly and severally as joint tortfeasors maliciously falsely published, "He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. With him as Jerry Corsi's lawyer, Corsi may get the electric chair. So your idea that he's a good guy is entirely wrong"

42.     As set forth in Exhibit 4, in actuality, Plaintiff Klayman has been a practicing attorney for over four decades and has won numerous cases on behalf of his clients and also against the government for constitutional and other violations.  He is the founder of both Judicial Watch and Freedom Watch, a former candidate for the U.S. Senate in Florida, a former trial attorney and prosecutor of the Antitrust Division of the U.S. Department of Justice, where he was a member of the trial team that successfully broke up the AT&T monopoly and created competition in the telecommunications industry. Among many other legal victories, Plaintiff Klayman also won landmark decisions at the chairman and general counsel of Freedom Watch enjoining the illegal mass surveillance by the National Security Agency. *Klayman v. Obama*, 1:13-cv-851 (D.D.C). *See* Exhibit 4  which is incorporated herein by reference. Stone and the

Defendants, each and every one of them jointly and severally as joint tortfeasors knew this when they published the malicious false and misleading statements about Klayman and thus willfully and maliciously defamed Plaintiff Klayman.

43.     At 2:01 in the January 18 Video, Stone and each and every one of the Infowars Defendants, jointly and severally as joint tortfeasors, maliciously falsely and misleadingly published that Plaintiff Klayman is a "piece of garbage."

44.     At 4:11 in the January 18 Video, Stone and each and every one of the Infowars Defendants, jointly and severally as joint tortfeasors, maliciously falsely and misleadingly published, "For those people out there who think…that Larry Klayman's IQ is higher than 70, you're wrong…"

45.     The Infowars Defendants and Stone published these malicious false, misleading, and defamatory statements with actual malice and with full knowledge that they were false and misleading, and/or at a minimum, with a reckless disregard for their truthfulness. These statements create the false and misleading implication that Plaintiff Klayman is unqualified to be an attorney, public advocate, author, columnist, radio talk show host  and is a bad and loathsome person.

## FACTS PERTAINING TO DEFENDANTS' UNFAIR COMPETITION

46.     In addition to being an investigative journalist/author and a public interest litigator/advocate, respectively, Plaintiff Klayman is a competitor to the Infowars Defendants and Stone as conservative media personalities, broadcasters, authors and columnists on social media and elsewhere. *See* Exhibit 4; Larry Klayman Affidavit.

47.     Mr. Klayman is the founder, Chairman and General Counsel of Freedom Watch, Inc., which has the mission of investigating and prosecuting government corruption and abuse

through legal advocacy. He also is in private practice with The Klayman Law Group, P.A. He is unique as a public interest advocate. He is a columnist for World Net Daily and has had about 600+ columns published over the last 10 years. He has also been a columnist for Newsmax through a blog titled "Klayman' Court" and in addition to his book "Whores: How and Why I Came to Fight the Establishment", he also published three other books. He also has his own syndicated radio show and daily podcasts with Radio America called "Special Prosecutor with Larry Klayman." *See* <u>Exhibit 4</u>; Larry Klayman Affidavit.

48.    Mr. Klayman derives financial benefit from appearing on radio and internet programs as a conservative political analysist and media personality, as well as from his other endeavors as pled herein. *See* <u>Exhibit 4</u>; Larry Klayman Affidavit.

49.    The Infowars Defendants and Stone also derive financial benefit from appearing on radio and internet programs as conservative political analysts and media personalities. *See* <u>Exhibit 4</u>; Larry Klayman Affidavit.

50.    Mr. Klayman is therefore a direct competitor of the Infowars Defendants and Stone, as they all derive income from appearing on radio and internet programs and through writings as political analysts, and as media pundits. *See* <u>Exhibit 4</u>; Larry Klayman Affidavit.

51.    By way of example, Stone, in a recent interview with Real Clear Politics, admitted that he intends to host a weekly syndicated radio show and a daily podcast in 2021. *See* <u>Exhibit 4</u>; Larry Klayman Affidavit.

52.    Mr. Klayman also hosts a weekly syndicated radio show and does daily podcasts. *See* <u>Exhibit 4</u>; Larry Klayman Affidavit.

53.    Mr. Klayman's client, Dr. Jerome Corsi, has also prepared an affidavit in this regard, which is incorporated hereto by reference. *See* <u>Exhibit 5</u>.

54.     The Infowars Defendants, each and every one of them jointly and severally as joint tortfeasors, have made, adopted, and or ratified numerous false or misleading statements of fact of and concerning Plaintiff during their various programs and media postings and publication, which all contain significant advertisement or promotions.

55.     These false and/or misleading facts materially prejudice and misrepresent to the viewers and/or listeners as to the quality, nature, and contents of Plaintiff's goods and services, which has caused significant competitive and commercial injury to Plaintiff, as well as loss of good will and reputation.

56.     Plaintiff, like the Infowars Defendants, rely on and derive viewer and listener financial support and sales in order to continue their work. Defendants' false and/or misleading statements concerning Plaintiffs are meant to, and have, diverted financial support and sales away from Plaintiff and to Infowars Defendants  and Stone instead.

57.     The Infowars Defendant have harmed Mr. Klayman as a competitor by publishing false statements about him which bear on his goods and services in order to eliminate him as a competitor. All Infowars Defendants and Stone compete with Mr. Klayman on the airwaves and in written publications.

58.     On information and belief, the Infowars Defendants and Stone are also tortuously interfering with Mr. Klayman by causing to be filed and then financing frivolous bar complaints against him in order to harm his legal practice and standing as a columnist, author, and radio talk show host.

59.     The Infowars Defendants and Stone have financed frivolous bar complaints from Pete Santilli and Dennis Montgomery, which force Mr. Klayman to expend a huge amount of valuable time and resources to defend, even though they are frivolous.

60.     As just one instance of the Infowars Defendants, Stone, and Pete Santilli working together in concert, among many, the episode of the Pete Santilli Show found at https://www.youtube.com/watch?v=xbpeHciUqP8&feature=youtu.be prominently features all of these people and Alex Jones actually directly tells Pete Santilli that Stone recommended him.

61.      In a deposition taken in February of 2020, Roger Stone smugly threatened to have Mr. Klayman disbarred as well:

> MR. KLAYMAN: I look forward to having you there.
> THE WITNESS: Yeah, me too.
> MR. KLAYMAN: If you're not in prison at that time.
> THE WITNESS: If you're not disbarred by then. Exhibit 4(F)

62.     Thus, the Infowars Defendants and Stone have tortuously interfered with Mr. Klayman by causing to be filed and then financing frivolous bar complaints against Plaintiff in order to harm his legal practice and standing as a columnist, author, and radio talk show host and to cause him to expend a huge amount of time and resources to defend himself. On information and belief the bar complaints which the Infowars Defendants and Stone caused to be filed and financed, were also in retaliation for Mr. Klayman asserting his legal rights against them. The bar complaints were filed by Pete Santilli and Dennis Montgomery before the District of Columbia Bar Disciplinary Counsel. Mr. Santilii is a convicted felon and Mr. Montgomery as widely recognized fraudster who is currently under indictment in Nevada, having been even called a fraud by his prior lawyer Michael Flynn and a host of others. *See* Exhibit 6 – Wikipedia.

## FIRST CAUSE OF ACTION
### *Defamation*

63.     Stone has appeared numerous times on programs of his colleagues at the Infowars Defendants, *The Alex Jones Show* and The *War Room*, which are hosted by Defendant Alex Jones and Shroyer where numerous false, misleading, malicious and defamatory statements of

and concerning Plaintiff were made, published, and or ratified by all of the Defendants, each and every one of them, at the direction of Stone and on their own.

64.     Plaintiff has demanded retraction and correction of the defamatory videos and publications set forth below and generally in this Complaint, but the Infowars Defendants and Stone have refused, thereby ratifying any and all defamatory statements contained therein. The latest examples are attached as Exhibit 3.

65.     As also set forth in attached Exhibit 4, the Infowars Defendants and Stone, at a minimum, acted with actual malice as they knew or had reason to know that the published statements were untrue, or at a minimum acted with reckless disregard for the truth, as they have known Plaintiff Klayman for a long time and he has appeared on Infowars numerous times, during which time Klayman was effusively praised by Defendant Alex Jones and Owen Shroyer, so they were well aware that the statements made by Stone, and their own false, misleading, malicious and defamatory statements were, indeed, false, as well as their participation in and ratification of the malicious false statements published by Stone on their networks and media sites in this district, nationally and internationally.

66.     As the content containing the malicious false, misleading, and defamatory statements were published on the internet in this district  and elsewhere, they proliferated like a "cancerous virus," and is now available for viewing from countless sources, thereby exponentially increasing the prejudicial and defamatory impact and severe damage inflicted on Plaintiff. Judge Jackson, in issuing her two gag orders against Stone, herself recognized how postings on the internet proliferate widely and once made cannot be taken back. To this day these published false and defamatory statements are therefore found proliferated on the internet in this district, nationally and internationally.

67.     Mr. Klayman has worked closely with the Infowars Defendants and Stone in the past and therefore they are all aware of his legal victories and his capabilities as an attorney and his standing and expertise as a columnist, author and syndicated media personality and syndicated radio talk show host.   Exhibit 4; *Affidavit of Larry Klayman* attached hereto and incorporated by reference.

68.     Before Stone was indicted, on or about January 18, 2019, he appeared on *The War Room* with Defendant Shroyer, where he made several malicious false, misleading, and defamatory statements in this district,  nationally and internationally  regarding Plaintiff (the "January 18 Video").[6] The same video was also published on Stone's YouTube channel, "*Stone Cold Truth*," on January 18, 2019.[7]

69.     These malicious false, misleading, and defamatory statements were facilitated, furthered and adopted and published by each and every one of the Infowars Defendants, rendering them joint tortfeasors and they are thus jointly and severally liable to Mr. Klayman.

70.     At 1:25 in the January 18 Video, Stone and the Infowars Defendants and Stone, each and every one of them jointly and severally as joint tortfeasors maliciously falsely published that "He's (Klayman) never actually won a courtroom victory in his life."

71.     At 1:30 in the January 18 Video, Stone and the Infowars Defendants, each and every one of them jointly and severally as joint tortfeasors, maliciously falsely published, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'"

72.     In actuality and truth, Plaintiff Klayman left Judicial Watch on his own accord in order to run for U.S. Senate in Florida in 2003-2004.

---

[6] https://www.infowars.com/watch/?video=5c3fbf24fe49383dcf6996e4
[7] https://www.youtube.com/watch?v=cJyfgdvtFx8

73.     Not coincidentally, Plaintiff Klayman has a jury verdict and judgment against Fitton's Judicial Watch for having defamed him with actual malice. Punitive damages were also awarded by the jury in the U.S. District Court for the Southern District of Florida. *Klayman v. Judicial Watch*, 13-cv-20610 (S.D.Fl.); Exhibit 4.

74.     At 1:37 in the January 18 Video, Stone and the Infowars Defendants and Stone, each and every one of them jointly and severally as joint tortfeasors maliciously falsely published, "He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. With him as Jerry Corsi's lawyer, Corsi may get the electric chair. So your idea that he's a good guy is entirely wrong"

75.     As set forth in Exhibit 4, in actuality, Plaintiff Klayman has been a practicing attorney for over four decades and has won numerous cases on behalf of his clients and also against the government for constitutional and other violations.  He is the founder of both Judicial Watch and Freedom Watch, a former candidate for the U.S. Senate in Florida, a former trial attorney and prosecutor of the Antitrust Division of the U.S. Department of Justice, where he was a member of the trial team that successfully broke up the AT&T monopoly and created competition in the telecommunications industry. Among many other legal victories, Plaintiff Klayman also won landmark decisions at the chairman and general counsel of Freedom Watch enjoining the illegal mass surveillance by the National Security Agency. *Klayman v. Obama*, 1:13-cv-851 (D.D.C). *See* Exhibit 4  which is incorporated herein by reference. Stone and the Defendants, each and every one of them jointly and severally as joint tortfeasors knew this when they published the malicious false and misleading statements about Klayman and thus willfully and maliciously defamed Plaintiff Klayman.

76.     At 2:01 in the January 18 Video, Stone and each and every one of the Infowars

Defendants, jointly and severally as joint tortfeasors, maliciously falsely and misleadingly published that Plaintiff Klayman is a "piece of garbage."

77.     At 4:11 in the January 18 Video, Stone and each and every one of the Infowars Defendants, jointly and severally as joint tortfeasors, maliciously falsely and misleadingly published, "For those people out there who think…that Larry Klayman's IQ is higher than 70, you're wrong…"

78.     Defendants published these malicious false, misleading, and defamatory statements with actual malice and with full knowledge that they were false and misleading, and/or at a minimum, with a reckless disregard for their truthfulness. These statements create the false and misleading implication that Plaintiff Klayman is unqualified to be an attorney, public advocate, author, columnist, radio talk show host  and is a bad and loathsome person

79.     Acting in concert as joint tortfeasors with Stone, as pled above, the Infowars Defendants published malicious, false, misleading and defamatory statements of and concerning Plaintiff in this judicial district, nationwide, and worldwide.

80.     These false and misleading statements were published with actual malice, as the Infowars Defendants knew that they were false and misleading, or at a minimum acted with a reckless disregard for the truth.

81.     Plaintiff has been severely harmed and damaged by these false and misleading statements because they subjected him to hatred, distrust, ridicule, contempt, and disgrace.

82.     Plaintiff has been damaged by these false and misleading statements because they severely injured Plaintiff Klayman in his profession and business endeavors as pled herein, as well as severely injured and damaged him personally, financially and in terms of his good will and reputation.

## SECOND CAUSE OF ACTION
### *Defamation Per Se*

83.     Stone has appeared numerous times on programs of his colleagues at the Infowars

Defendants, *The Alex Jones Show* and The *War Room*, which are hosted by Defendant Alex

Jones and Shroyer where numerous false, misleading, malicious and defamatory statements of

and concerning Plaintiff were made, published, and or ratified by all of the Infowars Defendants,

each and every one of them, at the direction of Stone and on their own.

84.     Plaintiff has demanded retraction and correction of the defamatory videos and

publications set forth below and generally in this Complaint, but the Infowars Defendants have

refused, thereby ratifying any and all defamatory statements contained therein. The latest

examples are attached as Exhibit 3.

85.     As also set forth in attached Exhibit 4, the Infowars Defendants and Stone, at a

minimum, acted with actual malice as they knew or had reason to know that the published

statements were untrue, or at a minimum acted with reckless disregard for the truth, as they have

known Plaintiff Klayman for a long time and he has appeared on Infowars numerous times,

during which time Klayman was effusively praised by Defendant Alex Jones and Owen Shroyer,

so they were well aware that the statements made by Stone, and their own false, misleading,

malicious and defamatory statements were, indeed, false, as well as their participation in and

ratification of the malicious false statements published by Stone on their networks and media

sites in this district, nationally and internationally.

86.     As the content containing the malicious false, misleading, and defamatory

statements were published on the internet in this district  and elsewhere, they proliferated like a

"cancerous virus," and is now available for viewing from countless sources, thereby

exponentially increasing the prejudicial and defamatory impact and severe damage inflicted on

Plaintiff. Judge Jackson, in issuing her two gag orders against Stone, herself recognized how postings on the internet proliferate widely and once made cannot be taken back. To this day these published false and defamatory statements are therefore found proliferated on the internet in this district, nationally and internationally.

87.     Mr. Klayman has worked closely with the Infowars Defendants and Stone in the past and therefore they are all aware of his legal victories and his capabilities as an attorney and his standing and expertise as a columnist, author and syndicated media personality and syndicated radio talk show host.   Exhibit 4; *Affidavit of Larry Klayman* attached hereto and incorporated by reference.

88.     Before Stone was indicted, on or about January 18, 2019, he appeared on *The War Room* with Defendant Shroyer, where he made several malicious false, misleading, and defamatory statements in this district,  nationally and internationally  regarding Plaintiff (the "January 18 Video").[8] The same video was also published on Stone's YouTube channel, "*Stone Cold Truth*," on January 18, 2019.[9]

89.     These malicious false, misleading, and defamatory statements were facilitated, furthered and adopted and published by each and every one of the Defendants, rendering them joint tortfeasors and they are thus jointly and severally liable to Mr. Klayman.

90.     At 1:25 in the January 18 Video, Stone and the Infowars Defendants and Stone, each and every one of them jointly and severally as joint tortfeasors maliciously falsely published that "He's (Klayman) never actually won a courtroom victory in his life."

91.     At 1:30 in the January 18 Video, Stone and the Infowars Defendants and Stone, each and every one of them jointly and severally as joint tortfeasors, maliciously falsely

---

[8] https://www.infowars.com/watch/?video=5c3fbf24fe49383dcf6996e4
[9] https://www.youtube.com/watch?v=cJyfgdvtFx8

published, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'"

92.     In actuality and truth, Plaintiff Klayman left Judicial Watch on his own accord in order to run for U.S. Senate in Florida in 2003-2004.

93.     Not coincidentally, Plaintiff Klayman has a jury verdict and judgment against Fitton's Judicial Watch for having defamed him with actual malice. Punitive damages were also awarded by the jury in the U.S. District Court for the Southern District of Florida. *Klayman v. Judicial Watch*, 13-cv-20610 (S.D.Fl.); Exhibit 4.

94.     At 1:37 in the January 18 Video, Stone and the Infowars Defendants, each and every one of them jointly and severally as joint tortfeasors maliciously falsely published, "He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. With him as Jerry Corsi's lawyer, Corsi may get the electric chair. So your idea that he's a good guy is entirely wrong"

95.     As set forth in Exhibit 4, in actuality, Plaintiff Klayman has been a practicing attorney for over four decades and has won numerous cases on behalf of his clients and also against the government for constitutional and other violations.  He is the founder of both Judicial Watch and Freedom Watch, a former candidate for the U.S. Senate in Florida, a former trial attorney and prosecutor of the Antitrust Division of the U.S. Department of Justice, where he was a member of the trial team that successfully broke up the AT&T monopoly and created competition in the telecommunications industry. Among many other legal victories, Plaintiff Klayman also won landmark decisions at the chairman and general counsel of Freedom Watch enjoining the illegal mass surveillance by the National Security Agency. *Klayman v. Obama*, 1:13-cv-851 (D.D.C). *See* Exhibit 4  which is incorporated herein by reference. Stone and the

Defendants, each and every one of them jointly and severally as joint tortfeasors knew this when they published the malicious false and misleading statements about Klayman and thus willfully and maliciously defamed Plaintiff Klayman.

96.     At 2:01 in the January 18 Video, Stone and each and every one of the Infowars Defendants, jointly and severally as joint tortfeasors, maliciously falsely and misleadingly published that Plaintiff Klayman is a "piece of garbage."

97.     At 4:11 in the January 18 Video, Stone and each and every one of the Infowars Defendants, jointly and severally as joint tortfeasors, maliciously falsely and misleadingly published, "For those people out there who think…that Larry Klayman's IQ is higher than 70, you're wrong…"

98.     The Infowars Defendants and Stone published these malicious false, misleading, and defamatory statements with actual malice and with full knowledge that they were false and misleading, and/or at a minimum, with a reckless disregard for their truthfulness. These statements create the false and misleading implication that Plaintiff Klayman is unqualified to be an attorney, public advocate, author, columnist, radio talk show host  and is a bad and loathsome person

99.     Acting in concert as joint tortfeasors with Stone, the Infowars Defendants as alleged herein, published numerous false, misleading and defamatory statements to severely harm and damage Plaintiff, which were republished elsewhere, and through surrogates, which published the falsity that Plaintiff have committed crimes, engaged in moral turpitude, and committed sexual misconduct, as set forth in the preceding paragraphs.

100.     These false, misleading and defamatory statements were published in this district and on the internet and elsewhere, domestically and for the entire world to see and hear and in so

doing the Infowars Defendants and Stone published false and misleading facts, *inter alia*, that Plaintiff's conduct, characteristics or a condition are incompatible with the proper exercise of his lawful business, trade, profession or office, as well as personally.

101.    These false and misleading statements were published with actual malice, as Defendants knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

102.    This statements are *per se* defamatory because they falsely and misleadingly published that Plaintiff Klayman had committed sexual misconduct and abuse which can rise to the level of federal offenses and felonies. Defamation *per se* gives rise to the legal presumption that severe harm and damage has arisen by virtue of the malicious false and misleading statements.

103.    These malicious false, misleading, and defamatory statements are defamatory *per se* and these false and misleading statements severely harmed and damaged Plaintiff Klayman in his profession as a public interest and private advocate and litigator and as an author, columnist and radio and internet radio talk show and syndicated host, as well as personally.

### THIRD CAUSE OF ACTION
#### *Defamation by Implication*

104.    Stone has appeared numerous times on programs of his colleagues at the Infowars Defendants, *The Alex Jones Show* and The *War Room*, which are hosted by Defendant Alex Jones and Shroyer where numerous false, misleading, malicious and defamatory statements of and concerning Plaintiff were made, published, and or ratified by all of the Defendants, each and every one of them, at the direction of Stone and on their own.

105.    Plaintiff has demanded retraction and correction of the defamatory videos and publications set forth below and generally in this Complaint, but the Infowats Defendants and

Stone have refused, thereby ratifying any and all defamatory statements contained therein. The latest examples are attached as Exhibit 3.

106.    As also set forth in attached Exhibit 4, the Infowars Defendants and Stone, at a minimum, acted with actual malice as they knew or had reason to know that the published statements were untrue, or at a minimum acted with reckless disregard for the truth, as they have known Plaintiff Klayman for a long time and he has appeared on Infowars numerous times, during which time Klayman was effusively praised by Defendant Alex Jones and Owen Shroyer, so they were well aware that the statements made by Stone, and their own false, misleading, malicious and defamatory statements were, indeed, false, as well as their participation in and ratification of the malicious false statements published by Stone on their networks and media sites in this district, nationally and internationally.

107.    As the content containing the malicious false, misleading, and defamatory statements were published on the internet in this district  and elsewhere, they proliferated like a "cancerous virus," and is now available for viewing from countless sources, thereby exponentially increasing the prejudicial and defamatory impact and severe damage inflicted on Plaintiff. Judge Jackson, in issuing her two gag orders against Stone, herself recognized how postings on the internet proliferate widely and once made cannot be taken back. To this day these published false and defamatory statements are therefore found proliferated on the internet in this district, nationally and internationally.

108.    Mr. Klayman has worked closely with the Infowars Defendants and Stone in the past and therefore they are all aware of his legal victories and his capabilities as an attorney and his standing and expertise as a columnist, author and syndicated media personality and syndicated radio talk show host.   Exhibit 4; *Affidavit of Larry Klayman* attached hereto and

incorporated by reference.

109.    Before Stone was indicted, on or about January 18, 2019, he appeared on *The War Room* with Defendant Shroyer, where he made several malicious false, misleading, and defamatory statements in this district,  nationally and internationally  regarding Plaintiff (the "January 18 Video").[10] The same video was also published on Stone's YouTube channel, "*Stone Cold Truth*," on January 18, 2019.[11]

110.    These malicious false, misleading, and defamatory statements were facilitated, furthered and adopted and published by each and every one of the Infowars Defendants and Stone, rendering them joint tortfeasors and they are thus jointly and severally liable to Mr. Klayman.

111.    At 1:25 in the January 18 Video, Stone and the Infowars Defendants, each and every one of them jointly and severally as joint tortfeasors maliciously falsely published that "He's (Klayman) never actually won a courtroom victory in his life."

112.    At 1:30 in the January 18 Video, Stone and the Infowars Defendants, each and every one of them jointly and severally as joint tortfeasors, maliciously falsely published, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'"

113.    In actuality and truth, Plaintiff Klayman left Judicial Watch on his own accord in order to run for U.S. Senate in Florida in 2003-2004.

114.    Not coincidentally, Plaintiff Klayman has a jury verdict and judgment against Fitton's Judicial Watch for having defamed him with actual malice. Punitive damages were also awarded by the jury in the U.S. District Court for the Southern District of Florida. *Klayman v.*

---

[10] https://www.infowars.com/watch/?video=5c3fbf24fe49383dcf6996e4
[11] https://www.youtube.com/watch?v=cJyfgdvtFx8

*Judicial Watch*, 13-cv-20610 (S.D.Fl.); Exhibit 4.

115.    At 1:37 in the January 18 Video, Stone and the Infowars Defendants, each and every one of them jointly and severally as joint tortfeasors maliciously falsely published, "He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. With him as Jerry Corsi's lawyer, Corsi may get the electric chair. So your idea that he's a good guy is entirely wrong"

116.    As set forth in Exhibit 4, in actuality, Plaintiff Klayman has been a practicing attorney for over four decades and has won numerous cases on behalf of his clients and also against the government for constitutional and other violations.  He is the founder of both Judicial Watch and Freedom Watch, a former candidate for the U.S. Senate in Florida, a former trial attorney and prosecutor of the Antitrust Division of the U.S. Department of Justice, where he was a member of the trial team that successfully broke up the AT&T monopoly and created competition in the telecommunications industry. Among many other legal victories, Plaintiff Klayman also won landmark decisions at the chairman and general counsel of Freedom Watch enjoining the illegal mass surveillance by the National Security Agency. *Klayman v. Obama*, 1:13-cv-851 (D.D.C). *See* Exhibit 4  which is incorporated herein by reference. Stone and the Defendants, each and every one of them jointly and severally as joint tortfeasors knew this when they published the malicious false and misleading statements about Klayman and thus willfully and maliciously defamed Plaintiff Klayman.

117.    At 2:01 in the January 18 Video, Stone and each and every one of the Infowars Defendants, jointly and severally as joint tortfeasors, maliciously falsely and misleadingly published that Plaintiff Klayman is a "piece of garbage."

118.    At 4:11 in the January 18 Video, Stone and each and every one of the Infowars

Defendants, jointly and severally as joint tortfeasors, maliciously falsely and misleadingly published, "For those people out there who think…that Larry Klayman's IQ is higher than 70, you're wrong…"

119.    The Infowars Defendants and Stone published these malicious false, misleading, and defamatory statements with actual malice and with full knowledge that they were false and misleading, and/or at a minimum, with a reckless disregard for their truthfulness. These statements create the false and misleading implication that Plaintiff Klayman is unqualified to be an attorney, public advocate, author, columnist, radio talk show host  and is a bad and loathsome person

120.    Acting in concert as joint tortfeasors with Stone, the Infowars Defendants published all of the numerous false, misleading and defamatory statements about Plaintiff, as set forth in the preceding paragraphs.

121.    These false, misleading and defamatory statements were published on the internet and published in this district and republished elsewhere domestically and for the entire world to see and hear.

122.    These false and misleading statements were published with actual malice, as the Infowars Defendants knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

123.    These statements, individually and taken as a whole, created the false and misleading implication that Plaintiff Klayman committed sexual misconduct and abuse and is incompetent and a total loser as a lawyer who has never won even one case, among other false and misleading statements as pled in the preceding paragraphs.

124.    Plaintiff has been severely harmed and damaged by these false and misleading

statements because they subject him to hatred, distrust, ridicule, contempt, and disgrace.

125.   Plaintiff has been damaged by these malicious false and misleading statements because the statements severely harmed and damaged Plaintiff in his professions as pubic interest and private practitioner lawyers and radio talk show host, author and columnist whose credibility is the most important trait, as well as personally.

**FOURTH CAUSE OF ACTION**
*Unfair Competition – Lanham Act Section 43(a)(1)(B) False Advertising*

126.   In addition to being an investigative journalist/author and a public interest litigator/advocate, respectively, Plaintiff Klayman is a competitor to the Infowars Defendants and Stone as conservative media personalities, broadcasters, authors and columnists on social media and elsewhere. *See* Exhibit 4; Larry Klayman Affidavit.

127.   Mr. Klayman is the founder, Chairman and General Counsel of Freedom Watch, Inc., which has the mission of investigating and prosecuting government corruption and abuse through legal advocacy. He also is in private practice with The Klayman Law Group, P.A. He is unique as a public interest advocate. He is a columnist for World Net Daily and has had about 600+ columns published over the last 10 years. He has also been a columnist for Newsmax through a blog titled "Klayman' Court" and in addition to his book "Whores: How and Why I Came to Fight the Establishment", he also published three other books. He also has his own syndicated radio show and daily podcasts with Radio America called "Special Prosecutor with Larry Klayman." *See* Exhibit 4; Larry Klayman Affidavit.

128.   Mr. Klayman derives financial benefit from appearing on radio and internet programs as a conservative political analysist and media personality, as well as from his other endeavors as pled herein. *See* Exhibit 4; Larry Klayman Affidavit.

129.   The Infowars Defendants and Stone also derive financial benefit from appearing

on radio and internet programs as conservative political analysts and media personalities. *See* Exhibit 4; Larry Klayman Affidavit.

130.    Mr. Klayman is therefore a direct competitor of the Infowars Defendants and Stone, as they all derive income from appearing on radio and internet programs and through writings as political analysts, and as media pundits. *See* Exhibit 4; Larry Klayman Affidavit.

131.    By way of example, Stone, in a recent interview with Real Clear Politics, admitted that he intends to host a weekly syndicated radio show and a daily podcast in 2021. *See* Exhibit 4; Larry Klayman Affidavit.

132.    Mr. Klayman also hosts a weekly syndicated radio show and does daily podcasts. *See* Exhibit 4; Larry Klayman Affidavit.

133.    Mr. Klayman's client, Dr. Jerome Corsi, has also prepared an affidavit in this regard, which is incorporated hereto by reference. *See* Exhibit 5.

134.    The Infowars Defendants, each and every one of them jointly and severally as joint tortfeasors, have made, adopted, and or ratified numerous false or misleading statements of fact of Stone and themselves of and concerning Plaintiff during their various programs and media postings and publication, which all contain significant advertisement or promotions.

135.    Before Stone was indicted, on or about January 18, 2019, he appeared on *The War Room* with Defendant Shroyer, where he made several malicious false, misleading, and defamatory statements in this district,  nationally and internationally  regarding Plaintiff (the "January 18 Video").[12] The same video was also published on Stone's YouTube channel, "*Stone Cold Truth*," on January 18, 2019.[13]

136.    These malicious false, misleading, and defamatory statements were facilitated,

---

[12] https://www.infowars.com/watch/?video=5c3fbf24fe49383dcf6996e4
[13] https://www.youtube.com/watch?v=cJyfgdvtFx8

furthered and adopted and published by each and every one of the Defendants, rendering them joint tortfeasors and they are thus jointly and severally liable to Mr. Klayman.

137.    At 1:25 in the January 18 Video, Stone and the Infowars Defendants, each and every one of them jointly and severally as joint tortfeasors maliciously falsely published that "He's (Klayman) never actually won a courtroom victory in his life."

138.    At 1:30 in the January 18 Video, Stone and the Infowars Defendants, each and every one of them jointly and severally as joint tortfeasors, maliciously falsely published, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'"

139.    In actuality and truth, Plaintiff Klayman left Judicial Watch on his own accord in order to run for U.S. Senate in Florida in 2003-2004.

140.    Not coincidentally, Plaintiff Klayman obtained  a jury verdict and judgment against Fitton's Judicial Watch for having defamed him with actual malice. Punitive damages were also awarded by the jury in the U.S. District Court for the Southern District of Florida. *Klayman v. Judicial Watch*, 13-cv-20610 (S.D.Fl.); Exhibit 4.

141.    At 1:37 in the January 18 Video, Stone and the Infowars Defendants, each and every one of them jointly and severally as joint tortfeasors maliciously falsely published, "He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. With him as Jerry Corsi's lawyer, Corsi may get the electric chair. So your idea that he's a good guy is entirely wrong"

142.    As set forth in Exhibit 4, in actuality, Plaintiff Klayman has been a practicing attorney for over four decades and has won numerous cases on behalf of his clients and also against the government for constitutional and other violations.  He is the founder of both Judicial

Watch and Freedom Watch, a former candidate for the U.S. Senate in Florida, a former trial attorney and prosecutor of the Antitrust Division of the U.S. Department of Justice, where he was a member of the trial team that successfully broke up the AT&T monopoly and created competition in the telecommunications industry. Among many other legal victories, Plaintiff Klayman also won landmark decisions at the chairman and general counsel of Freedom Watch enjoining the illegal mass surveillance by the National Security Agency. *Klayman v. Obama*, 1:13-cv-851 (D.D.C). *See* Exhibit 4  which is incorporated herein by reference. Stone and the Defendants, each and every one of them jointly and severally as joint tortfeasors knew this when they published the malicious false and misleading statements about Klayman and thus willfully and maliciously defamed Plaintiff Klayman.

143.    At 2:01 in the January 18 Video, Stone and each and every one of the Infowars Defendants, jointly and severally as joint tortfeasors, maliciously falsely and misleadingly published that Plaintiff Klayman is a "piece of garbage."

144.    At 4:11 in the January 18 Video, Stone and each and every one of the Infowars Defendants, jointly and severally as joint tortfeasors, maliciously falsely and misleadingly published, "For those people out there who think…that Larry Klayman's IQ is higher than 70, you're wrong…"

145.    These false and/or misleading facts materially prejudice and misrepresent to the viewers and/or listeners as to the quality, nature, and contents of Plaintiff's goods and services, which has caused significant competitive and commercial injury to Plaintiff, as well as loss of good will and reputation.

146.    Plaintiff, like the Infowars Defendants and Stone, rely on and derive viewer and listener financial support and sales in order to continue their work. Defendants' false and/or

misleading statements concerning Plaintiffs is meant to, and has, diverted financial support and sales away from Plaintiff and to Infowars Defendants  and Stone instead.

147.    The Infowars Defendant and Stone have harmed Mr. Klayman as a competitor by publishing false statements about him which bear on his goods and services in order to eliminate him as a competitor. All Defendants compete with Mr. Klayman on the airwaves and in written publications

148.    The Infowars Defendants, acting in concert as joint tortfeasors with Stone, have been and  continue to been engaged in acts of unfair competition in violation of the Lanham Act Section 43(a)(1)(B) for false advertising.

149.    The Infowars Defendants have made false and/or misleading statements along with Stone that have deceived and/or had the tendency to deceive a substantial segment of the receiving audience, which is Plaintiff's audience as well.

150.    The Infowars Defendants' and Stone's false and/or misleading statements misrepresent the nature, characteristics, and qualities of Plaintiff Klayman's goods or services.

151.    The Infowars Defendants' and Stone's false and/or misleading statements are material because that were highly likely to mislead and influence the audience's decisions to provide financial support and sales to the Infowars Defendants and Stone instead of Plaintiff and to destroy Plaintiff's reputation so as to harm, damage and  eliminate him as a competitor.

152.    These false and misleading statements were made in interstate commerce, as they were widely broadcast on radio, on the internet, in social media, and elsewhere in this district, nationally and internationally.

153.    These false and misleading published statements were also intended to break important personal and business relationships of the Plaintiff. Coercion and extortion was also

used to harm, damage and eliminate Plaintiff as a competitor, in addition to the above referenced false advertising.

154.    Plaintiff has suffered significant damages, which are ongoing, due to the Infowars Defendants' and Stone's false and/or misleading statements. By law these damages are calculated based on the Infowars Defendants' gross sales and receipts, which are trebled, plus an award of attorneys fees and costs.

## FIFTH CAUSE OF ACTION
### *Violation of the Florida Deceptive and Unfair Trade Practices Act*

155.    In addition to being an investigative journalist/author and a public interest litigator/advocate, respectively, Plaintiff Klayman is a competitor to the Infowars Defendants and Stone as conservative media personalities, broadcasters, authors and columnists on social media and elsewhere. *See* Exhibit 4; Larry Klayman Affidavit.

156.    Mr. Klayman is the founder, Chairman and General Counsel of Freedom Watch, Inc., which has the mission of investigating and prosecuting government corruption and abuse through legal advocacy. He also is in private practice with The Klayman Law Group, P.A. He is unique as a public interest advocate. He is a columnist for World Net Daily and has had about 600+ columns published over the last 10 years. He has also been a columnist for Newsmax through a blog titled "Klayman' Court" and in addition to his book "Whores: How and Why I Came to Fight the Establishment", he also published three other books. He also has his own syndicated radio show and daily podcasts with Radio America called "Special Prosecutor with Larry Klayman." *See* Exhibit 4; Larry Klayman Affidavit.

157.    Mr. Klayman derives financial benefit from appearing on radio and internet programs as a conservative political analysist and media personality, as well as from his other endeavors as pled herein. *See* Exhibit 4; Larry Klayman Affidavit.

158.    The Infowars Defendants and Stone also derive financial benefit from appearing on radio and internet programs as conservative political analysts and media personalities. *See* Exhibit 4; Larry Klayman Affidavit.

159.    Mr. Klayman is therefore a direct competitor of the Infowars Defendants and Stone, as they all derive income from appearing on radio and internet programs and through writings as political analysts, and as media pundits. *See* Exhibit 4; Larry Klayman Affidavit.

160.    By way of example, Stone, in a recent interview with Real Clear Politics, admitted that he intends to host a weekly syndicated radio show and a daily podcast in 2021. *See* Exhibit 4; Larry Klayman Affidavit.

161.    Mr. Klayman also hosts a weekly syndicated radio show and does daily podcasts. *See* Exhibit 4; Larry Klayman Affidavit.

162.    Mr. Klayman's client, Dr. Jerome Corsi, has also prepared an affidavit in this regard, which is incorporated hereto by reference. *See* Exhibit 5.

163.    The Infowars Defendants, each and every one of them jointly and severally as joint tortfeasors with Stone, have made, adopted, and or ratified numerous false or misleading statements of fact of and concerning Plaintiff during their various programs and media postings and publication, which all contain significant advertisement or promotions.

164.    These false and/or misleading facts materially prejudice and misrepresent to the viewers and/or listeners as to the quality, nature, and contents of Plaintiff's goods and services, which has caused significant competitive and commercial injury to Plaintiff, as well as loss of good will and reputation.

165.    Plaintiff, like the Infowars Defendants and Stone, rely on and derive viewer and listener financial support and sales in order to continue their work. Defendants' false and/or

misleading statements concerning Plaintiffs is meant to, and has, diverted financial support and sales away from Plaintiff and to Infowars Defendants and Stone instead.

166.    The Infowars Defendant and Stone have harmed Mr. Klayman as a competitor by publishing false statements about him which bear on his goods and services in order to eliminate him as a competitor. All of the Infowars Defendants and Stone compete with Mr. Klayman on the airwaves and in written publications.

167.    The Infowars Defendants acting in concert as joint tortfeasors with Stone, have violated the Florida Deceptive and Unfair Trade Practices Act.

168.    Mr. Klayman is a competitor to the Infowars Defendants and Stone.

169.    The Infowars Defendants have engaged in both deceptive acts and unfair practices by making false and/or misleading statements that misrepresent the nature, characteristics, and qualities of Plaintiff Klayman's goods or services.

170.    Before Stone was indicted, on or about January 18, 2019, he appeared on *The War Room* with Defendant Shroyer, where he made several malicious false, misleading, and defamatory statements in this district,  nationally and internationally  regarding Plaintiff (the "January 18 Video").[14] The same video was also published on Stone's YouTube channel, "*Stone Cold Truth*," on January 18, 2019.[15]

171.    These malicious false, misleading, and defamatory statements of Stone were facilitated, furthered and adopted and published by each and every one of the Infowars Defendants, rendering them joint tortfeasors and they are thus jointly and severally liable to Mr. Klayman.

172.    At 1:25 in the January 18 Video, Stone and the Infowars Defendants, each and

---

[14] https://www.infowars.com/watch/?video=5c3fbf24fe49383dcf6996e4
[15] https://www.youtube.com/watch?v=cJyfgdvtFx8

every one of them jointly and severally as joint tortfeasors maliciously falsely published that "He's (Klayman) never actually won a courtroom victory in his life."

173.    At 1:30 in the January 18 Video, Stone and the Infowars Defendants, each and every one of them jointly and severally as joint tortfeasors, maliciously falsely published, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'"

174.    In actuality and truth, Plaintiff Klayman left Judicial Watch on his own accord in order to run for U.S. Senate in Florida in 2003-2004.

175.    Not coincidentally, Plaintiff Klayman obtained  a jury verdict and judgment against Fitton's Judicial Watch for having defamed him with actual malice. Punitive damages were also awarded by the jury in the U.S. District Court for the Southern District of Florida. *Klayman v. Judicial Watch*, 13-cv-20610 (S.D.Fl.); Exhibit 4.

176.    At 1:37 in the January 18 Video, Stone and the Defendants, each and every one of them jointly and severally as joint tortfeasors maliciously falsely published, "He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. With him as Jerry Corsi's lawyer, Corsi may get the electric chair. So your idea that he's a good guy is entirely wrong"

177.    As set forth in Exhibit 4, in actuality, Plaintiff Klayman has been a practicing attorney for over four decades and has won numerous cases on behalf of his clients and also against the government for constitutional and other violations.  He is the founder of both Judicial Watch and Freedom Watch, a former candidate for the U.S. Senate in Florida, a former trial attorney and prosecutor of the Antitrust Division of the U.S. Department of Justice, where he was a member of the trial team that successfully broke up the AT&T monopoly and created

competition in the telecommunications industry. Among many other legal victories, Plaintiff Klayman also won landmark decisions at the chairman and general counsel of Freedom Watch enjoining the illegal mass surveillance by the National Security Agency. *Klayman v. Obama*, 1:13-cv-851 (D.D.C). *See* <u>Exhibit 4</u>  which is incorporated herein by reference. Stone and the Defendants, each and every one of them jointly and severally as joint tortfeasors knew this when they published the malicious false and misleading statements about Klayman and thus willfully and maliciously defamed Plaintiff Klayman.

178.    At 2:01 in the January 18 Video, Stone and each and every one of the Infowars Defendants, jointly and severally as joint tortfeasors, maliciously falsely and misleadingly published that Plaintiff Klayman is a "piece of garbage."

179.    At 4:11 in the January 18 Video, Stone and each and every one of the Defendants, jointly and severally as joint tortfeasors, maliciously falsely and misleadingly published, "For those people out there who think…that Larry Klayman's IQ is higher than 70, you're wrong…"

180.    The Infowars Defendants' false and/or misleading statements misrepresent the nature, characteristics, and qualities of Plaintiff Klayman's goods or services.

181.    The Infowars Defendants' and Stone's false and/or misleading statements are material because that were highly likely to mislead and influence supporters, consumers, buyers and customers decisions to provide financial support and sales to the Infowars Defendants instead of Plaintiff.

182.    The Infowars Defendants' and Stone's misstatements would likely mislead the objective supporter, consumer, buyer and customer acting reasonably under the circumstances.

183.    The Infowars Defendants' and Stone's misstatements have <u>actually</u> misled numerous supporters, consumers, buyers and customers which have had a direct negative impact

on the amount of financial support received by Plaintiff Klayman.

184.    Plaintiff has suffered significant pecuniary damages directly and proximately caused by the Infowars Defendants' deceptive acts and unfair practices, which are ongoing.

## SIXTH CAUSE OF ACTION
### *Tortious Interference*

185.    On information and belief, the Infowars Defendants and Stone are also tortuously interfering with Mr. Klayman by causing to be filed and then financing frivolous bar complaints against him in order to harm his legal practice and standing as a columnist, author, and radio talk show host.

186.    The Infowars Defendants and Stone have caused to be filed and then financed frivolous bar complaints from Pete Santilli and Dennis Montgomery, which force Mr. Klayman to expend a huge amount of valuable time and resources to defend, even though they are frivolous.

187.    As just one instance of the Infowars Defendants, Stone, and Pete Santilli working together in concert, among many, the episode of the Pete Santilli Show found at https://www.youtube.com/watch?v=xbpeHciUqP8&feature=youtu.be prominently features all of these people and Alex Jones actually directly tells Pete Santilli that Stone recommended him.

188.    In a deposition taken in February of 2020, Roger Stone smugly threatened to have Mr. Klayman disbarred as well:

> MR. KLAYMAN: I look forward to having you there.
> THE WITNESS: Yeah, me too.
> MR. KLAYMAN: If you're not in prison at that time.
> THE WITNESS: If you're not disbarred by then. Exhibit 4(F)

189.    Thus, the Infowars Defendants and Stone have tortuously interfered with Mr. Klayman by causing to be filed and then financing frivolous bar complaints against Plaintiff in

order to harm his legal practice and standing as a columnist, author, and radio talk show host and to cause him to expend a huge amount of time and resources to defend himself. On information and belief the bar complaints which the Infowars Defendants and Stone caused to be filed and financed, are also in retaliation for Mr. Klayman asserting his legal rights against them. These bar complaints were filed by Pete Santilli and Dennis Montgomery before the District of Columbia Bar Disciplinary Counsel. Mr. Santilii is a convicted felon and Mr. Montgomery as widely recognized fraudster who is currently under indictment in Nevada, having been called a fraud by his prior lawyer Michael Flynn and a host of others. *See* Exhibit 6 – Wikipedia.

190.    As pled above The Infowars Defendants acting in concert as joint tortfeasors with Stone, have tortuously interfered with Mr. Klayman by causing to be filed and then financing frivolous bar complaints against him in order to harm his legal practice and standing as a columnist, author, and radio talk show host.

191.    Mr. Klayman's legal practice, as well as his standing and reputation as a columnist, author, and radio talk show host, are all predicated on and/or augmented by his status as an attorney licensed to practice law.

192.    Mr. Klayman has numerous business relationships, as well as potentials for other new business relationships, based on his status as an attorney, columnist, author, and radio talk show host. *See* Exhibit 4.

193.    The Infowars Defendants, in concert with Stone, have actual knowledge of these relationships.

194.    The Infowars Defendants, in concert with Stone, have caused to be filed and then financed frivolous bar complaints against Mr. Klayman in order to try to have him disbarred in order to destroy his legal practice and standing and reputation as a columnist, author, and radio

talk show host, in order to destroy Mr. Klayman's existing and prospective business relationships.

195.    Plaintiff has suffered significant pecuniary damages directly and proximately caused by the Infowars Defendants' deceptive acts and unfair practices, more of which will be uncovered in discovery, which are ongoing.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

a.    Awarding Plaintiff compensatory including actual, consequential, incidental damages for malicious tortious concerted conduct, jointly and severally, in an amount to be determined at trial and in excess of $20, 000, 000.00 U.S. Dollars to Plaintiff, for the large damages caused to his personal and professional reputations and good will, as well as past and prospective financial losses, personally and professionally.

b.    Awarding punitive damages in excess of $30,000,000.00 U.S. Dollars.

c.    Awarding Plaintiff attorneys fees and costs

d.    Granting such other relief as the Court deems appropriate and necessary.

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL CLAIMS SO TRIABLE**.


Dated: December 5, 2020                                            Respectfully Submitted,


                                                                            *   /s/ Larry Klayman   *
                                                                            Larry Klayman, Esq.
                                                                            7050 W. Palmetto Park Rd
                                                                            Boca Raton FL 33433
                                                                            Telephone: 561-558-5336
                                                                            Email: leklayman@gmail.com

                                                                            *PLAINTIFF PRO SE*

EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

DR. JEROME CORSI, ET AL

Plaintiffs

        v.

INFOWARS, LLC, et al

        Defendants.

**Case Number:   1:20-cv-298-LY**

## SWORN DECLARATION OF KELLY MORALES

    1. I, Kelly Morales, hereby declare under penalty of perjury that the following is true and correct and based on my personal knowledge and belief.

    2. I am over the age of 18 and mentally and legally competent to make this affidavit, sworn under oath.

    3. I am the former wife of Defendant Alex Jones.  I was married to Alex Jones for 12 years and with him for 15 years and we have 3 children together. During our time together, I was involved in the activities of Alex, his father David and Infowars and am intimately knowledgeable about their activities and business structure.

    4. Based on my personal knowledge and experience, David Jones runs Infowars with Alex Jones and helps him with his activities, including fixing media stories and endorsing and/or aiding his slanderous and/or fraudulent behaviors, all for profit.

    5. Infowars, LLC is a sub-entity of Free Speech Systems, LLC ("FSS"), and David Jones is an employee of FSS, or he has been.

    6. David Jones is additionally a managing member of multiple entities that are closely held businesses, constituting financial holding companies or financial distribution centered around Infowars/Alex Jones' supplement line, which are quintessential to funding and running Infowars.

    7. Alex Jones could not function without David Jones, and has conspired with him on the past to commit this breach of fiduciary duty and fraud on my business/estate with Alex Jones. While David Jones did this, he slandered and/or defamed me to experts and assisted Alex Jones and his attorneys to do the same, so as to steal/hide my estate and his grandchildren's inheritance.

    8. Alex Jones is quasi-illiterate, and cannot use technology or apps such as email with any fluency, and he cannot function without assistance from those around him, including David Jones.

    I hereby swear under oath and penalty of perjury that the foregoing facts are true and correct to the best of my knowledge and belief.

    Executed on September 30, 2020

Kelly Morales

2

# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. |
| | * | |
| v. | * | Grand Jury Original |
| | * | |
| ROGER JASON STONE, JR., | * | 18 U.S.C. §§ 1001, 1505, 1512, 2 |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |
| | * | |
| | ******* | |

## **INDICTMENT**

The Grand Jury for the District of Columbia charges:

### **Introduction**

1.      By in or around May 2016, the Democratic National Committee ("DNC") and the Democratic Congressional Campaign Committee ("DCCC") became aware that their computer systems had been compromised by unauthorized intrusions and hired a security company ("Company 1") to identify the extent of the intrusions.

2.      On or about June 14, 2016, the DNC—through Company 1—publicly announced that it had been hacked by Russian government actors.

3.      From in or around July 2016 through in or around November 2016, an organization ("Organization 1"), which had previously posted documents stolen by others from U.S. persons, entities, and the U.S. government, released tens of thousands of documents stolen from the DNC and the personal email account of the chairman of the U.S. presidential campaign of Hillary Clinton ("Clinton Campaign").

      a.      On or about July 22, 2016, Organization 1 released documents stolen from the DNC.

      b.      Between on or about October 7, 2016 and on or about November 7, 2016, Organization 1 released approximately 33 tranches of documents that had been stolen from the personal email account of the Clinton Campaign chairman, totaling over 50,000 stolen documents.

4.     ROGER JASON STONE, JR. was a political consultant who worked for decades in U.S. politics and on U.S. political campaigns. STONE was an official on the U.S. presidential campaign of Donald J. Trump ("Trump Campaign") until in or around August 2015, and maintained regular contact with and publicly supported the Trump Campaign through the 2016 election.

5.     During the summer of 2016, STONE spoke to senior Trump Campaign officials about Organization 1 and information it might have had that would be damaging to the Clinton Campaign. STONE was contacted by senior Trump Campaign officials to inquire about future releases by Organization 1.

6.     By in or around early August 2016, STONE was claiming both publicly and privately to have communicated with Organization 1. By in or around mid-August 2016, Organization 1 made a public statement denying direct communication with STONE. Thereafter, STONE said that his communication with Organization 1 had occurred through a person STONE described as a "mutual friend," "go-between," and "intermediary." STONE also continued to communicate with members of the Trump Campaign about Organization 1 and its intended future releases.

7.     After the 2016 U.S. presidential election, the U.S. House of Representatives Permanent Select Committee on Intelligence ("HPSCI"), the U.S. Senate Select Committee on Intelligence ("SSCI"), and the Federal Bureau of Investigation ("FBI") opened or announced their respective

investigations into Russian interference in the 2016 U.S. presidential election, which included investigating STONE's claims of contact with Organization 1.

8.     In response, STONE took steps to obstruct these investigations.  Among other steps to obstruct the investigations, STONE:

        a.      Made multiple false statements to HPSCI about his interactions regarding Organization 1, and falsely denied possessing records that contained evidence of these interactions; and

        b.      Attempted to persuade a witness to provide false testimony to and withhold pertinent information from the investigations.

**Other Relevant Individuals**

9.     Person 1 was a political commentator who worked with an online media publication during the 2016 U.S. presidential campaign.  Person 1 spoke regularly with STONE throughout the campaign, including about the release of stolen documents by Organization 1.

10.    Person 2 was a radio host who had known STONE for more than a decade.  In testimony before HPSCI on or about September 26, 2017, STONE described Person 2 (without naming him) as an "intermediary," "go-between," and "mutual friend" to the head of Organization 1.  In a follow-up letter to HPSCI dated October 13, 2017, STONE identified Person 2 by name and claimed Person 2 was the "gentleman who confirmed for Mr. Stone" that the head of Organization 1 had "'[e]mails related to Hillary Clinton which are pending publication.'"

**Background**

STONE's Communications About Organization 1 During the Campaign

11.    By in or around June and July 2016, STONE informed senior Trump Campaign officials that he had information indicating Organization 1 had documents whose release would be

3

damaging to the Clinton Campaign.  The head of Organization 1 was located at all relevant times at the Ecuadorian Embassy in London, United Kingdom.

12.    After the July 22, 2016 release of stolen DNC emails by Organization 1, a senior Trump Campaign official was directed to contact STONE about any additional releases and what other damaging information Organization 1 had regarding the Clinton Campaign.  STONE thereafter told the Trump Campaign about potential future releases of damaging material by Organization 1.

13.    STONE also corresponded with associates about contacting Organization 1 in order to obtain additional emails damaging to the Clinton Campaign.

     a.    On or about July 25, 2016, STONE sent an email to Person 1 with the subject line, "Get to [the head of Organization 1]."  The body of the message read, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and get the pending [Organization 1] emails . . . they deal with Foundation, allegedly."  On or about the same day, Person 1 forwarded STONE's email to an associate who lived in the United Kingdom and was a supporter of the Trump Campaign.

     b.    On or about July 31, 2016, STONE emailed Person 1 with the subject line, "Call me MON."  The body of the email read in part that Person 1's associate in the United Kingdom "should see [the head of Organization 1]."

     c.    On or about August 2, 2016, Person 1 emailed STONE.  Person 1 wrote that he was currently in Europe and planned to return in or around mid-August.  Person 1 stated in part, "Word is friend in embassy plans 2 more dumps.  One shortly after I'm back.  2nd in Oct.  Impact planned to be very damaging."  The phrase "friend in embassy" referred to the head of Organization 1.  Person 1 added in the same email, "Time to let more than [the Clinton Campaign chairman] to be exposed as in bed w

4

enemy if they are not ready to drop HRC.  That appears to be the game hackers are now about.  Would not hurt to start suggesting HRC old, memory bad, has stroke – neither he nor she well.  I expect that much of next dump focus, setting stage for Foundation debacle."

14.     Starting in early August 2016, after receiving the August 2, 2016 email from Person 1, STONE made repeated statements about information he claimed to have learned from the head of Organization 1.

    a.    On or about August 8, 2016, STONE attended a public event at which he stated, "I actually have communicated with [the head of Organization 1].  I believe the next tranche of his documents pertain to the Clinton Foundation, but there's no telling what the October surprise may be."

    b.    On or about August 12, 2016, STONE stated during an interview that he was "in communication with [the head of Organization 1]" but was "not at liberty to discuss what I have."

    c.    On or about August 16, 2016, STONE stated during an interview that "it became known on this program that I have had some back-channel communication with [Organization 1] and [the head of Organization 1]."  In a second interview on or about the same day, STONE stated that he "communicated with [the head of Organization 1]" and that they had a "mutual acquaintance who is a fine gentleman."

    d.    On or about August 18, 2016, STONE stated during a television interview that he had communicated with the head of Organization 1 through an "intermediary, somebody who is a mutual friend."

e.   On or about August 23, 2016, Person 2 asked STONE during a radio interview, "You've been in touch indirectly with [the head of Organization 1]. . . .  Can you give us any kind of insight?  Is there an October surprise happening?"  STONE responded, "Well, first of all, I don't want to intimate in any way that I control or have influence with [the head of Organization 1] because I do not. . . .  We have a mutual friend, somebody we both trust and therefore I am a recipient of pretty good information."

15.   Beginning on or about August 19, 2016, STONE exchanged written communications, including by text message and email, with Person 2 about Organization 1 and what the head of Organization 1 planned to do.

a.   On or about August 19, 2016, Person 2 sent a text message to STONE that read in part, "I'm going to have [the head of Organization 1] on my show next Thursday." On or about August 21, 2016, Person 2 sent another text message to STONE, writing in part, "I have [the head of Organization 1] on Thursday so I'm completely tied up on that day."

b.   On or about August 25, 2016, the head of Organization 1 was a guest on Person 2's radio show for the first time.  On or about August 26, 2016, Person 2 sent a text message to STONE that stated, "[the head of Organization 1] talk[ed] about you last night."  STONE asked what the head of Organization 1 said, to which Person 2 responded, "He didn't say anything bad we were talking about how the Press is trying to make it look like you and he are in cahoots."

c.   On or about August 27, 2016, Person 2 sent text messages to STONE that said, "We are working on a [head of Organization 1] radio show," and that he (Person 2) was

"in charge" of the project.  In a text message sent later that day, Person 2 added, "[The head of Organization 1] has kryptonite on Hillary."

d.    On or about September 18, 2016, STONE sent a text message to Person 2 that said, "I am e-mailing u a request to pass on to [the head of Organization 1]."  Person 2 responded "Ok," and added in a later text message, "[j]ust remember do not name me as your connection to [the head of Organization 1] you had one before that you referred to."

    i.    On or about the same day, September 18, 2016, STONE emailed Person 2 an article with allegations against then-candidate Clinton related to her service as Secretary of State.  STONE stated, "Please ask [the head of Organization 1] for any State or HRC e-mail from August 10 to August 30—particularly on August 20, 2011 that mention [the subject of the article] or confirm this narrative."

    ii.    On or about September 19, 2016, STONE texted Person 2 again, writing, "Pass my message . . . to [the head of Organization 1]."  Person 2 responded, "I did."  On or about September 20, 2016, Person 2 forwarded the request to a friend who was an attorney with the ability to contact the head of Organization 1.  Person 2 blind-copied STONE on the forwarded email.

e.    On or about September 30, 2016, Person 2 sent STONE via text message a photograph of Person 2 standing outside the Ecuadorian Embassy in London where the head of Organization 1 was located.

f.      On or about October 1, 2016, which was a Saturday, Person 2 sent STONE text messages that stated, "big news Wednesday . . . now pretend u don't know me . . . Hillary's campaign will die this week."  In the days preceding these messages, the press had reported that the head of Organization 1 planned to make a public announcement on or about Tuesday, October 4, 2016, which was reported to be the ten-year anniversary of the founding of Organization 1.

g.      On or about October 2, 2016, STONE emailed Person 2, with the subject line "WTF?," a link to an article reporting that Organization 1 was canceling its "highly anticipated Tuesday announcement due to security concerns."  Person 2 responded to STONE, "head fake."

h.      On or about the same day, October 2, 2016, STONE texted Person 2 and asked, "Did [the head of Organization 1] back off."  On or about October 3, 2016, Person 2 initially responded, "I can't tal[k] about it."  After further exchanges with STONE, Person 2 said, "I think it[']s on for tomorrow."  Person 2 added later that day, "Off the Record Hillary and her people are doing a full-court press they [*sic*] keep [the head of Organization 1] from making the next dump . . . That's all I can tell you on this line . . . Please leave my name out of it."

16.    In or around October 2016, STONE made statements about Organization 1's future releases, including statements similar to those that Person 2 made to him.  For example:

a.      On or about October 3, 2016, STONE wrote to a supporter involved with the Trump Campaign, "Spoke to my friend in London last night.  The payload is still coming."

b.      Also on or about October 3, 2016, STONE received an email from a reporter who had connections to a high-ranking Trump Campaign official that asked, "[the head

of Organization 1] – what's he got?  Hope it's good."  STONE responded in part, "It is.  I'd tell [the high-ranking Trump Campaign official] but he doesn't call me back."

c.      On or about October 4, 2016, the head of Organization 1 held a press conference but did not release any new materials pertaining to the Clinton Campaign.  Shortly afterwards, STONE received an email from the high-ranking Trump Campaign official asking about the status of future releases by Organization 1.   STONE answered that the head of Organization 1 had a "[s]erious security concern" but that Organization 1 would release "a load every week going forward."

d.      Later that day, on or about October 4, 2016, the supporter involved with the Trump Campaign asked STONE via text message if he had "hear[d] anymore from London."  STONE replied, "Yes - want to talk on a secure line - got Whatsapp?" STONE subsequently told the supporter that more material would be released and that it would be damaging to the Clinton Campaign.

17.     On or about October 7, 2016, Organization 1 released the first set of emails stolen from the Clinton Campaign chairman.  Shortly after Organization 1's release, an associate of the high-ranking Trump Campaign official sent a text message to STONE that read "well done."   In subsequent conversations with senior Trump Campaign officials, STONE claimed credit for having correctly predicted the October 7, 2016 release.

<u>The Investigations</u>

18.     In or around 2017, government officials publicly disclosed investigations into Russian interference in the 2016 U.S. presidential election and possible links to individuals associated with the campaigns.

a.    On or about January 13, 2017, the chairman and vice chairman of SSCI announced the committee would conduct an inquiry that would investigate, among other things, any intelligence regarding links between Russia and individuals associated with political campaigns, as well as Russian cyber activity and other "active measures" directed against the United States in connection with the 2016 election.

b.    On or about January 25, 2017, the chairman and ranking member of HPSCI announced that HPSCI had been conducting an inquiry similar to SSCI's.

c.    On or about March 20, 2017, the then-director of the FBI testified at a HPSCI hearing and publicly disclosed that the FBI was investigating Russian interference in the 2016 election and possible links and coordination between the Trump Campaign and the Russian government.

d.    By in or around August 2017, news reports stated that a federal grand jury had opened an investigation into matters relating to Russian government efforts to interfere in the 2016 election, including possible links and coordination between the Trump Campaign and the Russian government.

**STONE's False Testimony to HPSCI**

19.    In or around May 2017, HPSCI sent a letter requesting that STONE voluntarily appear before the committee and produce:

> Any documents, records, electronically stored information including e-mail, communication, recordings, data and tangible things (including, but not limited to, graphs, charts, photographs, images and other documents) regardless of form, other than those widely available (e.g., newspaper articles) that reasonably could lead to the discovery of any facts within the investigation's publicly-announced parameters.

On or about May 22, 2017, STONE caused a letter to be submitted to HPSCI stating that "Mr.

Stone has no documents, records, or electronically stored information, regardless of form, other than those widely available that reasonably could lead to the discovery of any facts within the investigation's publicly-announced parameters."

20.     On or about September 26, 2017, STONE testified before HPSCI in Washington, D.C. as part of the committee's ongoing investigation.  In his opening statement, STONE stated, "These hearings are largely based on a yet unproven allegation that the Russian state is responsible for the hacking of the DNC and [the Clinton Campaign chairman] and the transfer of that information to [Organization 1]."  STONE further stated that  "[m]embers of this Committee" had made certain "assertions against me which must be rebutted here today," which included "[t]he charge that I knew in advance about, and predicted, the hacking of Clinton campaign chairman['s] email, [and] that I had advanced knowledge of the source or actual content of the [Organization 1] disclosures regarding Hillary Clinton."

21.     In the course of his HPSCI testimony, STONE made deliberately false and misleading statements to the committee concerning, among other things, his possession of documents pertinent to HPSCI's investigation; the source for his early August 2016 statements about Organization 1; requests he made for information from the head of Organization 1; his communications with his identified intermediary; and his communications with the Trump Campaign about Organization 1.

<u>STONE's False and Misleading Testimony About His Possession of Documents Pertinent to HPSCI's Investigation</u>

22.     During his HPSCI testimony, STONE was asked, "So you have no emails to anyone concerning the allegations of hacked documents . . . or any discussions you have had with third parties about [the head of Organization 1]?  You have no emails, no texts, no documents whatsoever, any kind of that nature?"  STONE falsely and misleadingly answered, "That is correct.

Not to my knowledge."

23.     In truth and in fact, STONE had sent and received numerous emails and text messages during the 2016 campaign in which he discussed Organization 1, its head, and its possession of hacked emails.  At the time of his false testimony, STONE was still in possession of many of these emails and text messages, including:

a.     The email from STONE to Person 1 on or about July 25, 2016 that read in part, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and get the pending [Organization 1] emails . . . they deal with Foundation, allegedly.";

b.     The email from STONE to Person 1 on or about July 31, 2016 that said an associate of Person 1 "should see [the head of Organization 1].";

c.     The email from Person 1 to STONE on or about August 2, 2016 that stated in part, "Word is friend in embassy plans 2 more dumps.  One shortly after I'm back.  2nd in Oct.  Impact planned to be very damaging.";

d.     Dozens of text messages and emails, beginning on or about August 19, 2016 and continuing through the election, between STONE and Person 2 in which they discussed Organization 1 and the head of Organization 1;

e.     The email from STONE on or about October 3, 2016 to the supporter involved with the Trump Campaign, which read in part, "Spoke to my friend in London last night.  The payload is still coming."; and

f.     The emails on or about October 4, 2016 between STONE and the high-ranking member of the Trump Campaign, including STONE's statement that Organization 1 would release "a load every week going forward."

24.     By falsely claiming that he had no emails or text messages in his possession that referred to the head of Organization 1, STONE avoided providing a basis for HPSCI to subpoena records in his possession that could have shown that other aspects of his testimony were false and misleading.

<u>STONE's False and Misleading Testimony About His Early August 2016 Statements</u>

25.     During his HPSCI testimony on or about September 26, 2017, STONE was asked to explain his statements in early August 2016 about being in contact with the head of Organization 1. STONE was specifically asked about his statement on or about August 8, 2016 that "I've actually communicated with [the head of Organization 1]," as well as his statement on or about August 12, 2016 that he was "in communication with [the head of Organization 1]" but was "not at liberty to discuss what I have."

26.     STONE responded that his public references to having a means of contacting Organization 1 referred exclusively to his contact with a journalist, who STONE described as a "go-between, as an intermediary, as a mutual friend" of the head of Organization 1.  STONE stated that he asked this individual, his intermediary, "to confirm what [the head of Organization 1] ha[d] tweeted, himself, on July 21st, that he ha[d] the Clinton emails and that he [would] publish them."  STONE further stated that the intermediary "was someone I knew had interviewed [the head of Organization 1].  And I merely wanted confirmation of what he had tweeted on the 21st."  STONE declined to tell HPSCI the name of this "intermediary" but provided a description in his testimony that was consistent with Person 2.

27.     On or about October 13, 2017, STONE caused a letter to be submitted to HPSCI that identified Person 2 by name as the "gentleman who confirmed for Mr. Stone" that the head of Organization 1 had "'[e]mails related to Hillary Clinton which are pending publication.'"

28.     STONE's explanation of his August 2016 statements about communicating with the head of Organization 1 was false and misleading.  In truth and in fact, the first time Person 2 interviewed the head of Organization 1 was on or about August 25, 2016, after STONE made his August 8 and August 12, 2016 public statements.  Similarly, at the time STONE made his August 2016 statements, STONE had directed Person 1—not Person 2—to contact the head of Organization 1.  And Person 1—not Person 2—had told STONE in advance of STONE's August 8 and August 12, 2016 public statements that "[w]ord is friend in embassy plans 2 more dumps," including one in October.  At no time did STONE identify Person 1 to HPSCI as another individual STONE contacted to serve as a "go-between," "intermediary," or other source of information from Organization 1.  STONE also never disclosed his exchanges with Person 1 when answering HPSCI's questioning about STONE's August 8 and August 12, 2016 statements.

<u>STONE's False and Misleading Testimony About Requests He Made for Information from the Head of Organization 1</u>

29.     During his HPSCI testimony, STONE was asked, "[W]hat was the extent of the communication with [the intermediary]?"  STONE replied, "I asked him to confirm . . . that the tweet of [the head of Organization 1] of the 21st was accurate, that they did in fact have . . . Hillary Clinton emails and that they would release them."  STONE was then asked, "Did you ask [the intermediary] to communicate anything else to [the head of Organization 1]?"  STONE falsely and misleadingly responded, "I did not."  STONE was then asked, "Did you ask [the intermediary] to do anything on your own behalf?"  STONE falsely and misleadingly responded, "I did not."

30.     In truth and in fact, STONE directed both Person 1 and Person 2 to pass on requests to the head of Organization 1 for documents that STONE believed would be damaging to the Clinton Campaign.  For example:

        a.     As described above, on or about July 25, 2016, STONE sent Person 1 an email that

read, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and get the pending [Organization 1] emails . . . they deal with Foundation, allegedly."

b.  On or about September 18, 2016, STONE sent a text message to Person 2 that said, "I am e-mailing u a request to pass on to [the head of Organization 1]," and then emailed Person 2 an article with allegations against then-candidate Clinton related to her service as Secretary of State.  STONE added, "Please ask [the head of Organization 1] for any State or HRC e-mail from August 10 to August 30—particularly on August 20, 2011 that mention [the subject of the article] or confirm this narrative."

c.  On or about September 19, 2016, STONE texted Person 2 again, writing "Pass my message . . . to [the head of Organization 1]."  Person 2 responded, "I did," and the next day Person 2, on an email blind-copied to STONE, forwarded the request to an attorney who had the ability to contact the head of Organization 1.

<u>STONE's False and Misleading Testimony About Communications with His Identified Intermediary</u>

31.  During his HPSCI testimony, STONE was asked repeatedly about his communications with the person he identified as his intermediary.  STONE falsely and misleadingly stated that he had never communicated with his intermediary in writing in any way.  During one exchange, STONE falsely and misleadingly claimed only to have spoken with the intermediary telephonically:

Q:  [H]ow did you communicate with the intermediary?

A:  Over the phone.

Q:  And did you have any other means of communicating with the intermediary?

A:  No.

Q:  No text messages, no – none of the list, right?

15

> A:      No.

Later during his testimony, STONE again falsely denied ever communicating with his intermediary in writing:

> Q:      So you never communicated with your intermediary in writing in any way?
>
> A:      No.
>
> Q:      Never emailed him or texted him?
>
> A:      He's not an email guy.
>
> Q:      So all your conversations with him were in person or over the phone.
>
> A:      Correct.

32.     In truth and in fact, as described above, STONE and Person 2 (who STONE identified to HPSCI as his intermediary) engaged in frequent written communication by email and text message.  STONE also engaged in frequent written communication by email and text message with Person 1, who also provided STONE with information regarding Organization 1.

33.     Written communications between STONE and Person 1 and between STONE and Person 2 continued through STONE's HPSCI testimony.  Indeed, on or about September 26, 2017—the day that STONE testified before HPSCI and denied having ever sent or received emails or text messages from Person 2—STONE and Person 2 exchanged over thirty text messages.

34.     Certain electronic messages between STONE and Person 1 and between STONE and Person 2 would have been material to HPSCI.  For example:

> a.      In or around July 2016, STONE emailed Person 1 to "get to" the head of Organization 1 and obtain the pending emails.
>
> b.      In or around September 2016, STONE sent messages directing Person 2 to pass a request to the head of Organization 1.
>
> c.      On or about January 6, 2017, Person 2 sent STONE an email that had the subject

line "Back channel bs." In the email, Person 2 wrote, "Well I have put together

timelines[] and you [] said you have a back-channel way back a month before I had

[the head of Organization 1] on my show . . . I have never had a conversation with

[the head of Organization 1] other than my radio show . . . I have pieced it all

together . . . so you may as well tell the truth that you had no back-channel or there's

the guy you were talking about early August."

<u>STONE's False and Misleading Testimony About Communications with the Trump Campaign</u>

35.    During his HPSCI testimony, STONE was asked, "did you discuss your conversations with

the intermediary with anyone involved in the Trump campaign?" STONE falsely and misleadingly

answered, "I did not." In truth and in fact, and as described above, STONE spoke to multiple

individuals involved in the Trump Campaign about what he claimed to have learned from his

intermediary to Organization 1, including the following:

   a.    On multiple occasions, STONE told senior Trump Campaign officials about
         materials possessed by Organization 1 and the timing of future releases.

   b.    On or about October 3, 2016, STONE wrote to a supporter involved with the Trump
         Campaign, "Spoke to my friend in London last night. The payload is still coming."

   c.    On or about October 4, 2016, STONE told a high-ranking Trump Campaign official
         that the head of Organization 1 had a "[s]erious security concern" but would release
         "a load every week going forward."

**<u>Attempts to Prevent Person 2 from Contradicting STONE's False Statements to HPSCI</u>**

36.    On or about October 19, 2017, STONE sent Person 2 an excerpt of his letter to HPSCI that

identified Person 2 as his "intermediary" to Organization 1. STONE urged Person 2, if asked by

HPSCI, to falsely confirm what STONE had previously testified to, including that it was Person 2

who provided STONE with the basis for STONE's early August 2016 statements about contact with Organization 1. Person 2 repeatedly told STONE that his testimony was false and told him to correct his testimony to HPSCI. STONE did not do so. STONE then engaged in a prolonged effort to prevent Person 2 from contradicting STONE's false statements to HPSCI.

37.     In or around November 2017, Person 2 received a request from HPSCI to testify voluntarily before the committee. After being contacted by HPSCI, Person 2 spoke and texted repeatedly with STONE. In these discussions, STONE sought to have Person 2 testify falsely either that Person 2 was the identified intermediary or that Person 2 could not remember what he had told STONE. Alternatively, STONE sought to have Person 2 invoke his Fifth Amendment right against self-incrimination. For example:

a.      On or about November 19, 2017, in a text message to STONE, Person 2 said that his lawyer wanted to see him (Person 2). STONE responded, "'Stonewall it. Plead the fifth. Anything to save the plan' . . . Richard Nixon." On or about November 20, 2017, Person 2 informed HPSCI that he declined HPSCI's request for a voluntary interview.

b.      On or about November 21, 2017, Person 2 texted STONE, "I was told that the house committee lawyer told my lawyer that I will be getting a subpoena." STONE responded, "That was the point at which your lawyers should have told them you would assert your 5th Amendment rights if compelled to appear."

c.      On or about November 28, 2017, Person 2 received a subpoena compelling his testimony before HPSCI. Person 2 informed STONE of the subpoena.

d.      On or about November 30, 2017, STONE asked Person 1 to write publicly about Person 2. Person 1 responded, "Are you sure you want to make something out of

this now? Why not wait to see what [Person 2] does. You may be defending yourself too much—raising new questions that will fuel new inquiries. This may be a time to say less, not more." STONE responded by telling Person 1 that Person 2 "will take the 5th—but let's hold a day."

e.     On multiple occasions, including on or about December 1, 2017, STONE told Person 2 that Person 2 should do a "Frank Pentangeli" before HPSCI in order to avoid contradicting STONE's testimony. Frank Pentangeli is a character in the film *The Godfather: Part II*, which both STONE and Person 2 had discussed, who testifies before a congressional committee and in that testimony claims not to know critical information that he does in fact know.

f.     On or about December 1, 2017, STONE texted Person 2, "And if you turned over anything to the FBI you're a fool." Later that day, Person 2 texted STONE, "You need to amend your testimony before I testify on the 15th." STONE responded, "If you testify you're a fool. Because of tromp I could never get away with a certain [*sic*] my Fifth Amendment rights but you can. I guarantee you you are the one who gets indicted for perjury if you're stupid enough to testify."

38.     On or about December 12, 2017, Person 2 informed HPSCI that he intended to assert his Fifth Amendment privilege against self-incrimination if required to appear by subpoena. Person 2 invoked his Fifth Amendment privilege in part to avoid providing evidence that would show STONE's previous testimony to Congress was false.

39.     Following Person 2's invocation of his Fifth Amendment privilege not to testify before HPSCI, STONE and Person 2 continued to have discussions about the various investigations into Russian interference in the 2016 election and what information Person 2 would provide to

investigators.   During these conversations, STONE repeatedly made statements intended to prevent Person 2 from cooperating with the investigations.  For example:

    a.    On or about December 24, 2017, Person 2 texted STONE, "I met [the head of Organization 1] for f[i]rst time this yea[r] sept 7 . . . docs prove that. . . .  You should be honest w fbi . . . there was no back channel . . . be honest."  STONE replied approximately two minutes later, "I'm not talking to the FBI and if your smart you won't either."

    b.    On or about April 9, 2018, STONE wrote in an email to Person 2, "You are a rat. A stoolie.  You backstab your friends-run your mouth my lawyers are dying Rip you to shreds."  STONE also said he would "take that dog away from you," referring to Person 2's dog.  On or about the same day, STONE wrote to Person 2, "I am so ready.  Let's get it on.  Prepare to die [expletive]."

    c.    On or about May 21, 2018, Person 2 wrote in an email to STONE, "You should have just been honest with the house Intel committee . . . you've opened yourself up to perjury charges like an idiot."  STONE responded, "You are so full of [expletive].  You got nothing.  Keep running your mouth and I'll file a bar complaint against your friend [the attorney who had the ability to contact the head of Organization 1]."

## COUNT ONE
### (Obstruction of Proceeding)

40.     Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

41.     From in or around May 2017 through at least December 2017, within the District of Columbia and elsewhere, the defendant ROGER JASON STONE, JR., corruptly influenced, obstructed, impeded, and endeavored to influence, obstruct, and impede the due and proper exercise of the power of inquiry under which any inquiry and investigation is being had by either House, and any committee of either House and any joint committee of the Congress, to wit: STONE testified falsely and misleadingly at a HPSCI hearing in or around September 2017; STONE failed to turn over and lied about the existence of responsive records to HPSCI's requests about documents; STONE submitted and caused to be submitted a letter to HPSCI falsely and misleadingly describing communications with Person 2; and STONE attempted to have Person 2 testify falsely before HPSCI or prevent him from testifying.

All in violation of Title 18, United States Code, Sections 1505 and 2.

## COUNTS TWO THROUGH SIX
### (False Statements)

42.     Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

43.     On or about September 26, 2017, within the District of Columbia and elsewhere, in a matter within the jurisdiction of the legislative branch of the Government of the United States, the defendant ROGER JASON STONE, JR., knowingly and willfully made and caused to be made materially false, fictitious, and fraudulent statements and representations, to wit:

| Count | False Statement |
|:---:|:---|
| **2** | STONE testified falsely that he did not have emails with third parties about the head of Organization 1, and that he did not have any documents, emails, or text messages that refer to the head of Organization 1. |
| **3** | STONE testified falsely that his August 2016 references to being in contact with the head of Organization 1 were references to communications with a single "go-between," "mutual friend," and "intermediary," who STONE identified as Person 2. |
| **4** | STONE testified falsely that he did not ask the person he referred to as his "go-between," "mutual friend," and "intermediary," to communicate anything to the head of Organization 1 and did not ask the intermediary to do anything on STONE's behalf. |
| **5** | STONE testified falsely that he and the person he referred to as his "go-between," "mutual friend," and "intermediary" did not communicate via text message or email about Organization 1. |
| **6** | STONE testified falsely that he had never discussed his conversations with the person he referred to as his "go-between," "mutual |

| Count | False Statement |
|-------|-----------------|
|       | friend," and "intermediary" with anyone involved in the Trump Campaign. |

All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

## COUNT SEVEN
### (Witness Tampering)

44.     Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

45.     Between in or around September 2017 and present, within the District of Columbia and elsewhere, the defendant ROGER JASON STONE, JR., knowingly and intentionally corruptly persuaded and attempted to corruptly persuade another person, to wit: Person 2, with intent to influence, delay, and prevent the testimony of any person in an official proceeding.

All in violation of Title 18, United States Code, Section 1512(b)(1).

_____
Robert S. Mueller, III
Special Counsel
U.S. Department of Justice

A TRUE BILL:

_____
Foreperson

Date:  January 24, 2019

# EXHIBIT 3

# KLAYMAN LAW GROUP

### A PROFESSIONAL ASSOCIATION

Larry Klayman, Esq.        7050 W. Palmetto Park Road        Tel: 561-558-5336
Boca Raton FL 33433

Via Email and Mail

November 9, 2020

Marc J. Randazza, Esq.
Randazza Legal Group, PLLC
2764 Lake Sahara Drive, Suite 109
Las Vegas, NV 89117
ecf@randazza.com; mjr@randazza.com

Counsel for the Infowars Defendants

Robert Buschel, Esq.
100 Southeast Third Ave Suite 1300
Fort Lauderdale FL 33394
buschel@bglaw-pa.com

Counsel for Defendant Stone

Re:     Further Notice Pursuant to Florida Statute §770.01

With full reservation of rights, and though Defendants have already been on notice of the the false and misleading defamatory statements at issue for over well over a year and one-half, this letter serves as further notice under Florida Statute §770.01 that the statements made on or about January 18, 2019 on Infowars, during an episode of "The War Room" with Owen Shroyer contained false and defamatory statements about me. This moots out any incorrect claim that the statute was not satisfied. Your clients now have an additional five days to retract the false and misleading defamatory statements set forth below, as well as to make an on-air apology.

Specifically, the defamatory statements are:

"He's (Klayman) never actually won a courtroom victory in his life."

"He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'"

He'sv(Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. With him as Jerry Corsi's

lawyer, Corsi may get the electric chair. So your idea that he's a good guy is entirely wrong"

Klayman is a "piece of garbage."

"For those people out there who think…that Larry Klayman's IQ is higher than 70, you're wrong…"

I again demand a formal, on-air retraction of these false and defamatory statements, along with an on-air apology within 5 days, as this could serve to mitigate in some small way the considerable damage which was inflicted on me.

 Govern yourselves accordingly.

Sincerely,

Larry Klayman, Esq.

# KLAYMAN LAW GROUP

### A PROFESSIONAL ASSOCIATION

Larry Klayman, Esq.                    7050 W. Palmetto Park Road                    Tel: 561-558-5336
                                       Boca Raton FL 33433

Via Email and Mail

November 10, 2020

David S. Wachen, Esq.
Wachen LLC
11605 Montague Court
Potomac, MD  20854
david@wachenlaw.com

Counsel for David Jones

Re:      Further Notice Pursuant to Florida Statute §770.01

With full reservation of rights, and though Defendant David Jones has already been on notice of the the false and misleading defamatory statements at issue for over well over a year and one-half, this letter serves as further notice under Florida Statute §770.01 that the statements made on or about January 18, 2019 on Infowars, during an episode of "The War Room" with Owen Shroyer contained false and defamatory statements about me. This moots out any incorrect claim that the statute was not satisfied. Your client now has an additional five days to retract the false and misleading defamatory statements set forth below, as well as to make an on-air apology.

Specifically, the defamatory statements are:

> "He's (Klayman) never actually won a courtroom victory in his life."

> "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'"

> He'sv(Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. With him as Jerry Corsi's lawyer, Corsi may get the electric chair. So your idea that he's a good guy is entirely wrong"

> Klayman is a "piece of garbage."

> "For those people out there who think…that Larry Klayman's IQ is higher than 70, you're wrong…"

I again demand a formal, on-air retraction of these false and defamatory statements, along with an on-air apology within 5 days, as this could serve to mitigate in some small way the considerable damage which was inflicted on me.

Govern yourselves accordingly.

Sincerely,

Larry Klayman, Esq.

EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

LARRY KLAYMAN

              Plaintiff

      v.

INFOWARS, LLC et. al

              Defendants.

**Case Number:   0:20-cv-61912**

<u>**SWORN AFFIDAVIT OF LARRY KLAYMAN**</u>

I, Larry Klayman, being over eighteen years of age and duly competent to testify, hereby swear and affirm as follows:

<u>**FACTS PERTAINING TO MY BACKGROUND AND DEFAMATION**</u>

1.      I have personal knowledge of the following facts and if called upon as a witness, could testify competently thereto.

2.      In 1973, I graduated from Duke University where I majored in political science and French literature. I excelled academically and graduated with honors.

3.      I then matriculated at Emory Law School where I excelled academically and graduated in 1977. While in law school, I worked as an intern at the U.S. International Trade Commission, the Georgia Attorney General and the U.S. Attorney for the Northern District of Georgia.

4.      I passed The Florida Bar the first time I took the exam.

5.      I passed all bar exams on my first attempt, including the District of Columbia Bar.

6.      I began my legal career in this circuit in Miami, Florida as an associate for Blackwell, Walker, Gray, Roberts, Flick & Hoehl ("Blackwell"), which was then the largest and arguably the most prestigious law firm in Miami, Florida. I was admitted into The Florida Bar

having been sworn in on December 7, 1977. I have practiced law in this circuit continuously and extensively throughout my forty-three-year career and have active cases pending in this circuit and elsewhere in Florida, including during the period that I was a trial attorney for the U.S. Department of Justice's ("DOJ") Antitrust Division, from 1980 to 1982, where I was assigned litigation in this circuit, where I was later a candidate for U.S. Attorney, the post eventually having been given to the roommate of Jeb Bush in college by President George H. W. Bush.

7.      I conceived of and founded Judicial Watch, Inc. ("Judicial Watch") in 1994, a public interest group that's mission was to investigate and prosecute government corruption and abuse. I was the Chairman, General Counsel, and Corporate Treasurer of Judicial Watch until I voluntarily departed in 2003 to run as a candidate for the U.S. Senate in Florida in the Republican primary election.

8.      In 1998, during the time I ran Judicial Watch, I hired Thomas J. Fitton ("Fitton") as my contract assistant. I later appointed him president of the organization I founded.

9.      In September of 2003, I voluntarily departed from Judicial Watch to run for the U.S. Senate in Florida. At the time I left Judicial Watch, I learned that Fitton had never graduated from college, which he had told me he had when I initially hired him.

10.     Contrary to Defendant Roger Stone's ("Stone") and Defendants Infowars LLC, Free Speech Systems LLC, Alex Jones, David Jones, and Owen Shroyer (the "Infowars Defendants") false and defamatory publications, I have enjoyed many successes in my career as a lawyer, many of which have been brought to the attention of the public by complimentary newspapers, magazines, editorials and journals.

11.     As shown in the Affidavit of Kelly Morales, attached to the Amended Complaint as Exhibit 1, David Jones runs Infowars with Alex Jones and is intricately and intimately involved the Infowars Defendants' numerous defamatory and otherwise improper and illegal actions.

12.     For example, I practiced law at Blackwell with my supervising partners Paul Larkin and Layton Mank and participating in winning product liability cases as defense counsel for Blackwell including cases involving Raleigh bicycles, pharmaceutical drugs manufactured by Burroughs-Welcome, and allegedly misdiagnosed cancer victims, and other personal injury and medical malpractice cases. Additionally, I handled lawsuits in admiralty.

13.     I left Blackwell to join the DOJ as a trial lawyer, prosecutor and defense lawyer in late 1979. During my time at the DOJ, I had many victories in the courtroom as well as favorable settlements for the government, i.e., such as for the Consumer Affairs Section of the Antitrust Division over misbranded, adulterated food and drug products including fruit drinks and prophylactics for the Food & Drug Administration ("FDA") and successful seizures and criminal prosecutions of dangerous products on behalf of the Consumer Product Safety Commission ("CPSC") such as slant-sided refuse bins, flammable children's sleepwear, and intraocular lens implants for cataract patients.

14.     Importantly, I was also on the trial team that successfully broke up the AT&T monopoly – creating competition in the telecommunications industry. I left the DOJ in late 1981.

15.     Then, working as an international trade lawyer for Busby, Rehm & Leonard and after a few years having founded my own firm The Law Offices of Larry E. Klayman, later named Klayman & Associates, P.C., I won countervailing duty and antidumping duty cases concerning steel from South Africa, garden furniture from Italy, musical instrument pads from Italy, coffee filters from Brazil, key limes from Peru, fireworks from China and a host of other product imports. I represented both importers and exporters. (While at Busby, Rehm & Leonard, I also took some months on hiatus and worked in the Competition Directorate (DG-4) of the Commission of the European Communities Section ("E.C.").

16.     Later, with my law firm, I won Section 337 unfair trade practice cases at the U.S. International Trade Commission ("USITC") concerning tennis rackets from Belgium, power tools from Taiwan, luggage from Taiwan, mass spectrometers from France, jam from Belgium, and machine tools from Brazil. I won a landmark case concerning recloseable plastic bags, which broke the patents of Minigrip and Dow Corning, Minigrip's licensee. That case victory opened up competition for zip lock bags, a multi-trillion dollar industry.

17.     There was also an USITC patent case, pursuant to Section 337, which I litigated and won involving motorcycle helmets and won other antidumping and countervailing duty cases before the Commerce Department and USITC concerning fire protection products and scuba diving neoprene body suits.

18.     I also won a Section 302 case involving paper from Brazil.

19.     All of the Section 337 cases were judge-tried and I won every one of them.

20.     I won a jury trial against Makita over power tools, another jury trial against a domestic manufacturer of removable swimming pools for my client Remova Pool Fence Co., and yet another jury trial for my client, Maccaferri, on a contract dispute. These are only some of the jury trials I won during my early career.

21.     Because of my work during the time I ran Judicial Watch, a court ruled that President William Clinton committed a crime during the Filegate litigation. I also triggered the famous Chinagate scandal in a Freedom of Information Act, 5 U.S.C. § 552 et seq. case, which gave rise to Judicial Watch ultimately being awarded almost a million dollars. I filed cases which ended Bill and Hillary Clinton's attempted illegal purchase at below market rates for their mortgage of their home at Chappaqua, New York and ended the illegal payment of legal fees to the Clintons by State Farm, which was alleged to be a form of bribery. I also participated in the famous *Gore v. Bush* litigation in Tallahassee, Florida that settled the 2000 presidential elections

4

by the U.S Supreme Court. I also brought a case under the Foreign Agents Registration Act ("FARA") over the Cheney Energy Task Force that made its way to the U.S. Supreme Court.

22.      I brought a case for Jose Basulto of Brothers to the Rescue in this Court, which resulted in a $1.8 million judgment against the Republic of Cuba for shooting down Brothers to the Rescue planes, and I represented the Miami family of Elian Gonzales and other victims of Fidel Castro, such as journalists who were jailed by Castro for their political beliefs. In this regard, I not only filed criminal complaints for these victims against Fidel Castro in Belgium courts, but also lobbied and testified in both Italian and French in Italy and France, as I am fluent in both languages, before various European parliaments to increase economic sanctions on Cuba for abuse of human rights. I also lobbied the European Union in Brussels, Belgium for increased sanctions on Cuba.

23.      On December 16, 2013, Judge Richard J. Leon granted my request for a preliminary injunction in my case against the National Security Agency ("NSA") and the Obama administration, when Judge Leon found for the first time in history that the collection of metadata telephony records by the NSA was likely unconstitutional.

24.      Because of that ruling, Congress enacted the USA Freedom Act, which sought to end illegal and unconstitutional mass surveillance by government intelligence agencies and the Federal Bureau of Investigation ("FBI").

25.      I obtained a jury verdict in this Court, U.S. District Court for the Southern District of Florida, against my former public interest group Judicial Watch, which was then run by Fitton, for maliciously defaming me in the amount of $181,000, which included punitive damages.

26.      My client Sheriff Joe Arpaio and I were the first to challenge former President Obama's unconstitutional executive amnesty for over 5 million illegal aliens and were ultimately successful, along with 25 other attorneys general, in front of the U.S. Supreme Court.

27.     It was my efforts that prevented Dr. Jerome Corsi ("Dr. Corsi") from getting indicted, first because he told the truth and did not engage in witness tampering and threaten to kill a witness such as Randy Credico, as Stone did, and second because of my legal skills and acumen. Dr. Corsi was a material witness in the Russian Collusion investigation by Special Counsel Robert Mueller ("Mueller") and is listed as a material witness as Person 1 in Stone's Mueller indictment.

28.     I have had many other successes in addition to the above-listed victories.

29.     I myself authored a book titled "Whores: Why and How I Came to Fight the Establishment" published in 2009. In it, I wrote about my unfortunate experience with Stone. *See* Exhibit A. I authored this book myself without a ghostwriter and I came runner-up at an International Book Fair. It also still has a review on www.Barnesandnoble.com of 4.5 stars out of the maximum 5 stars.

30.     Upon its publication, Jack Cashill, the author of "Ron Brown's Body" had this to say about me: "That *Time* magazine has yet to name Larry Klayman 'Man of the Year' is a failure of *Time*, not Klayman's. The work he and Judicial Watch did on the Brown case is stunning." *See* Exhibit B.

31.     Joseph Farah, the founder of WorldNetDaily.com, had this to say about me: "Larry Klayman is my hero because he has integrity – enough to prevent him from blind loyalty to party or ideology . . . That's because he is fearless and relentless in the pursuit of justice . . . There were other men like Larry early in American history. Their names were Washington, Jefferson, Madison and Henry. *See* Exhibit B.

32.     Louis Jacobson of the National Journal said this of me: " . . . through his challenge of secrecy rules, Larry Klayman has become a force in Washington. *See* Exhibit B.

33.     Bill Moyers, of "Now" PBS, said this: ". . . his idea of fun is trying to kick down a door some public official has marked secret . . . Larry Klayman is himself a conservative, but there's nothing partisan bout his indignation."

34.     Frank Rich, famed columnist for "The New York Times" said this: "Larry . . . I appreciate your own maverick – if we can still use that word! – thinking and stands."

35.     My new book, *It Takes a Revolution: Forget the Scandal Industry* has garnered the following advance praise:

> Larry Klayman is a fearless advocate who defeated special counsel Mueller's 'deep state' attempt to have me testify against President Trump by threatening me with prosecution if I did not lie under oath. I am eternally grateful to him! He is a true champion of justice! —Dr. Jerome Corsi, New York Times Bestselling Author

> Larry Klayman is a uniquely public-spirited lawyer. He has never lost sight of the fact that the responsible activity of individual citizens, seriously seeking to exercise their God-endowed rights, is the indispensable energy source for all our institutions of self-government.—Ambassador Alan L. Keyes, Former UN Ambassador and Presidential Candidate

> That Time magazine has yet to name Larry Klayman 'Man of the Year' is a failure of Time, not Klayman's —Jack Cashill, Bestselling Author of Ron Brown's Body

> "While others talk of corruption and injustice in our federal courts, Larry Klayman is a man who has done something about it. As founder of Judicial Watch and Freedom Watch, Larry Klayman became a household name to those of us who want to stop the runaway power of federal judges and restore honesty and integrity to our federal court system. Echoing the sentiments of our Founding Fathers like Thomas Jefferson and James Madison, Larry Klayman has fought for a return to the principles and foundation of our Constitutional Republic wherein people are the source of all power. With over forty years of experience in the practice of law, Larry Klayman has represented defendants across America in defense of their right to 'life, liberty, and the pursuit of happiness.' Larry is a valiant warrior for truth and justice, and a man I am proud to call my friend. I hope that you will enjoy his noble work, It Takes a Revolution: Forget the Scandal Industry!" —Chief Justice Roy Moore

> "Larry Klayman is my hero because he has integrity—enough to prevent him from blind loyalty to party or ideology...That's because he is fearless and relentless in the pursuit of justice... There were other men like Larry early in American history. Their names were Washington, Jefferson, Madison, and Henry."—Joseph Farah, CEO, www.wnd.com

7

"Larry Klayman stood in the stead for my family and me under very trying circumstances. He is persistent, loyal, and a great believer in the Constitution, as my sons and I are as well. I respect his wisdom and strength and cherish his friendship." —Cliven Bundy, Nevada Rancher

"Klayman's work It Takes a Revolution: Forget the Scandal Industry! is brilliant, however unorthodox. But Larry is always right!" —Ben Stein, Lawyer, Actor, Writer

"As the father of Navy SEAL Ty Woods, who was killed at Benghazi, I highly recommend this book. Just as Ty was a warrior as a Navy SEAL, as a fellow lawyer and as his friend I can attest to Larry being a warrior in the courtroom." —Charles Woods, Father of Navy SEAL Ty Woods

"I admire Larry, because he is first and foremost a patriot. He not only believes in the words of the Constitution, he practices those words in all of his endeavors. He was there when I needed him." —Laura Luhn, Sexual Abuse Victim of Roger Ailes

"Larry Klayman is one of the most principled and intellectual minds in the world of litigation. He believes in fighting for justice at all costs to protect our constitutional freedoms! I am honored to be able to call him a friend and mentor. God brings people into your life for different reasons. I believe that God connected us because he wanted me to have a big brother to encourage me to maximize my potential and guide me in the right direction. Thank you, Larry!" —Sergeant Demetrick Pennie, President of the Dallas Fallen Officer Foundation

"Larry Klayman was the only attorney who had the guts to stand beside us and go against the government to get answers when our son, Michael, was killed in Afghanistan aboard Extortion 17 on 08/06/2011. Larry is a bulldog in the courtroom! He helped us win against the NSA, the first time in American history!" —Charles Strange, Gold Star Father of PO1 Michael Strange (DEVGRU) Exhibit B.

36.     These are just a few of the accolades I have received over the years from conservatives and liberals alike, who appreciate and admire my work. *See* my biography attached as Exhibit C and incorporated herein by reference; *see also* Exhibit D, "Larry Klayman, the One Man Tea Party" which attributes the genesis of the Tea Party to me.

37.     I am now the founder, Chairman and General Counsel of Freedom Watch, Inc., which has the mission of investigating and prosecuting government corruption and abuse through legal advocacy. I also am in private practice with The Klayman Law Group, P.A., which is a

Florida professional association aka a "P.A." I am unique as a public interest advocate. I am a columnist for World Net Daily and have had about 500+ columns published over the last 10 years. I have also been a columnist for Newsmax through a blog titled "Klayman' Court" and in addition to my books "It Takes a Revolution: Forget the Scandal Industry!" and "Whores: How and Why I Came to Fight the Establishment!", I also published two other books: "Fatal Neglect" and "Essays of a Mad Man." I also have my own syndicated radio show and daily podcasts with Radio America called "Special Prosecutor with Larry Klayman."

38.     Each of the Defendants, Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars, is intimately familiar with my background, qualifications and successes as a public interest and private attorney. For this reason, I was previously invited to appear on Infowars on many occasions before Defendants decided – at the direction of and in concert Roger Stone as joint tortfeasors– to defame, harm, unfairly compete with and tortiously interfere with my client, Dr. Corsi and me.

## MY EXPERIENCE WITH STONE AND INFOWARS

39.     I met Stone at the Old Ebbitt Grill in Washington, D.C. in 1988 while he was a partner with Paul Manafort and others and was working as a lobbyist for the firm Black, Manafort, Stone, & Kelly.

40.     Stone was a "political consultant" who claimed to help get presidents and other politicians elected. The firm made money by then lobbying the very men they put in office.

41.     Stone backed Republican candidate Jack Kemp for President and he recommended that I be put on the executive finance committee, which also included Donald J. Trump.

42.     Because Stone knew of my successes and capabilities as a private lawyer, he told me that he had recommended me for U.S. Attorney when George Bush was President in 1992.

43.     In 1996, at a Republican Convention in San Diego, California, Stone was filmed at a "toga party" with his wife at a "swingers party."

44.     The media at the time went after Stone because of his alleged participation in the "sex party" and created a scandal.

45.     The media alleged at the time that Stone solicited sex half-naked, and that there was a picture of Stone in a compromising position to back up the story.

46.     Stone contacted me and, because he knew my capabilities and acumen as a lawyer, retained me to represent him to get the media to cease what he claimed then was a smear campaign.

47.     I successfully got the media to back off Stone through my skill as a lawyer and Stone was grateful.

48.     I maintained in sporadic contact with Stone until 2003 when I told him of my plans to voluntarily leave Judicial Watch and run for the U.S. Senate.

49.     There were confirmed rumors that Senator Bob Graham would retire from the U.S Senate well before he announced his retirement in November 2003. Stone traveled in Republican and political circles and knew that the Senator would be retiring in early to mid 2003.

50.     Thus, I was in contact with Stone in early to mid 2003, having been put in contact with him by Scott Reed, then Chief of Staff to Jack Kemp, who then was Secretary of Housing and Urban Development, and Stone was made aware by Scott Reed that I intended to run for the U.S. Senate to fill Bob Graham's seat.

51.     As I was a newcomer to politics, it would have been virtually impossible for me to beat Bob Graham, the incumbent, given the privileges and name recognition an incumbent receives, unless he or she is enmeshed in a major scandal. Senator Bob Graham was never enmeshed in such scandal.

52.     Because he was aware of my prior successes at Judicial Watch and before, Stone wanted to work with me as my U.S. Senate campaign manager. During this time, the spring, summer, and fall of 2003, and in preparation for my U.S. Senate run, Stone researched and kept books and records of many of my accomplishments. He had several binders (2-3 feet) full of information about me and the victories that I had obtained at Judicial Watch and elsewhere, which he compiled with his assistant Diane Thorne. Again, because Stone knew of my successes and legal political acumen, Stone wanted to be on my team and help me run for the U.S. Senate.

53.     Stone thus knew of many cases I had won in courtrooms and other legal accomplishments and in fact had kept records of successes in a book of my accomplishments.

54.     Soon after I hired him and during the height of my U.S. Senate campaign, I discovered that Stone had a conflict of interest and was working with Al Sharpton, while simultaneously working with me. He had agreed to represent me exclusively and I considered Al Sharpton to be an unsavory character. He also was not competently running my campaign with a staff of his friends which he had hired at great expense to me.

55.     I let Stone go roughly after about one month of his working with me on my U.S. Senate campaign. Shortly after his being let go, Stone and his sidekick Mike Caputo, whom he hired on my behalf as the campaign's press secretary, along with other staff Stone had hired, stole thousands of dollars of campaign cell phones and laptops, which I had purchased with my personal funds for the campaign.

56.     I have not spoken to Stone since I parted ways with him in 2003 given this experience, other than at a fairly recent deposition of him.[1]

---

[1] The transcript is available at
https://empirelegal.reporterbase.com/Contact?ep=cGdtaWQ9Q0NfUlAwMCZzmaWxlTm89MTQ5OTIy  and is incorporated herein by reference

57.     Stone is an individual and citizen of Florida. Special Counsel Robert Mueller ("Mueller") indicted Stone as part of the alleged "Russian Collusion" investigation with seven different felony counts, including lying under oath, witness tampering and obstruction of justice by threatening to kill a material witness and his service dog.

58.     Stone acted with actual malice when he published the false, misleading and defamatory statements concerning me because he knew they were false or acted with a reckless disregard to their truth, as set forth herein.

59.     Stone not only acted with actual malice when he published the false, misleading and defamatory statements concerning me, but he also had motives to maliciously defame me. He published the false and misleading statements knowing that they were false or with a reckless disregard for their truth. Stone had reason to know that his statements were false.

60.     The January 18, 2019 InfoWars video, was published, where Stone acted in concert with Infowars and other defendants pled in the Amended Complaint in this case. This video was this widely published in this district and elsewhere and contained several false, misleading and defamatory statements concerning me. As pled in the Amended Complaint, these false and defamatory statements include but are not limited to:

**At 1:25, Defendant Stone says, "He's (Klayman) never actually won a courtroom victory in his life."**

**At 1:30, Defendant Stone says, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton why he left. He was 'ousted' because of a 'sexual harassment complaint.'"**

**At 1:37, Defendant Stone says, "He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. With him as Jerry Cori's lawyer, Corsi may get the electric chair. So your idea that he's a good guy is entirely wrong."**

**At 2:01, Defendant Stone published that Plaintiff is "a piece of garbage."**

**At 4:11, Defendant Stone says, "For those people out there who think . . . that Larry Klayman's IQ is higher than 70, you're wrong . . ."**

61.     Stone is aware of *many, many* victories of mine as he was in charge of putting together the book of my accomplishments for fundraising purposes for my U.S. Senate campaign, among other reasons.

62.     As pled in the Amended Complaint, Mr. Klayman "left Judicial Watch voluntarily on his own accord in order to run for U.S. Senate in Florida in 2003-2004." Stone's false revisionist history is therefore a malicious and false statement of fact.

63.     Furthermore, as the final "nail in the coffin" to the Infowars Defendants' assertions, Thomas Fitton ("Fitton"), under oath, at a deposition in another matter testified that "[y]ou [Mr. Klayman] weren't ousted as a result of a sexual harassment complaint." Exhibit E. This conclusively shows that Defendant Stone, in concert with the Infowars Defendants, published an objectively verifiable false statement. Indeed, at the same deposition, Fitton admits to never haven spoken to Stone, which shows that Stone simply made this lie up. Exhibit E. Stone admitted under oath in a deposition that he did not speak to Fitton about this either, so it is clear that Stone made this up to defame me. Exhibit E.

64.     Since the time I let Stone go as my campaign manager in late 2003, Stone has tried to trade off my clients like a "scavenger." I have warned my clients not to become involved with him as, in my opinion and through my experience, Stone is not an honorable, ethical or honest person, but in my opinion based on my experience with him a sleazy "bottom feeder." He has been widely and rightly called a self-styled "dirty trickster." In my opinion, this characterization is accurate based on my experience dealing with him. *See* "Get me Roger Stone" on Netflix, https://www.netflix.com/title/80114666. He tried to trade off my clients for his own profit and purposes.

65.     When the National Enquirer contacted me in 2018 to get a comment on a story it was writing about President Donald Trump and to get my legal opinion on the Mueller investigation, I told the reporter not to quote me in the same article as Stone, or any article in which he wrote, as Stone wrote for the National Enquirer at the time. The National Enquirer is located in South Florida and is apparently close with Stone, a South Florida citizen. I did not want to be quoted or associated at all with Stone because I consider him – like others do – to be a self-styled dirty trickster who was likely going to be indicted for alleged criminal behavior by Mueller and in fact was indicted by Mueller and later convicted, Stone not having put forth even one witness on his behalf because he had no defense to the charges.

66.     In 2018, I also told Alex Jones and his show producers on InfoWars that I did not want to appear on any show which included Stone or had ties to Stone, either as a guest or as a host, because I strongly felt at the time that Mueller may indict Stone. Stone was at the time a host on InfoWars and again is working for and/or with Infowars on its broadcasts and other commercial activities in this district, and throughout the nation and internationally.

67.     I also warned Alex Jones not to release any information – that was potentially under seal in the contempt case of *Melendrez v. Arpaio*, 07-cv-02513 (D. Ariz. 2007) – which he may have improperly obtained from Stone or others concerning Dennis Montgomery, another whistleblower client of mine who contracted with the U.S. government so it could use his software capabilities for intelligence gathering.

68.     During the criminal trial of my client Cliven Bundy, again to try to scavenge off my clients, Stone flew to Las Vegas, Nevada where the Bundys lived and boasted that he could get a pardon for Cliven Bundy and his sons. I told Carol Bundy, Cliven's wife and the sons' mother, to stay away from Stone and she did.

69.     I also warned my then client at the time, Dennis Montgomery, to stay away from Stone.

70.     Stone wanted to – and did – intimate and threaten my client Dr. Corsi since he was a material witness in the Mueller investigation as Stone obviously feared that he would testify against him to Mueller. Stone feared me as Dr. Corsi's lawyer as he knew that I know what type of person he is and must have thought falsely that my representation of Dr. Corsi was my revenge for him having harmed me during my U.S. Senate campaign.

71.     In sum, Stone tried to trade off my clients and at the time  I shut this down every time in order to protect my clients from Stone. He also knew that I wanted nothing to do with him and I predicted early on in the Russian collusion investigation that Mueller would most likely indict Stone because of – in my experience with him – his rank dishonesty and dirty tricks.

72.     This, in addition to other information that will be uncovered in discovery, supplies the motive to maliciously defame me. That he attacks my acumen and ability as a lawyer and defamed me personally with false sexual harassment complaint claims is directly related to my having kept him away from my clients and my representation of Dr. Corsi, as well as his intent and the Infowars Defendants intent and practice to compete unfairly against me, as well as tortiously interfere in my various endeavors as pled in the Amended Complaint in this case.

73.     This vindictive, malicious retaliation by Stone had a logical purpose. He tried to intimate and threaten Dr. Corsi and me in order for us not to collaborate with Mueller. We obviously did not collaborate with Mueller but Stone is both unstable and unhinged apparently paranoid and he tried to prevent collaboration at all costs in order to try to save his own skin. His conduct toward us is similar to his conduct toward Material Witness 2 in the Mueller investigation, Randy Credico, who he allegedly threatened "Mafioso style" to kill. He even

allegedly threatened to kill Credico's service dog, for which he was in part indicted. He has also threatened Dr. Corsi and me.

## FACTS PERTAINING TO UNFAIR COMPETITION

74.     I derive financial benefit from appearing on radio and internet programs as a conservative political analysist and media personality, as well as my writings as a columnist and author. These endeavors enhance by reputation and good will which derives financial and other benefits for me as part of my livelihood.

75.     I am a direct competitor of Roger Stone, as well as the Infowars Defendants, as I derive income from appearing on radio and internet programs and my writings as a conservative political analysts and media pundit nationwide and in this judicial district

76.     Roger Stone and the Infowars Defendants are direct competitors with me, as they are also conservative political analysts, authors and media pundits who broadcast and do substantial business in this judicial district.

77.     Roger Stone and the Infowars Defendants sell products and services, publish books, and appear on the radio and internet nationwide and in this judicial district.

78.     I also sell products and services, publish books, and appear on the radio and nationwide in this judicial district.

79.     In a recent interview with Real Clear Politics, Roger Stone admitted that he intends to host a weekly syndicated radio show as well as a daily podcast in 2021.[2] Stone has had and continues to have a blog and does podcasts as the Stone Cold Truth. I too have blogs and do a daily podcast entitled, as is my syndicated radio show, "Special Prosecutor Larry Klayman,"

---

[2]https://www.realclearpolitics.com/articles/2020/11/25/roger_stone_on_his_conviction_trump_vote_fraud_and_faith_144725.html

which is posted as www.radioamerica.com and on www.freedomwatch.org as well as YouTube and other social media sites.

80.     Thus, I also host a weekly syndicated radio show and I do daily podcasts as well. I am therefore a direct competitor with Roger Stone and the Infowars Defendants.

81.     Roger Stone and the Infowars Defendants have harmed me as a competitor by publishing false statements about and which bear on my services in order to harm and eliminate me as a competitor. All of the Defendants compete with me on the airwaves and in written publications.

82.     The Infowars Defendants, acting at the direction of Roger Stone, are therefore liable under the FDUTPA and the Lanham Act.

83.     On information and belief, the Infowars Defendants and Stone are also tortuously interfering with me causing to be filed and then  financing frivolous bar complaints against me in order to harm my legal practice and standing as a columnist, author, and radio talk show host, as pled in the Amended Complaint in this case.

84.     The Infowars Defendants and Stone have caused to be filed and then financed frivolous bar complaints from Pete Santilli and Dennis Montgomery, which force me to expend a ton of valuable time and resources to defend, even though they are frivolous. They then have these frivolous bar complaints publicized by Santilli and others to further harm me personally and professionally, by damaging my reputation and good will.

85.     As pled in the Amended Complaint, as just one instance of the Infowars Defendants, Stone, and Pete Santilli working together in concert, the episode of the Pete Santilli show found at https://www.youtube.com/watch?v=xbpeHciUqP8&feature=youtu.be prominently features all of these people and Alex Jones actually directly tells Pete Santilli that Stone recommended him. In this video, Stone through his surrogate Santilli viciously attacks Judge Amy

Berman Jackson with vile and disgusting language that was produced on his behalf. Also appearing and endorsing this video is Alex Jones of Infowars, again underscoring that the Infowars Defendants as pled in the Amended Complaint are all very close colleagues and have worked together in concert as joint tortfeasors to harm Plaintiff. The full impact and relevancy of this vile and disgusting video must be viewed in its entirely to fully appreciate the nature and conduct of the Infowars Defendants in this case, as well as their joint tortfeasor Roger Stone.

86.     In a deposition taken in February of 2020, Roger Stone smugly threatened to have me disbarred as well, consistent the allegations of the Amended Complaint in this case.:

> MR. KLAYMAN: I look forward to having you  there.
> THE WITNESS: Yeah, me too.
> MR. KLAYMAN: If you're not in prison at that  time.
> THE WITNESS: If you're not disbarred by then. Exhibit F.

87.     Thus, the Infowars Defendants and Stone have tortuously interfered with me by causing to be filed and then financing frivolous bar complaints against me in order to harm my legal practice and standing as a columnist, author, and radio talk show host. Further actionable tortious acts will undoubtedly be uncovered during discovery and I reserve the right to seek to amend the Amended Complaint in this case.

Affiant Sayeth Not

SWORN TO UNDER PENALTY OF PERJURY THIS 4th  DAY OF DECEMBER 2020

_____
Larry Klayman

# EXHIBIT A



*Larry Klayman is a prickly troublemaker uncongenial to party and ideological establishment.*
Robert Novak, columnist

# WHORES

## WHY AND HOW I CAME
## TO FIGHT THE ESTABLISHMENT

## LARRY KLAYMAN
FOUNDER OF JUDICIAL WATCH AND FREEDOM WATCH

# EXHIBIT B



©1998, The Washington Post. Photography by Larry Morris. Reprinted with permission.

*...his idea of fun is trying to kick
down a door some public official
has marked secret...Larry Klayman
is himself a conservative, but
there's nothing partisan about
his indignation.*
—BILL MOYERS, "NOW" PBS

*Larry...I appreciate your own maverick—if we can still use that
word!—thinking and stands.*
—FRANK RICH, COLUMNIST FOR *THE NEW YORK TIMES*

*That* Time *magazine has yet to name Larry Klayman "Man of the
Year" is a failure of* Time, *not Klayman's. The work he and Judicial
Watch did on the Brown case is stunning.*
—JACK CASHILL, AUTHOR OF *RON BROWN'S BODY*

*Larry Klayman is my hero because he has integrity—enough to
prevent him from blind loyalty to party or ideology...That's because
he is fearless and relentless in the pursuit of justice...There were
other men like Larry throughout American history. Their names were
Washington, Jefferson, Madison and Henry.*
—JOSEPH FARAH, WORLDNETDAILY.COM

*...through his challenge of secrecy rules, Larry Klayman has become a
force in Washington.*
—LOUIS JACOBSON, *NATIONAL JOURNAL*

*Nobody ever accused Larry
Klayman of thinking small,
but his latest suit may be
outsized by even his standards.
The former head of conservative
watchdog Judicial Watch who
now runs Freedom Watch has
filed a $10 trillion class action
against Iran at the U.S. District
Court for the District of Columbia.*
—*THE NATIONAL LAW JOURNAL*

$26.95

ISBN: 978-0-9792012-2-6

9 780979 201226

5 2695

# Advance Praise for
# *It Takes a Revolution*

"Larry Klayman is a fearless advocate who defeated special counsel Mueller's 'deep state' attempt to have me testify against President Trump by threatening me with prosecution if I did not lie under oath. I am eternally grateful to him! He is a true champion of justice!"

—**Dr. Jerome Corsi,** *New York Times* **Bestselling Author**

"I have known Larry Klayman for many years as a friend and as my lawyer. He's a straight shooter and a patriot. We need more people like Larry in the legal profession."

—**Sheriff Joe Arpaio**

"Larry Klayman is a uniquely public-spirited lawyer. He has never lost sight of the fact that the responsible activity of individual citizens, seriously seeking to exercise their God-endowed rights, is the indispensable energy source for all our institutions of self-government."

—**Ambassador Alan L. Keyes, Former UN**
**Ambassador and Presidential Candidate**

"Larry Klayman is my hero because he has integrity—enough to prevent him from blind loyalty to party or ideology…That's because he is fearless and relentless in the pursuit of justice… There were other men like Larry early in American history. Their names were Washington, Jefferson, Madison, and Henry."

—**Joseph Farah, CEO, www.wnd.com**

"That *Time* magazine has yet to name Larry Klayman 'Man of the Year' is a failure of *Time*, not Klayman's."

—**Jack Cashill, Bestselling Author of Ron Brown's Body**

"Larry Klayman stood in the stead for my family and me under very trying circumstances. He is persistent, loyal, and a great believer in the Constitution, as my sons and I are as well. I respect his wisdom and strength and cherish his friendship."

—Cliven Bundy, Nevada Rancher

"While others talk of corruption and injustice in our federal courts, Larry Klayman is a man who has done something about it. As founder of Judicial Watch and Freedom Watch, Larry Klayman became a household name to those of us who want to stop the runaway power of federal judges and restore honesty and integrity to our federal court system. Echoing the sentiments of our Founding Fathers like Thomas Jefferson and James Madison, Larry Klayman has fought for a return to the principles and foundation of our Constitutional Republic wherein people are the source of all power. With over forty years of experience in the practice of law, Larry Klayman has represented defendants across America in defense of their right to 'life, liberty, and the pursuit of happiness.' Larry is a valiant warrior for truth and justice, and a man I am proud to call my friend. I hope that you will enjoy his noble work, *It Takes a Revolution: Forget the Scandal Industry!*"

—Chief Justice Roy Moore

"Klayman's work *It Takes a Revolution: Forget the Scandal Industry!* is brilliant, however unorthodox. But Larry is always right!"

—Ben Stein, Lawyer, Actor, Writer

"As the father of Navy SEAL Ty Woods, who was killed at Benghazi, I highly recommend this book. Just as Ty was a warrior as a Navy SEAL, as a fellow lawyer and as his friend I can attest to Larry being a warrior in the courtroom."

—Charles Woods, Father of Navy SEAL Ty Woods

"I admire Larry, because he is first and foremost a patriot. He not only believes in the words of the Constitution, he practices those words in all of his endeavors. He was there when I needed him."

**—Laura Luhn, Sexual Abuse Victim of Roger Ailes**

"Larry Klayman is one of the most principled and intellectual minds in the world of litigation. He believes in fighting for justice at all costs to protect our constitutional freedoms! I am honored to be able to call him a friend and mentor. God brings people into your life for different reasons. I believe that God connected us because he wanted me to have a big brother to encourage me to maximize my potential and guide me in the right direction. Thank you, Larry!"

**—Sergeant Demetrick Pennie, President of the Dallas Fallen Officer Foundation**

"Larry Klayman was the only attorney who had the guts to stand beside us and go against the government to get answers when our son, Michael, was killed in Afghanistan aboard Extortion 17 on 08/06/2011. Larry is a bulldog in the courtroom! He helped us win against the NSA, the first time in American history!"

**—Charles Strange, Gold Star Father of PO1 Michael Strange (DEVGRU)**

# EXHIBIT C



JOIN OUR FIGHT AT WWW.FWUSA.ORG

# ABOUT LARRY KLAYMAN



Larry Klayman, founder of Judicial Watch and Freedom Watch, is known for his strong public interest advocacy in furtherance of ethics in government and individual freedoms and liberties. During his tenure at Judicial Watch, he obtained a court ruling that Bill Clinton committed a crime, the first lawyer ever to have done so against an American president. Larry became so famous for fighting corruption in the government and the legal profession that the NBC hit drama series "West Wing" created a character after him: Harry Klaypool of Freedom Watch. His character was played by actor John Diehl.

In 2004, Larry ran for the U.S. Senate as a Republican in Florida's primary. After the race ended, he founded Freedom Watch.

Larry graduated from Duke University with honors in political science and French literature. Later, he received a law degree from Emory University. During the administration of President Ronald Reagan, Larry was a Justice Department prosecutor and was on the trial team that succeeded in breaking up the telephone monopoly of AT&T, thereby creating competition in the telecommunications industry.

Between Duke and Emory, Larry worked for U.S. Senator Richard Schweiker (R-Pa.) during the Watergate era. He has also studied abroad and was a stagiaire for the Commission of the European Union in its Competition Directorate in Brussels, Belgium. During law school, Larry also worked for the U.S. International Trade Commission in Washington, D.C.



Larry speaks four languages—English, French, Italian, and Spanish —and is an international lawyer, among his many areas of legal expertise and practice.

The author of two books, *Fatal Neglect* and *Whores: Why and How I Came to Fight the Establishment,* Larry has a third book in the works dealing with the breakdown of our political and legal systems. His current book, *Whores,* is on now sale at WND.com, Amazon.com, BarnesandNoble.com, Borders.com, and all major stores and booksellers.

Larry is a frequent commentator on television and radio, as well as a weekly columnist, on Friday, for WND.com. He also writes a regular blog for Newsmax called "Klayman's Court."

Larry has been credited as being the inspiration for the Tea Party movement. (See "Larry Klayman - The One Man TEA Party," by Dr. Richard Swier.)

# EXHIBIT D



**FREEDOM**WATCH     JOIN OUR FIGHT AT WWW.FWUSA.ORG

# LARRY KLAYMAN - THE ONE MAN TEA PARTY

By Dr. Richard Swier (Scribe)
RedCounty.com
July 31, 2010

Long before there was a TEA Party, Glenn Beck 912 movement, 13 Patriots and thousands of others, there was Larry Klayman. Larry believes it is more important to be virtuous than be liked.

**Larry believes there is an ultimate right and wrong.**

Some of you may not know Larry Klayman but you should. If you believe in the Constitution of the United States and that the Executive, Legislative and Judicial branches of our federal government are corrupt to the core then you need to read Larry's book, *WHORES: Why and How I Came to Fight the Establishment*.

If you see our courts legislating from the bench rather than enforcing the law as in Arizona then you will love Larry Klayman. If you love politics and want to understand what really happens behind the scenes get his book. I just finished reading WHORES and could not put it down. It is a mosaic of both the man and his struggles against an out of control government bent on aggrandizing itself at the expense of the people and the law. It is about corruption on the part of both parties writ large. I found it particularly interesting because of Larry's insights into Florida politics. You see Larry ran for the very same U.S. Senate seat Marco Rubio is seeking. Larry ran against, among others, Bill McCollum and Mel Martinez. If you want to learn more about Florida politics and political insiders, read this book.

Larry is the founder of Judicial Watch and Freedom Watch USA. Freedom Watch USA "is the only group that speaks through actions, rather than just words." When reading his book I found it a fascinating personal and professional journey that reflects the work of a real patriot. Larry has won my patriot award for being a thorn in the side of Iran, Hugo Chavez, Bill and Hillary Clinton, Dick Cheney, George W. Bush and Barack Obama. Not a bad record if I say so myself.

I really felt a symbiotic relationship with Larry as I read his story. When you speak truth to power you are always attacked. The progressive model is identify the target, marginalize it and then demonize it. That is the cross that Larry, TEA Party members and others who are like minded bear today.

**Larry was fighting the establishment since the early 1990s and he continues to do so even today with the filing of a lawsuit against Elena Kagan, President Obama's nominee for the U.S. Supreme Court.**

According to the WorldNetDaily.com column, *Papers prepped to disbar Elena Kagan*:

One of Washington, D.C.'s most feared and fearless corruption watchers has told WND he intends to file an ethics complaint to have Supreme Court nominee Elena Kagan disbarred from practicing before the court she aspires to join – and possibly subjected to criminal prosecution – for her role in an escalating controversy over partial-birth abortion.

As WND reported, dozens of pro-life organizations are already asking the Senate to investigate Kagan's 1997 amendment to an American College of Obstetricians and Gynecologists report, which was then used by the Supreme Court as justification for overturning Nebraska's partial-birth abortion ban in 2000.

In her confirmation hearings, Kagan defended the amendment, saying, "My only dealings with (the College) were about talking with them about how to ensure that their statement expressed their views."

Several analyses have concluded, however, that Kagan's amendment dramatically changed the meaning of the organization statement, and court records show the statement was passed off on the Supreme Court as official scientific opinion, even though the organization's panel of scientists never approved Kagan's wording.

Klayman told WND he believes Kagan's behind-the-scenes work constitutes "conspiracy to defraud the Supreme Court," and he intends to take the evidence that has been compiled by the pro-life groups to file a complaint before the clerk's office of the U.S. Supreme Court, seeking to have Kagan disbarred as a practicing lawyer infront of the Supreme Court.

So the battle goes on for Larry, you and me. I hope you will read Larry's book and make it a point to learn more about the great work he is doing to stop corruption in our courts, at the White House and in Congress. Larry has been a one man TEA Party, now it is time for us to join with him as we together fight in the same cause – a grass roots revolution to save the Republic.

http://www.redcounty.com/content/larry-klayman-one-man-tea-party

# EXHIBIT E



# Transcript of Thomas J. Fitton

**Date:** June 6, 2019
**Case:** Klayman -v- Fitton

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

**Page 1**

```
1          IN THE UNITED STATES DISTRICT COURT
2          FOR THE SOUTHERN DISTRICT OF FLORIDA
3
4  LARRY KLAYMAN,           *
5          Plaintiff,        *
6     vs.                    *  Civil Action
7  THOMAS FITTON,           *  No. 1:19-cv-20544
8          Defendant.        *
9
10
11
12     Videotaped Deposition of THOMAS J. FITTON
13               Washington, D.C.
14          Thursday, June 6, 2019
15               3:06 p.m.
16
17
18
19  Job No.: 247643
20  Pages 1 - 92
21  Reported by:  Vicki L. Forman
22
23
24
25
```

**Page 2**

```
1          Videotaped Deposition of THOMAS J. FITTON,
2  held at the offices of:
3
4     Planet Depos
5     Suite 950
6     1100 Connecticut Avenue, Northwest
7     Washington, D.C.  20036
8     (888) 433-3767
9
10
11
12          Pursuant to agreement, before Vicki L.
13  Forman, Court Reporter and Notary Public in and
14  for the District of Columbia.
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1          A P P E A R A N C E S
2
3  ON BEHALF OF THE PLAINTIFF PRO SE:
4     LARRY KLAYMAN, ESQUIRE
5     Klayman Law Group, P.A.
6     Suite 345
7     2020 Pennsylvania Avenue, Northwest
8     Washington, D.C.  20006
9     (310) 595-8088
10
11
12
13  ON BEHALF OF THE DEFENDANT:
14     RICHARD W. DRISCOLL, ESQUIRE
15     Driscoll & Seltzer
16     Suite 610
17     300 North Washington Street
18     Alexandria, Virginia  22314
19     (703) 822-5001
20
21
22
23
24
25
```

**Page 4**

```
1  ON BEHALF OF THE DEFENDANT:
2     KATIE M. MERWIN, ESQUIRE
3     Cole, Scott & Kissane, P.A.
4     Suite 120
5     222 Lakeview Avenue
6     West Palm Beach, Florida  33401
7     (561) 383-9206
8     (Present via Telephone.)
9
10
11
12  ALSO PRESENT:  Joannis Arsenis, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**41**

1      MR. KLAYMAN:  Certify it.
2      Q  So as President of Judicial Watch you
3  would have known for sure that this Complaint had
4  been filed, correct?
5      MR. DRISCOLL:  Objection to form.
6      A  Well, the press release indicates it was
7  filed and I recall we sued about the raid, yes.
8      Q  And you gave interviews about suing in the
9  raid, correct, in the media?
10     A  I don't remember.
11     Q  Turn to the last page, page five.
12        The Complaint is signed by James F
13  Peterson, correct?
14     A  His name is on the last page of the
15  Complaint as a signatory.
16     Q  He is an attorney at Judicial Watch,
17  correct?
18     A  Yes.
19     Q  Now, Mr. Peterson had contact with Roger
20  Stone over the issue of the raid on his house, did
21  he not?
22     A  Not that I'm aware of.
23     MR. DRISCOLL:  Objection to form.
24     Q  You're saying you don't know one way or
25  the other?

**42**

1      A  I don't believe he has.  I said I would
2  know if he had.
3      Q  How would you know if you couldn't even
4  identify the Complaint?
5      A  Another abusive harassing question.
6      MR. DRISCOLL:  It's a foundation question.
7  You can go ahead and answer it.
8        How would you know if he had contacted
9  Roger Stone?
10     MR. KLAYMAN:  Or if Roger Stone contacted
11  him.
12     A  Is it privileged?
13     MR. DRISCOLL:  That's an interesting
14  question.  The fact of the communication would not
15  be.  The contents of it would be.
16     A  How I would know is my question of whether
17  it's privileged or not.
18     MR. DRISCOLL:  No, I'm going to allow you
19  to answer that one.
20     A  How I would know about what my attorneys
21  are doing or Judicial Watch's attorneys are doing?
22     MR. DRISCOLL:  Yeah, and you're not
23  disclosing a communication.  You're just
24  describing a process.
25     A  Typically that type of communication would

**43**

1  have been disclosed to me.
2      Q  But you don't know for sure that
3  Mr. Peterson didn't have contact with Roger Stone?
4      MR. DRISCOLL:  Objection to form.
5      A  I'm confident there was no such contact.
6      Q  You have told Mr. Peterson in the past,
7  have you not, that I was ousted from Judicial
8  Watch because of a sexual harassment complaint?
9      MR. DRISCOLL:  Objection to form.
10  Mr. Peterson is an in-house counsel and I'm going
11  to direct the witness not to answer.  That's an
12  attorney-client privilege.
13     MR. KLAYMAN:  Certify it.
14     Q  So you don't know whether or not
15  Mr. Peterson repeating what you had told him then
16  republished that to Roger Stone?
17     MR. DRISCOLL:  The communications between
18  an in-house counsel and the President of the
19  corporation relating to legal advice and
20  assistance are privileged.  He can't answer the
21  question about the contents of the communication
22  or derivative questions that would disclose the
23  content of the communication.
24     MR. KLAYMAN:  That's the crux of the
25  lawsuit.  That does not apply in this context.

**44**

1      MR. DRISCOLL:  That doesn't waive the
2  privilege.
3      Q  Are you saying that you never told anyone
4  at Judicial Watch that I was ousted because of a
5  sexual harassment complaint?
6      MR. DRISCOLL:  Anyone other than the
7  attorneys?
8      MR. KLAYMAN:  Anyone.
9      MR. DRISCOLL:  No, I can't allow him to
10  answer that question.
11     Q  Are you saying that you never told anyone
12  that I was -- regardless -- let's take attorneys
13  out of it.
14        Have you ever -- you have told other
15  people in addition to -- strike that.
16        You have told other people excluding
17  attorneys that I was ousted from Judicial Watch
18  because of a sexual harassment complaint?
19     A  You have to ask the question again.
20     MR. KLAYMAN:  Read it back, please.
21     A  Please.
22     MR. KLAYMAN:  Let me rephrase it.
23     Q  I'm taking attorneys out of this question.
24  I'm saying you have told others who aren't
25  attorneys over the course of the last 16 years

---

45

1  since I left Judicial Watch that I was ousted
2  because of a sexual harassment complaint?
3       A No, because that's not true.  You weren't
4  ousted as a result of a sexual harassment
5  complaint.
6       Q After I sued you in this particular case
7  has anyone -- have you or anyone at Judicial Watch
8  or your counsel tried to contact Roger Stone?
9       MR. DRISCOLL:  Objection to form.  The
10 question invades the attorney-client privilege and
11 the attorney work product.  I direct the witness
12 not to answer.
13      MR. KLAYMAN:  Certify it.
14      Madam court reporter, have a page in the
15 front where you have all the certified questions
16 and where you can find them to make it easy for
17 the Magistrate Judge.  Thank you.
18      Q Now, I turn your attention back to your
19 affidavit which is --
20      A Exhibit 3.
21      Q Exhibit 3.  Turn your attention to
22 paragraph seven where it says "I have no
23 recollection of ever having any communication with
24 Roger Stone," do you see that?
25      A Uh-huh.

46

1       Q Now, it doesn't say you didn't have a
2  communication with Roger Stone.  It just says that
3  you have no recollection of having one, correct?
4       A That's correct.
5       Q Do you remember during the Clinton years
6  that witnesses would always come in and say we
7  have no specific recollection and we would contest
8  that?
9       MR. DRISCOLL:  Just ask your question,
10 Larry.
11      Q So you can't say categorically that you
12 haven't had communications with Roger Stone?
13 You're just saying you don't have a recollection
14 of ever having it, correct?
15      A I think the statement speaks for itself.
16      Q You could have said I have never
17 communicated with Roger Stone, correct, if that's
18 what you were trying to say, that you never had
19 any contact?
20      A The statement speaks for itself.
21      Q Then you state in the next sentence "I
22 have never published, uttered or implied to Roger
23 Stone that Klayman was the subject of a sexual
24 harassment complaint during his employment by
25 Judicial Watch or that his resignation from

47

1  Judicial Watch was motivated by an employee's
2  sexual harassment complaint," do you see that?
3       A Yeah.
4       Q Again, that statement does not say that
5  you never spoke with Roger Stone, just that you've
6  never published that particular issue, correct?
7       A It says what it says.
8       Q And then it states "Any statement by Roger
9  Stone regarding Klayman was made without my
10 knowledge or information and therefore I did not
11 intend and could not intend to harm Klayman or his
12 reputation," do you see that?
13      A Yes.
14      Q Now, you're not saying in that statement
15 that you didn't communicate with Roger Stone.
16 You're saying that you didn't know that he was
17 going to republish anything about me, correct?
18      MR. DRISCOLL:  Objection to form.  The
19 document speaks for itself.
20      A The document speaks for itself.
21      Q If you don't want to explain it that's
22 fine.
23      A You're mischaracterizing it.
24      Q I do agree.  It speaks for itself and
25 there's a lot of loopholes in it.

48

1       MR. DRISCOLL:  Why don't you just ask him
2  the question.  Did he ever --
3       MR. KLAYMAN:  I will ask the questions
4  that I want to ask, Mr. --
5       MR. DRISCOLL:  All right.
6       Q I want to turn to paragraph eight.
7       Do you see the statements in the last
8  sentence of paragraph eight where it says "To
9  support his claim Judicial Watch submitted
10 evidence demonstrating that Klayman was forced to
11 resign due to inappropriate conduct" and you list
12 three examples of your alleged inappropriate
13 conduct, do you see that?
14      A Yeah.
15      Q Now, you have in the last 16 years told
16 many people, and I'm excluding any attorneys,
17 exactly what is written in this affidavit and
18 which you swore to under oath?
19      MR. DRISCOLL:  I'm going to object to the
20 question and direct the witness not to answer that
21 question to the extent it's related to the other
22 lawsuit that is currently pending in the U.S.
23 District Court for the District of Columbia, Case
24 Number 06-cv-670.
25      MR. KLAYMAN:  That's not a basis to tell

# EXHIBIT F

```
 1              IN THE CIRCUIT COURT OF THE SEVENTEENTH CIRCUIT
          IN AND FOR BROWARD COUNTY AND THE FIFTEENTH JUDICIAL
 2            CIRCUIT FOR PALM BEACH COUNTY, FLORIDA, FLORIDA


 3


 4    LARRY KLAYMAN,
                                      CASE NO. 19-011394
 5              Plaintiff,


 6       -vs-


 7    ROGER STONE,


 8              Defendant.
      _____/
 9

10    JEROME CORSI, et al

11                   Plaintiff


12    vs.                        CASE NO. 50-2019-CA-013711


13

14    ROGER STONE, et al

15              Defendant
      _____/

16

17              VIDEOTAPED DEPOSITION OF ROGER STONE

18                    VOLUME I OF II

19              Wednesday, February 12, 2020
                    9:42 a.m. - 4:28 p.m.

20

21         110 Southeast 6th Street, Suite 1700
                Fort Lauderdale, Florida 33301

22

23    Stenographically Reported By:
      PATRICIA BAILEY-ENTIN, FPR
      Notary Public, State of Florida
24    BAILEY & ASSOCIATES REPORTING, INC.
      Fort Lauderdale Office
25    Phone - 954-358-9090
```

Page 268

1  William Brennan --
2        MR. KLAYMAN:  It's not funny.
3     A.  No, I'm not aware of that.  I'm not aware of
4  that, but I don't --
5        MR. BUSCHEL:  Why don't you ask questions like
6  who was on the committee?
7        These are leading, assuming facts not in
8  evidence.
9        MR. KLAYMAN:  Okay.  You can ask your
10 questions.  Have fun.
11       THE WITNESS:  Believe me, we will.
12       MR. KLAYMAN:  At the end, have fun.
13       THE WITNESS:  Believe me, we will.
14       MR. KLAYMAN:  Have fun.
15       Have fun.
16       MR. BUSCHEL:  All right.  I'm just --
17       THE WITNESS:  We'll need three or four days.
18       MR. KLAYMAN:  I look forward to having you
19 there.
20       THE WITNESS:  Yeah, me too.
21       MR. KLAYMAN:  If you're not in prison at that
22 time.
23       THE WITNESS:  If you're not disbarred by then.
24       MR. BUSCHEL:  All right.  I'm sorry.
25       Keep going.

Page 269

1        THE WITNESS:  I like my odds better than yours.
2        MR. BUSCHEL:  Keep going.
3        MR. KLAYMAN:  Well, pray for a pardon.
4        MR. BUSCHEL:  Keep going.
5        THE WITNESS:  But if you say there was a
6  communist on the board, I'm happy to believe you.  I
7  don't -- either one -- neither one of the --
8        MR. KLAYMAN:  I didn't say the board.  I said
9  the hearing committee.
10       THE WITNESS:  Oh, the hearing committee.
11 Pardon me.
12 BY MR. KLAYMAN:
13    Q.  The board didn't make any recommendation.
14       Then your -- your counsel gets into my divorce
15 proceedings and custody proceedings, correct?
16    A.  It's been a long time since I read this, so I
17 don't recall.
18       MR. BUSCHEL:  You want to point to a line
19 number?
20 BY MR. KLAYMAN:
21    Q.  Yeah.
22       The Eleventh Circuit Court of Appeals or
23 federal --
24       MR. BUSCHEL:  Line number.
25    A.  Like, 000 section and then a line number.

Page 270

1  BY MR. KLAYMAN:
2     Q.  Yes.  I'm just going to refer generally to it.
3  Your -- your -- your lawyer can cross-examine if he
4  wishes.
5        But this is a transcript that discusses my
6  custody fight with my former wife over my children,
7  correct?
8     A.  I wouldn't -- unless I can see that section, I
9  couldn't tell you.
10    Q.  Yes.
11       Look at -- look at lines 1 through 25 below the
12 third set of statements.
13    A.  I'll start from the beginning.
14       MR. BUSCHEL:  There's a page number and then
15 there are lines numbers.
16       MR. KLAYMAN:  You didn't put page numbers on
17 it.
18       MR. BUSCHEL:  That's what I'm pointing out.
19 Here's a page number.
20       MR. KLAYMAN:  All right.
21       Page 7.
22       MR. BUSCHEL:  And then the line number.
23       MR. KLAYMAN:  Right.
24       MR. BUSCHEL:  Where it says seven.
25       THE WITNESS:  Oh, I see.  That's the page.  I

Page 271

1  got it.  All right.
2        Number -- page 7, what -- what line number?
3        MR. KLAYMAN:  One through twenty five.
4        THE WITNESS:  Okay.
5  BY MR. KLAYMAN:
6     Q.  Okay.
7        So this transcript contains argument by your
8  counsel, Mr. Buschel, which states that I have been
9  found unfit to practice law, makes certain statements
10 about court rulings regarding my children and me, about
11 Judicial Watch, in a lawsuit that does not concern
12 Newsmax, correct?
13    A.  Correct.
14    Q.  Yet you sent this to Cardillo of Newsmax to
15 disparage me with Cardillo and to harm my relationship
16 with John Cardillo, correct?
17    A.  No, incorrect.
18       MR. BUSCHEL:  Objection to form.
19    A.  I don't -- I don't know why I sent it to him,
20 but --
21 BY MR. KLAYMAN:
22    Q.  You sent this vindictively to try to harm me?
23    A.  Oh, boy, you are sensitive.
24       I don't recall why I sent it, but I do think
25 it's probably accurate.

EXHIBIT 5

## UNITED STATES DISTRICT COURT SOUTHERN
## DISTRICT OF FLORIDA

| | | |
|---|---|---|
| **LARRY KLAYMAN**, | § | CIVIL ACTION NO. 0:20-CV-61912 |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| **INFOWARS, LLC, FREE SPEECH** | § | |
| **SYSTEMS, LLC, ALEX E. JONES,** | § | |
| **DAVID JONES, OWEN SHROYER** | § | |
| | § | |
| Defendants. | § | |

## SWORN DECLARATION OF DR. JEROME CORSI

I, Dr. Jerome Corsi, being over eighteen years of age and duly competent to testify, hereby swear and affirm as follows:

1.      I have personal knowledge of the following facts and if called upon as a witness, could testify competently thereto.

2.      I graduated magna cum laude with a B.A. in Political Science and Economics from Case Western Reserve University in 1968.

3.      I received a Ph.D. in Political Science from Harvard University in 1972.

4.      For over twenty-five (25) years, I worked in banking and finance, establishing investment programs for banks in the United States and worldwide to create financial planning services for their retail customers.

5.      From 1968 to 1981, I worked at various universities where I conducted research on federally funded grants.

6.      In 1981, I published "Terrorism as a Desperate Game: Fear, Bargaining, and Communication in the Terrorist Event" in *Journal of Conflict Resolution*, a mathematical game-theoretical model for predicting the outcome of terrorist events.

7.      The content of my publication resulted in a top-secret clearance by the U.S. Department of State's ("State Department") Agency for International Development, where I joined a team of psychiatrists and psychologists to develop a hostage-survival training program for State Department's officials overseas.

8.      Since 2004, I have published over twenty-five (25) books, seven (7) of which were *New York Times* Bestsellers, including two (2) #1 *New York Times* Best-sellers.

9.      In addition to being a New York Times Bestselling author, I am also an investigative journalist and political analyst.

10.     I currently hold active Life & Health insurance licenses, as well as Property & Casualty insurance licenses in New Jersey.

11.     For over twenty (20) years, I have been a licensed National Association of Security Dealers registered representative, currently holding FINRA-registered licenses as a Registered Principal, Financial Principal, Options Principal and Municipals Principal.

12.     I have been a frequent guest on radio and television shows, including but not limited to appearances on CNN, Fox News, Fox Business, MSNBC, and on Infowars, before having been defamed by Defendants.

13.     I derive significant income from appearing on radio and internet programs as a conservative political analysist and media personality.

14.     I am a direct competitor of Roger Stone, as well as the Infowars Defendants, as we all derive income from my writings and  appearing on radio and internet

2

programs as a conservative political analyst and media pundit. All of the Defendants also publish books and engage in these other activities in competition with me.

15.     Stone and the Infowars Defendants have harmed me as a competitor by publishing false statements about  and which bear on my services in order to eliminate me as a competitor.

16.     Stone and the Infowars Defendants are therefore liable under the Lanham Act.

SWORN TO PENALTY OF PERJURY THIS 3rd DAY OF DECEMBER  2020.


                                                      _/s/ Jerome Corsi_____
                                                      Dr. Jerome Corsi

EXHIBIT 6

WIKIPEDIA

# Dennis L. Montgomery

**Dennis Lee Montgomery** (born 1953) is an American software designer and former medical technician who sold federal officials computer programs he claimed would decode secret Al-Qaeda messages hidden in Al Jazeera broadcasts and identify terrorists based on Predator drone videos.[1] A 2010 *Playboy* investigation called Montgomery "The man who conned the Pentagon", saying he won millions in federal contracts for his supposed terrorist-exposing intelligence software.[2] The software was later reported to have been an elaborate hoax and Montgomery's former lawyer called him a "con artist" and "habitual liar engaged in fraud".[3]

| Dennis L. Montgomery | |
|---|---|
| **Born** | July 9, 1953 |
| | Mena, Arkansas |
| **Nationality** | American |
| **Occupation** | Software designer |

## Contents

**Career**
    eTreppid Technologies, LLC
    Blxware partnership
**Terrorist software hoax**
**Nevada governor bribery scandal**
**Confidential informant for Sheriff Joe Arpaio**
**Wiretapping allegations**
**References**
**External links**

# Career

In 1998, Montgomery co-founded eTreppid Technologies with partner Warren Trepp to develop video compression and noise filtering software for the gaming and casino industries.[4] Montgomery and Trepp evolved their offerings for military applications and in 2004 won a no-bid contract with the United States Department of Defense. Following a dispute over software ownership, Montgomery was separated from eTreppid in 2006 and formed a new venture with billionaire backers Edra and Tim Blixseth. Originally called OpSpring, the venture was later renamed Blxware, and Montgomery had the title of Chief Scientist.[5] Blxware was dissolved in 2009 as part of the Blixseths' divorce and Edra Blixseth's bankruptcy.[6]

### eTreppid Technologies, LLC

Montgomery became a partner in 1998 to Warren G. Trepp, the former chief junk bond trader for Michael Milken at Drexel Burnham Lambert,[5] and another investor, Wayne Prim, to develop and sell audio, video, and data compression software under the banner eTreppid Technologies. As Executive Vice

President and Chief technology officer of eTreppid, Montgomery led the company's efforts to develop the company's software and promote it to government agencies associated with tracking terrorist activities. In 2004, eTreppid was awarded a $30 million no-bid contract with United States Special Operations Command and was ranked the 16th-largest defense contractor that year, according to *Aerospace Daily*.[7]

## Blxware partnership

After his separation from eTreppid, Montgomery joined with Edra and Tim Blixseth to bring his alleged terrorist tracking software to other U.S. and foreign government clients. With the Blixseths and former presidential candidate Jack Kemp he helped formed OpSpring LLC, later renamed Blxware. Via Blxware, Montgomery pursued selling his terror tracking software to the U.S. and Israel governments, leveraging political connections of the Blixseth partnership.[5] Blxware's owners Edra and Tim Blixseth divorced in 2008 and Blxware became part of Edra Blixseth's sole property. She filed for personal bankruptcy in 2009, which resulted in a Chapter 7 liquidation of her assets, including Blxware and its associated software and intellectual property.[6]

# Terrorist software hoax

National Public Radio reported, "For several months starting in the fall of 2003, Montgomery's analysis led directly to national code orange security alerts and cancelled flights. The only problem: he was making it all up."[8]

Montgomery's software claims were reportedly responsible for a false terror alert which grounded international flights and caused Department of Homeland Security Secretary Tom Ridge to raise the government's security level.[9] In February 2006, the Federal Bureau of Investigation (FBI) and U.S. Air Force office of Special Investigations opened an economic espionage and theft of intellectual property investigation into Montgomery and Blxware.[10]

In 2015, Montgomery, through his counsel Larry Klayman, sued James Risen, the author of *Pay Any Price: Greed, Power, and Endless War*, for defamation, alleging the book falsely described Montgomery as "the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history."[11] In 2016, a federal court dismissed Montgomery's lawsuit.[12] In November 2017, the United States Court of Appeals for the District of Columbia Circuit affirmed the dismissal.

# Nevada governor bribery scandal

During the run-up to the 2006 gubernatorial election, Dennis Montgomery accused gubernatorial candidate Jim Gibbons of accepting bribes while serving as a member of Congress to help Montgomery's company eTreppid Technologies secure military contracts for his terrorist software. In court papers associated with a lawsuit between Montgomery and former business partner Warren Trepp, Montgomery accused Gibbons of accepting casino chips and $100,000 in cash from Trepp during a Caribbean cruise. Montgomery provided copies of what he said were Trepp's personal e-mails that he accessed while working at eTreppid Technologies.[13] Gibbons' lawyers claimed they had evidence Montgomery fabricated the emails[14] and presented computer expert evidence in trial that challenged the authenticity of Montgomery's alleged evidence.[15] In November of 2008, Gibbons' defense attorney said that an 18-month investigation by the FBI resulted in no charges and cleared Gibbons of any wrongdoing.[16]

# Confidential informant for Sheriff Joe Arpaio

In June 2014, reporter Stephen Lemons of the *Phoenix New Times* wrote that Montgomery had been hired by Sheriff Joe Arpaio of the Maricopa County Sheriff's Office (MCSO) as a confidential informant.[17] Lemons, citing an anonymous source in the MCSO, said that Montgomery had claimed that, using data he had obtained while working for the Central Intelligence Agency (CIA), he could prove there was a conspiracy against Arpaio between the U.S. Department of Justice and G. Murray Snow, the federal judge presiding over a racial-profiling lawsuit filed against Maricopa County. In April 2015, Arpaio confirmed the confidential informant relationship in testimony before Judge Snow.[18] At Arpaio's request, two National Security Agency computer specialists examined Montgomery's material and concluded, contrary to Montgomery's representations, that it did not contain data from the CIA.[19] Arpaio later characterized the result of Montgomery's investigation as "junk".[20]

In May 2015, Montgomery attempted to intervene in the contempt proceedings against Joe Arpaio that had stemmed from the racial-profiling lawsuit.[21] Montgomery, through his counsel Larry Klayman, asked Judge Snow to recuse himself; Montgomery also asked the United States Court of Appeals for the Ninth Circuit to replace the judge, but the court declined to do so.[22]

# Wiretapping allegations

In the wake of the Trump Tower wiretapping allegations, Klayman on Montgomery's behalf claimed that Montgomery had evidence that security agencies have been involved in "systematic illegal surveillance on prominent Americans", including Donald Trump. Jerome Corsi and Mike Zullo, a former member of the MSCO's cold-case posse, similarly echoed the claims about Montgomery's data; Zullo, however, had previously doubted the authenticity of the data.[23]

In June 2017, Montgomery and Klayman jointly sued James Comey and other federal government officials, alleging a coverup of evidence that, according to Montgomery, shows the existence of widespread illegal surveillance by the federal government.[24] In March 2018, the federal district court dismissed their lawsuit.

According to Klayman, Montgomery also claimed these security agencies had manipulated voting in Florida during the 2008 United States presidential election.[25]

# References

1. Lichtblau, Eric; Risen, James (February 19, 2012). "Hiding Details of Dubious Deal, U.S. Invokes National Security" (https://www.nytimes.com/2011/02/20/us/politics/20data.html). *The New York Times*.

2. The Man Who Conned the Pentagon (https://archive.today/20130131111426/http://members.i.playbo y.com/Playboy-Magazine/Jan-2010-Issue/70), (alternative link (https://web.archive.org/web/2009122 5102733/http://www.playboy.com/articles/the-man-who-conned-the-pentagon-dennis-montgomery/in dex.html?page=1)) by Aram Roston, *Playboy*, January 2010. (subscription required)

3. Williams, Christopher (December 24, 2009). "Software fraudster fooled CIA into terror alert" (https://w ww.theregister.co.uk/2009/12/24/cia_montgomery/). *The Register* (UK). Retrieved 21 February 2017.

4. Effinger, Anthony (August 29, 2008). "Yellowstone Club Divorcee Entangled in Terrorist Software Suits" (https://www.bloomberg.com/news/articles/2008-08-29/yellowstone-club-divorcee-entangled-in -terrorist-software-suits). *Bloomberg*. Retrieved November 21, 2020.

5. Kihara, David (June 7, 2009). "True Believers: Nevada company's troubles entangle Gibbons, federal government" (http://www.lvrj.com/news/47141377.html). *Las Vegas Review-Journal*.

6. Yellowstone Club Chronicles: The Edra Blixeth Bankruptcy (http://www.newwest.net/city/article/yellowstone_club_chronicles_edra_blixseth_bankruptcy/C396/L396/), by Jonathan Weber, New West, June 11, 2009.

7. Who is Warren Trepp (https://web.archive.org/web/20080403124707/http://www.nvtoday.com/index.php?option=com_content&task=view&id=246&Itemid=1), Nevada Today, February 2008.

8. The man who conned the Pentagon (https://www.npr.org/templates/story/story.php?storyId=121667905), by Guy Raz, All Things Considered, NPR, December 19, 2009.

9. Programmer conned CIA, Pentagon into buying bogus anti-terror code (https://www.wired.com/threatlevel/2009/12/montgomery-2/), *Wired*, December 28, 2009.

10. Nevada company's troubles (http://www.lvrj.com/news/47141377.html), *Las Vegas Review Journal*, June 7, 2009

11. Nelson, Steven (February 25, 2015). "Journalist James Risen Sued for Reporting Post-9/11 Contractor Was Con Man" (https://www.usnews.com/news/articles/2015/02/25/journalist-james-risen-sued-for-reporting-post-9-11-contractor-was-con-man). *U.S. News & World Report*.

12. Klasfeld, Adam (July 18, 2016). "Risen Cleared on Labeling CIA Contractor a 'Con Artist' " (https://web.archive.org/web/20160719125830/http://www.courthousenews.com/2016/07/18/risen-cleared-on-labeling-cia-contractor-a-con-artist.htm). *Courthouse News Service*. Archived from the original (http://www.courthousenews.com/2016/07/18/risen-cleared-on-labeling-cia-contractor-a-con-artist.htm) on July 19, 2016.

13. FBI probes Nevada governor for corruption (http://www.nbcnews.com/id/18613647), by Lisa Myers & Jim Popkin, NBC News, May 11, 2007.

14. NBC Investigates Jim Gibbons, an exclusive interview with Dennis Montgomery (https://www.youtube.com/watch?v=Zjux5im6RRs) on YouTube, NBC News, May 11, 2007.

15. Nevada governor cleared in corruption probe, may sue (http://usatoday30.usatoday.com/news/nation/2008-11-03-nevada-governor_N.htm), by AP, *USA Today*, November 3, 2008.

16. Apuzzo, Matt; Press, Associated (2008-11-02). "Attorney: Gibbons cleared in FBI probe" (https://lasvegassun.com/news/2008/nov/02/attorney-gibbons-cleared-fbi-probe/). *Las Vegas Sun*. Retrieved 2020-11-24.

17. Lemons, Stephen (June 4, 2014). "Joe Arpaio's Investigating Federal Judge G. Murray Snow, DOJ, Sources say, and using a Seattle scammer to do it" (http://www.phoenixnewtimes.com/news/joe-arpaios-investigating-federal-judge-g-murray-snow-doj-sources-say-and-using-a-seattle-scammer-to-do-it-6630628). *Phoenix New Times*. Retrieved May 21, 2015.

18. Joffe-Block, Jude (May 8, 2015). "Man Sheriff Joe Arpaio Hired to Investigate Federal Agencies Tries to Intervene in Contempt Case" (https://web.archive.org/web/20150518083043/http://kjzz.org/content/136962/man-sheriff-joe-arpaio-hired-investigate-federal-agencies-tries-intervene-contempt). KJZZ. Archived from the original (http://kjzz.org/content/136962/man-sheriff-joe-arpaio-hired-investigate-federal-agencies-tries-intervene-contempt) on May 18, 2015. Retrieved May 21, 2015.

19. Joffe-Block, Jude (May 20, 2016). "10 Key Findings From The Civil Contempt Ruling Against Sheriff Joe Arpaio" (http://kjzz.org/content/308856/10-key-findings-civil-contempt-ruling-against-sheriff-joe-arpaio#five). KJZZ.

20. Santos, Fernanda (June 15, 2015). "Twists Outnumber Judges (So Far) in Case Against Arizona Sheriff" (https://www.nytimes.com/2015/06/16/us/twists-outnumber-judges-so-far-in-case-against-arizona-sheriff-joe-arpaio.html). *The New York Times*.

21. Joffe-Block, Jude (May 8, 2015). "Man Sheriff Joe Arpaio Hired To Investigate Federal Agencies Tries To Intervene In Contempt Case" (http://kjzz.org/content/136962/man-sheriff-joe-arpaio-hired-investigate-federal-agencies-tries-intervene-contempt). KJZZ.

22. Joffe-Block, Jude (May 14, 2015). "Judge Expected To Address Informant's Motion To Intervene In Sheriff Arpaio's Contempt Case" (http://kjzz.org/content/139326/judge-expected-address-informants-motion-intervene-sheriff-arpaios-contempt-case). KJZZ.

23. Ruelas, Richard (April 4, 2017). "Conspiracy theory tries to connect Joe Arpaio, the Obama birth certificate and Trump's wiretap claims" (http://www.azcentral.com/story/news/politics/arizona/2017/04/05/conspiracy-theory-joe-arpaio-barack-obama-birth-certificate-donald-trump-wiretap-claims/99761074/). *The Arizona Republic*.

24. Solomon, John; Carter, Sara (June 7, 2017). "Did the FBI have evidence of a breach larger than Snowden? A lawsuit says yes" (http://circa.com/politics/accountability/james-comey-sued-by-intelligence-contractor-dennis-montgomery-over-spying-on-americans). *Circa News*.

25. Tashman, Brian (March 27, 2017). "Rick Wiles: Obama Is 'Hiding From Arrest' In French Polynesia For Stealing Elections And Surveilling Trump" (http://www.rightwingwatch.org/post/rick-wiles-obama-is-hiding-from-arrest-in-french-polynesia-for-stealing-elections-and-surveilling-trump/). *Right Wing Watch*.

# External links

- Agency France Press: Swindler duped CIA over Al-Qaeda decoding scam (https://www.google.com/hostednews/afp/article/ALeqM5hlYRd6FVf_FvslqUlWb78RD0kk-w)
- The Guardian: The Nevada gambler, al-Qaida, the CIA and the mother of all cons (https://www.theguardian.com/world/2009/dec/23/dennis-montgomery-cia-al-jazeera)
- Harpers Magazine: State Stupidities; State Secrets (http://harpers.org/blog/2011/02/state-stupidities-state-secrets/)

Retrieved from "https://en.wikipedia.org/w/index.php?title=Dennis_L._Montgomery&oldid=992071946"

This page was last edited on 3 December 2020, at 09:49 (UTC).

Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.